Barry I. Levy, Esq.
Max Gershenoff, Esq.
Christina M. Bezas, Esq.
Qasim I. Haq, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
926 RXR Plaza,
Uniondale, NY 11553
(516) 357-3000
max.gershenoff@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General Insurance*
*Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY COMPANY,<br><br>                        Plaintiffs,<br><br>       -against-<br><br>SUKDEB DATTA, M.D., DATTA ENDOSCOPIC SURGERY & PAIN CENTER, L.L.C., GARDEN STATE NEURO STIMULATION, L.L.C., SADDLE BROOK ANESTHESIA ASSOCIATES, L.L.C., SURGISTAR HOLDINGS, L.L.C. d/b/a SADDLE BROOK ENDOSCOPIC & ORTHOPEDIC SURGERY CENTER, GABRIEL DASSA, D.O., DASSA ORTHOPEDIC MEDICAL SERVICES, P.C., DARRIN KALOZ, D.C., and ADJUST FOR LIFE CHIROPRACTIC, P.C.,<br><br>                        Defendants. | Docket No.: _____( )<br><br>**Plaintiffs Demand a Trial by Jury** |

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $6,500,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent and unlawful no-fault insurance charges through Dassa Orthopedic Medical Services, P.C. ("Dassa Ortho"), Adjust for Life Chiropractic P.C. ("Adjust for Life"), Garden State Neuro Stimulation, L.L.C. ("Garden State Neuro"), Datta Endoscopic Back Surgery & Pain Center, L.L.C. ("Datta Endoscopic"), Saddle Brook Anesthesia Associates, L.L.C. ("Saddle Brook Anesthesia"), and Surgistar Holdings, LLC d/b/a Saddle Brook Endoscopic & Orthopedic Surgery Center ("Saddle Brook ASC") for purported initial examinations, follow-up examinations, chiropractic/physical therapy services, "pain fiber" testing, electrodiagnostic ("EDX") testing, pain management injections, anesthesia services, and surgical facility fees (the purported initial examinations, follow-up examinations, chiropractic/physical therapy services, pain management injections, "pain fiber" testing, EDX testing, anesthesia services, and surgical facility fees are collectively referred to hereinafter as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $150,000.00 in pending no-fault insurance claims that have been

submitted by or on behalf of Dassa Ortho, Adjust for Life, Datta Endoscopic, Garden State Neuro,

Saddle Brook Anesthesia, and Saddle Brook ASC because of the fraudulent and unlawful conduct

described herein.

4.      The Defendants fall into the following categories:

(i)      Defendant Gabriel Dassa, D.O. ("Dassa") is a physician who was licensed to practice medicine in New York and New Jersey. Dassa owned and controlled Dassa Ortho, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(ii)     Defendant Dassa Ortho is a New York medical professional corporation, which was owned and controlled by Dassa, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(iii)    Defendant Darrin Kaloz, D.C. ("Kaloz") is a chiropractor who was licensed to practice chiropractic in New York.  Kaloz owned and controlled Adjust for Life, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(iv)     Defendant Adjust for Life is a New York chiropractic professional corporation, which was owned and controlled by Kaloz, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(v)      Defendant Sukdeb Datta, M.D. ("Datta") is a physician who was licensed to practice medicine in New York and New Jersey. Datta owned, controlled, and was the member of Garden State Neuro, Datta Endoscopic, and Saddle Brook Anesthesia, and owned, controlled, and was the controlling member of Saddle Brook ASC (collectively, with Datta, the "Datta Defendants").

(vi)     Defendant Garden State Neuro is a New Jersey medical professional limited liability company, which was owned and controlled by Datta, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(vii)    Defendant Datta Endoscopic is a New Jersey medical professional limited liability company, which was owned and controlled by Datta, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(viii)   Defendant Saddle Brook Anesthesia is a New Jersey medical professional limited liability company, which was owned and controlled by Datta, through which many

of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(ix)    Defendant Saddle Brook ASC is a New Jersey limited liability company that is licensed as a New Jersey ambulatory care facility, which was owned and controlled by Datta, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

5.    As discussed below, the Defendants at all relevant times have known that:

(i)    the Defendants paid and received unlawful compensation in exchange for patient referrals;

(ii)    the Datta Defendants engaged in unlawful self-referrals;

(iii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services never were provided in the first instance;

(v)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(vi)    the Fraudulent Services were not provided in compliance with all relevant licensing laws and, as a result, were not eligible for no-fault reimbursement in the first instance;

6.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed or caused to be billed to GEICO. The charts annexed hereto as Exhibits "1" – "6" set forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO via the mail.

7.    The Defendants' fraudulent and unlawful scheme began no later than 2014 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $6,500,000.00.

4

## THE PARTIES

### I.        Plaintiffs

8.        Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.       Defendants

9.        Defendant Dassa resides in and is a citizen of New York.  Dassa is a physician who was licensed to practice medicine in New York on or about August 17, 1992, and in New Jersey on or about April 2, 2012. Dassa owned and controlled Dassa Ortho, and used Dassa Ortho as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

10.       Defendant Dassa Ortho is a New York medical professional corporation with its principal place of business in New York. Dassa Ortho was incorporated in New York on or about April 6, 2010, was owned and controlled by Dassa, and was used as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

11.       Defendant Kaloz resides in and is a citizen of New York. Kaloz is a chiropractor who was licensed to practice chiropractic in New York on or about December 20, 1999.  Kaloz owned and controlled Adjust for Life, and used Adjust for Life as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

12.       Defendant Adjust for Life is a New York chiropractic professional corporation with its principal place of business in New York. Adjust for Life was incorporated in New York on or about December 9, 2003, was owned and controlled by Kaloz, and was used as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

13.    Defendant Datta resides in and is a citizen of New Jersey. Datta is a physician who was licensed to practice medicine in New Jersey on or about August 11, 2010, and in New York on or about October 12, 2010. Datta owned, controlled, and was the member of Garden State Neuro, Datta Endoscopic, and Saddle Brook Anesthesia, and -- together with an attorney named Gerard Vince, Esq. ("Vince") -- owned, controlled, and was the member of Saddle Brook ASC. Datta used Garden State Neuro, Datta Endoscopic, Saddle Brook Anesthesia, and Saddle Brook ASC as vehicles to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

14.    Defendant Garden State Neuro is a New Jersey medical professional limited liability company that is authorized to do business in New York, to operate as a medical practice in New York, and has its principal place of business in New York. Garden State Neuro was organized in New Jersey on or about January 27, 2011, was authorized to operate as a medical practice in New York on or about June 1, 2012, was owned and controlled by Datta and had Datta as its member, and was used as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

15.    Defendant Datta Endoscopic is a New Jersey medical professional limited liability company that is authorized to do business in New York, to operate as a medical practice in New York, and has its principal place of business in New York. Datta Endoscopic was organized in New Jersey on or about May 17, 2011, authorized to operate as a medical practice in New York on or about September 22, 2011, was owned and controlled by Datta and had Datta as its member, and was used as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

16.     Defendant Saddle Brook Anesthesia is a New Jersey medical professional limited liability company with its principal place of business in New Jersey. Saddle Brook Anesthesia was organized in New Jersey on or about October 17, 2018, was owned and controlled by Datta and had Datta as its member, and was used as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers. Saddle Brook Anesthesia transacted substantial business in New York, regularly solicited business in New York, and committed tortious acts that caused injury to GEICO in New York.

17.     Defendant Saddle Brook ASC is a New Jersey limited liability company with its principal place of business in New Jersey. Saddle Brook ASC was organized in New Jersey on or about April 9, 2018, purported to be properly licensed as an ambulatory care facility, had Datta and Vince as its members, had Datta as its majority member, and was used as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers. Saddle Brook ASC transacted substantial business in New York, regularly solicited business in New York, and committed tortious acts that caused injury to GEICO in New York.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

19.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

20.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of New York is the District where one or more of the Defendants reside and where a substantial amount of the activities forming the basis of the Complaint occurred.

22.     For example, the Defendants submitted or caused to be submitted a massive amount of fraudulent billing to GEICO in New York, under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds, oftentimes in the Southern District of New York. In reliance on the fraudulent and unlawful claims, personnel at a GEICO office in New York issued payment on the claims.

23.     What is more, and as set forth herein, the Defendants transacted and solicited substantial business in New York, derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York, and committed tortious acts that caused injury to GEICO in New York.

## ALLEGATION COMMON TO ALL CLAIMS

### I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

24.     GEICO underwrites automobile insurance in New York.

25.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

26.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to Insureds.

27.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

28.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those services.

29.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or by using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

30.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

31.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

32.     New York law prohibits licensed healthcare services providers, including licensed chiropractors and physicians, from paying or accepting compensation in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530; 6531; <u>see also</u> 8 N.Y.C.R.R. §

29.1. Therefore, a healthcare provider that pays or receives kickbacks or unlawful compensation in exchange for patient referrals is not eligible to receive PIP Benefits.

33.     In addition, New York law prohibits licensed healthcare services providers, including physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative healthcare provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

34.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule").

35.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

36.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

37.    Beginning in 2014, and continuing through the present day, the Defendants masterminded and implemented a massive fraudulent scheme in which they submitted thousands of fraudulent and unlawful charges to GEICO for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

### A.    The Unlawful Referrals Between and Among Dassa Ortho, Adjust for Life, and Garden State Neuro

38.    In order to bill GEICO and other automobile insurers for their Fraudulent Services, including medically unnecessary patient examinations, medically unnecessary chiropractic/physical therapy services, and medically useless "pain fiber" testing, Adjust for Life and Kaloz need to obtain access to patients.

39.    Similarly, in order to bill GEICO and other automobile insurers for their Fraudulent Services, including medically unnecessary patient examinations, electrodiagnostic testing, and pain management injections, Garden State Neuro and Datta needed to obtain patient referrals from other healthcare providers.

40.    However, Kaloz and Datta did not operate Adjust for Life or Garden State Neuro from fixed, stand-alone treatment locations, did not make any significant efforts to advertise or market their services to the general public, and did not engage in any legitimate means to generate goodwill or to obtain patient access or referrals.

41.    At the same time, Dassa Ortho and Dassa had access to a steady stream of no-fault insurance patients at their New York offices, and wanted to submit as much billing for medically unnecessary patient examinations and physical therapy services as possible to GEICO and other insurers, without regard for whether the underlying examinations and/or physical therapy services were medically necessary.

42.     Dassa Ortho and Dassa knew that it would be much easier for them to submit and obtain reimbursement on the billing for their Fraudulent Services if other healthcare providers, such as Koloz and Datta, were to falsely diagnose Insureds with continuing injuries and symptoms as the result of car accidents, and recommend the continued performance of the Fraudulent Services by Dassa Ortho and Dassa.

43.     Accordingly, Dassa Ortho and Dassa entered into a secret agreement with Adjust for Life and Kaloz, whereby Dassa Ortho and Dassa would provide Adjust for Life and Kaloz with medically unnecessary patient referrals and access to Insureds in order for Adjust for Life and Kaloz to perform expensive and medically unnecessary examinations, chiropractic/physical therapy services, and "pain fiber" testing, regardless of the Insureds' need for such examinations, chiropractic/physical therapy, and "pain fiber" testing.

44.     Similarly, Dassa Ortho and Dassa entered into a secret agreement with Garden State Neuro and Datta, whereby Dassa Ortho and Dassa would provide Garden State Neuro and Datta with medically unnecessary patient referrals and access to Insureds in order for Garden State Neuro and Datta to perform expensive and medically unnecessary examinations and EDX testing, regardless of the Insureds' need for such examinations and EDX testing.

45.     In exchange for these referrals and access to patients, Adjust for Life, Kaloz, Garden State Neuro, and Datta paid unlawful compensation to Dassa Ortho and Dassa.

46.     The unlawful compensation was provided in two forms: (i) ostensibly legitimate payments to "lease" space at Dassa Ortho's New York offices, which actually were disguised compensation paid in exchange for patient referrals; and (ii) false contentions that the Insureds continued to suffer serious symptoms as the result of their accidents and/or cross-referrals back to Dassa and Dassa Ortho for continued, prolonged, ineffective, and medically unnecessary physical

therapy services, which in turn permitted Dassa and Dassa Ortho to submit a much larger amount of fraudulent and unlawful billing, per Insured.

47.     These were "pay–to–play" arrangements that caused Dassa Ortho and Dassa to provide access to Insureds to Adjust for Life, Kaloz, Garden State Neuro, and Datta for medically unnecessary patient examinations, chiropractic/physical therapy services, "pain fiber" testing, and electrodiagnostic testing, regardless of the Insureds' need for such "services".

48.     In keeping with the fact that these ostensibly legitimate "rent" payments, and cross referrals for medically unnecessary services, actually were disguised kickbacks in exchange for patient access, Garden State Neuro, Datta, Adjust for Life, and Kaloz operated from Dassa Ortho's various New York office locations on an itinerant and sporadic basis.

49.     For example, Kaloz and Datta did not maintain regular office hours at any single one of Dassa Ortho's offices. Rather, they appeared at Dassa Ortho and Dassa's various offices on different days each month, only when Dassa had patients to provide to Adjust for Life and Garden State Neuro pursuant to their unlawful referral scheme.

50.     In further keeping with the fact that the putative "rent" payments were not for fixed fees set in advance, and did not cover any regular lease terms, Dassa Ortho and Dassa's various offices did not contain any external signage or other indicia of Adjust for Life, Kaloz, Garden State Neuro, or Datta's ongoing presence at the offices.

51.     Further still, in keeping with the fact that Adjust for Life, Kaloz, Garden State Neuro, and Datta's return referrals to Dassa Ortho and Dassa were not predicated on medical necessity, and in fact constituted unlawful compensation to Dassa Ortho and Dassa for the initial referrals of the Insureds, Kaloz, Adjust for Life, Datta, and Garden State Neuro's own records

indicated that Dassa Ortho and Dassa's prior physical therapy treatment services had not been effective in resolving the Insureds' supposed complaints.

52.    For example:

(i)    On January 15, 2016, an Insured named SD was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, SD thereafter sought treatment from Dassa and Dassa Ortho, who provided SD with physical therapy treatment between February 2016 and November 2016. In November 2016, Dassa and Dassa Ortho caused SD to be referred to Garden State Neuro in exchange for unlawful compensation that Datta and Garden State Neuro provided to Dassa and Dassa Ortho. Thereafter, on November 2, 2016, Datta purported to examine SD on behalf of Garden State Neuro. In the November 2, 2016 examination report, Datta falsely contended that SD continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – SD had received more than nine months of physical therapy services from Dassa and Dassa Ortho. Though the physical therapy treatment that Dassa and Dassa Ortho purportedly had provided supposedly had been ineffective in resolving SD's putative symptoms, Datta nonetheless referred SD back to Dassa and Dassa Ortho for continued physical therapy treatment at the conclusion of the November 2, 2016 examination – over nine months after the accident, and long after any legitimate symptoms SD have experienced as a result of his minor automobile accident had resolved. The medically unnecessary return referral to Dassa and Dassa Ortho was additional unlawful compensation for the initial, medically unnecessary referral to Garden State Neuro.

(ii)   On January 15, 2016, an Insured named SD was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Nonetheless, SD thereafter sought treatment from Dassa and Dassa Ortho, who provided SD with physical therapy treatment between February 2016 and September 2016. In September 2016, Dassa and Dassa Ortho caused SD to be referred to Adjust for Life in exchange for unlawful compensation that Kaloz and Adjust for Life provided to Dassa and Dassa Ortho. Thereafter, on September 15, 2016, Kaloz purported to examine SD on behalf of Adjust for Life. In the September 15, 2016 examination report, Kaloz falsely contended that SD continued

to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – SD had received eight months of physical therapy services from Dassa and Dassa Ortho, which was long after any legitimate symptoms SD have experienced as a result of his minor automobile accident had resolved. Kaloz's contention that SD continued to suffer from high levels of pain – even after receiving eight months of physical therapy from Dassa and Dassa Ortho – enabled Dassa and Dassa Ortho to continue to provide additional medically unnecessary, ineffective, and useless, physical therapy services to SD. Kaloz's false contention was additional unlawful compensation for the initial, medically unnecessary referral to Adjust for Life.

(iii)     On February 18, 2016, an Insured named EG was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EG's vehicle was drivable following the accident. The police report further indicated that EG was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that EG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Nonetheless, nearly three months following the accident, EG sought treatment from Dassa and Dassa Ortho, who provided EG with physical therapy treatment between May 2016 and January 2017. In January 2017, Dassa and Dassa Ortho caused EG to be referred to Garden State Neuro in exchange for unlawful compensation that Datta and Garden State Neuro provided to Dassa and Dassa Ortho. Thereafter, on January 26, 2017, Datta purported to examine EG on behalf of Garden State Neuro. In the January 26, 2017 examination report, Datta falsely contended that EG continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – EG had received more than eight months of physical therapy services from Dassa and Dassa Ortho. Though the physical therapy treatment that Dassa and Dassa Ortho purportedly had provided supposedly had been ineffective in resolving EG's putative symptoms, Datta nonetheless referred EG back to Dassa and Dassa Ortho for continued physical therapy treatment at the conclusion of the January 26. 2017 examination – over eight months after the accident, and long after any legitimate symptoms EG may have experienced as a result of his minor automobile accident had resolved. The medically unnecessary return referral to Dassa and Dassa Ortho was additional unlawful compensation for the initial, medically unnecessary referral to Garden State Neuro.

(iv)     On February 18, 2016, an Insured named EG was involved in a minor automobile accident The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EG's vehicle was drivable following the accident. The police report further indicated that EG was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that EG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Nonetheless, nearly three months following the accident, EG

sought treatment from Dassa and Dassa Ortho, who provided EG with physical therapy treatment between May 2016 and February 2017. In February 2017, Dassa and Dassa Ortho caused EG to be referred to Adjust for Life in exchange for unlawful compensation that Kaloz and Adjust for Life provided to Dassa and Dassa Ortho. Thereafter, on February 3, 2017, Kaloz purported to examine EG on behalf of Adjust for Life. In the February 3, 2017 examination report, Kaloz falsely contended that EG continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – EG had received more than eight months of physical therapy services from Dassa and Dassa Ortho, which was long after any legitimate symptoms EG may have experienced as a result of his minor automobile accident had resolved. Kaloz's contention that EG continued to suffer from high levels of pain – even after receiving over eight months of physical therapy from Dassa and Dassa Ortho – enabled Dassa and Dassa Ortho to continue to provide additional medically unnecessary, ineffective, and useless, physical therapy services to EG. Kaloz's false contention was additional unlawful compensation for the initial, medically unnecessary referral to Adjust for Life.

(v)     On July 30, 2016, an Insured named KS was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that KS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Nonetheless, KS thereafter sought treatment from Dassa and Dassa Ortho, who provided KS with physical therapy treatment between August 2016 and August 2017. In August 2017, Dassa and Dassa Ortho caused KS to be referred to Garden State Neuro in exchange for unlawful compensation that Datta and Garden State Neuro provided to Dassa and Dassa Ortho. Thereafter, on August 16, 2017, Datta purported to examine KS on behalf of Garden State Neuro. In the August 16, 2017 examination report, Datta falsely contended that KS continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – KS had received more than ten months of physical therapy services from Dassa and Dassa Ortho. Though the physical therapy treatment that Dassa and Dassa Ortho purportedly had provided supposedly had been ineffective in resolving KS's putative symptoms, Datta nonetheless referred KS back to Dassa and Dassa Ortho for continued physical therapy treatment at the conclusion of the August 16, 2017 examination – over ten months after the accident, and long after any legitimate symptoms KS may have experienced as a result of his minor automobile accident had resolved. The medically unnecessary return referral to Dassa and Dassa Ortho was additional unlawful compensation for the initial, medically unnecessary referral to Garden State Neuro.

(vi)    On July 30, 2016, an Insured named KS was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the

accident. The police report further indicated that KS was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that KS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Nonetheless, KS thereafter sought treatment from Dassa and Dassa Ortho, who provided KS with physical therapy treatment between August 2016 and June 2017. In June 2018, Dassa and Dassa Ortho caused KS to be referred to Adjust for Life in exchange for unlawful compensation that Kaloz and Adjust for Life provided to Dassa and Dassa Ortho. Thereafter, on June 23, 2017, Kaloz purported to examine KS on behalf of Adjust for Life. In the June 23, 2017 examination report, Kaloz falsely contended that KS continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – KS had received more than ten months of physical therapy services from Dassa and Dassa Ortho, which was long after any legitimate symptoms KS may have experienced as a result of his minor automobile accident had resolved. Kaloz's contention that KS continued to suffer from high levels of pain – even after receiving over ten months of physical therapy from Dassa and Dassa Ortho – enabled Dassa and Dassa Ortho to continue to provide additional medically unnecessary, ineffective, and useless, physical therapy services to KS. Kaloz's false contention was additional unlawful compensation for the initial, medically unnecessary referral to Adjust for Life.

(vii)   On October 11, 2017, an Insured named EL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured and did not complain of any pain at the scene of the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Nonetheless, EL thereafter sought treatment from Dassa and Dassa Ortho, who provided EL with physical therapy treatment between November 2017 and September 2018. In September 2018, Dassa and Dassa Ortho caused EL to be referred to Garden State Neuro in exchange for unlawful compensation that Datta and Garden State Neuro provided to Dassa and Dassa Ortho. Thereafter, on September 24, 2018, Datta purported to examine EL on behalf of Garden State Neuro. In the September 24, 2018 examination report, Datta falsely contended that EL continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – EL had received more than ten months of physical therapy services from Dassa and Dassa Ortho. Though the physical therapy treatment that Dassa and Dassa Ortho purportedly had provided supposedly had been ineffective in resolving EL's putative symptoms, Datta nonetheless referred EL back to Dassa and Dassa Ortho for continued physical therapy treatment at the conclusion of the September 24, 2018 examination – over ten months after the accident, and long after any legitimate symptoms EL may have experienced as a result of his minor automobile accident had resolved. The medically unnecessary return referral to Dassa and Dassa Ortho

was additional unlawful compensation for the initial, medically unnecessary referral to Garden State Neuro.

(viii)    On January 2, 2018, an Insured named JV was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that JV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Nonetheless, JV thereafter sought treatment from Dassa and Dassa Ortho, who provided JV with physical therapy treatment between January 2018 and June 2018. In June 2018, Dassa and Dassa Ortho caused JV to be referred to Garden State Neuro in exchange for unlawful compensation that Datta and Garden State Neuro provided to Dassa and Dassa Ortho. Thereafter, on June 18, 2018, a physician named Aditya Patel, M.D. ("Patel") – at the direction of Datta – purported to examine JV on behalf of Garden State Neuro. In the June 18, 2018 examination report, Patel -- at the direction of Datta -- falsely contended that JV continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – JV had received more than five months of physical therapy services from Dassa and Dassa Ortho. Though the physical therapy treatment that Dassa and Dassa Ortho purportedly had provided supposedly had been ineffective in resolving JV's putative symptoms, Patel -- at Datta's direction -- nonetheless referred JV back to Dassa and Dassa Ortho for continued physical therapy treatment at the conclusion of the June 18, 2018 examination – over five months after the accident, and long after any legitimate symptoms JV may have experienced as a result of his minor automobile accident had resolved. The medically unnecessary return referral to Dassa and Dassa Ortho was additional unlawful compensation for the initial, medically unnecessary referral to Garden State Neuro.

(ix)    On January 2, 2018, an Insured named JV was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that JV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Nonetheless, JV thereafter sought treatment from Dassa and Dassa Ortho, who provided JV with physical therapy treatment between January 2018 and May 2018.  In May 2018, Dassa and Dassa Ortho caused JV to be referred to Adjust for Life in exchange for unlawful compensation that Kaloz and Adjust for Life provided to Dassa and Dassa Ortho. Thereafter, on May 21, 2018, Kaloz purported to examine JV on behalf of Adjust for Life. In the May 21, 2018 examination report, Kaloz falsely contended that JV continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – JV

had received more than four months of physical therapy services from Dassa and Dassa Ortho, which was long after any legitimate symptoms JV may have experienced as a result of his minor automobile accident had resolved. Kaloz's contention that JV continued to suffer from high levels of pain – even after receiving over four months of physical therapy from Dassa and Dassa Ortho – enabled Dassa and Dassa Ortho to continue to provide additional medically unnecessary, ineffective, and useless, physical therapy services to JV. Kaloz's false contention was additional unlawful compensation for the initial, medically unnecessary referral to Adjust for Life.

(x)     On June 12, 2018, an Insured named LM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that LM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Nonetheless, LM thereafter sought treatment from Dassa and Dassa Ortho, who provided LM with physical therapy treatment between August 2018 and April 2020.  In April 2020, Dassa and Dassa Ortho caused LM to be referred to Adjust for Life in exchange for unlawful compensation that Kaloz and Adjust for Life provided to Dassa and Dassa Ortho. Thereafter, on April 27, 2020, Kaloz purported to examine LM on behalf of Adjust for Life. In the April 27, 2020 examination report, Kaloz falsely contended that LM continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – LM had received more than four months of physical therapy services from Dassa and Dassa Ortho, which was long after any legitimate symptoms LM may have experienced as a result of his minor automobile accident had resolved. Kaloz's contention that LM continued to suffer from high levels of pain – even after receiving over four months of physical therapy from Dassa and Dassa Ortho – enabled Dassa and Dassa Ortho to continue to provide additional medically unnecessary, ineffective, and useless, physical therapy services to LM.  Kaloz's false contention was additional unlawful compensation for the initial, medically unnecessary referral to Adjust for Life.

53.     These are only representative examples. In the claims identified in Exhibits "1" – "3", Adjust for Life, Kaloz, Garden State Neuro, Datta, Dassa, and Dassa Ortho routinely paid and received unlawful compensation in exchange for medically unnecessary referrals.

54.     In claims identified in Exhibits "1" - "3", Dassa Ortho, Dassa, Adjust for Life, Kaloz, Garden State Neuro, and Datta falsely represented that they were in compliance with all

relevant licensing laws in New York, and therefore were eligible to collect PIP Benefits in the first instance.

55.     In fact, Dassa Ortho, Dassa, Adjust for Life, Kaloz, Garden State Neuro, and Datta were not in compliance with all relevant licensing laws in New York, inasmuch as they paid and/or received unlawful compensation in exchange for patient referrals.

56.     In keeping with the fact that Dassa and Dassa Ortho's referrals to Adjust for Life or Garden State Neuro were not based on medical necessity, and instead were the product of unlawful compensation paid by Kaloz, Adjust for Life, Datta, and Garden State Neuro, Dassa and Dassa Ortho routinely caused multiple Insureds who had been involved in the same underlying minor accident to be referred to Adjust for Life or Garden State Neuro for chiropractic and/or pain management services on or about the same date, in many instances months after the accident, despite the fact that the Insureds were differently situated.

57.     In this context, it is highly improbable that any two or more Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibits "1" - "3" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

58.     It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds referred from Dassa and Dassa Ortho to Adjust for Life or Garden State Neuro for chiropractic and/or pain management services on or about the exact same dates after their accidents, oftentimes many months after their accidents.

59.     Even so, Dassa and Dassa Ortho routinely caused multiple Insureds who had been involved in the same underlying minor accident to be referred to Adjust for Life or Garden State Neuro for medically unnecessary chiropractic and/or pain management services on or about the

same date, months after their underlying accidents.

60.     For example:

(i)     On February 18, 2016, two Insureds – EG and RG – were involved in the same
        minor automobile accident. The contemporaneous police report indicated that the
        accident was a low-speed, low-impact collision, and that EG and RG's vehicles
        were drivable following the accident. Nonetheless, EG and RG thereafter sought
        treatment from Dassa and Dassa Ortho, who provided EG and RG with an initial
        examination on May 11, 2016. EG and RG were different ages, in different physical
        condition, experienced the impact from different locations in the vehicle, and
        suffered different injuries in the accident, to the extent that they suffered any
        injuries at all. Even so, Dassa and Dassa Ortho caused EG and RG to be referred to
        Adjust for Life for medically unnecessary chiropractic services – incredibly, on the
        exact same date, May 11, 2016 – in exchange for unlawful compensation that Kaloz
        and Adjust for Life provided Dassa and Dassa Ortho.

(ii)    On February 18, 2016, two Insureds – EG and RG – were involved in the same
        minor automobile accident. Thereafter, EG and RG sought treatment from Dassa
        and Dassa Ortho, who provided EG and RG with an initial examination on May 11,
        2016. EG and RG were different ages, in different physical condition, experienced
        the impact from different locations in the vehicle, and suffered different injuries in
        the accident, to the extent that they suffered any injuries at all. Even so, Dassa and
        Dassa Ortho caused EG and RG to be referred to Garden State Neuro for medically
        unnecessary EDX testing services – incredibly, on the exact same date, May 11,
        2016 – in exchange for unlawful compensation that Datta and Garden State Neuro
        provided Dassa and Dassa Ortho.

(iii)   On February 3, 2017, three Insureds – JN, CC, and RC – were involved in the same
        minor automobile accident. The contemporaneous police report indicated that the
        accident was a low-speed, low-impact collision, and that JN, CC, and RC's vehicles
        were drivable following the accident. Nonetheless, JN, CC,  and RC thereafter
        sought treatment from Dassa and Dassa Ortho, who provided JN, CC, and RC with
        an initial examination on February 15, 2017. JN, CC, and RC were different ages,
        in different physical condition, experienced the impact from different locations in
        the vehicle, and suffered different injuries in the accident, to the extent that they
        suffered any injuries at all. Even so, Dassa and Dassa Ortho caused JN, CC, and
        RC to be referred to Adjust for Life for medically unnecessary chiropractic services
        – incredibly, on the exact same date, February 15, 2017 – in exchange for unlawful
        compensation that Kaloz and Adjust for Life provided Dassa and Dassa Ortho.

(iv)    On February 3, 2017, three Insureds – JN and RC – were involved in the same
        automobile accident. The contemporaneous police report indicated that the accident
        was a low-speed, low-impact collision, and that JN and RC's vehicles were drivable
        following the accident. Nonetheless, JN and RC thereafter sought treatment from
        Dassa and Dassa Ortho, who provided JN and RC with a follow-up examination on

May 2, 2017. JN and RC were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. Even so, Dassa and Dassa Ortho caused JN and RC to be referred to Garden State Neuro for medically unnecessary EDX testing services – incredibly, on the exact same date, May 2, 2017 – in exchange for unlawful compensation that Datta and Garden State Neuro provided Dassa and Dassa Ortho.

(v)     On July 2, 2021, two Insureds – BM and AW – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BM and AW's vehicles were drivable following the accident. Nonetheless, BM and AW thereafter sought treatment from Dassa and Dassa Ortho, who provided BM and AW with an initial examination on July 14, 2021. BM and AW were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. Even so, Dassa and Dassa Ortho caused BM and AW to be referred to Adjust for Life for medically unnecessary chiropractic services – incredibly, on the exact same date, July 14, 2021 – in exchange for unlawful compensation that Kaloz and Adjust for Life provided Dassa and Dassa Ortho.

61.     These are only representative examples. In the claims identified in Exhibits "1" – "3" Dassa and Dassa Ortho routinely caused multiple Insureds from the same accident to be referred to Adjust for Life or Garden State Neuro for medically unnecessary chiropractic and/or pain management services on or about the same date, months after the accident, despite the fact that the Insureds were differently situated.

**B.     The Defendants' Fraudulent Treatment and Billing Protocol**

62.     The substantial majority of the Insureds whom the Defendants purported to treat did not suffer from any significant injuries or health problems at all as a result of the underlying accidents they experienced.

63.     In keeping with the fact that the substantial majority of the Insureds whom the Defendants purported to treat were not seriously injured in the underlying accidents, most of the accidents in the claims identified in Exhibits "1" - "6" were demonstrably minor.

64.     For example, in many cases, contemporaneous police reports indicated that that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

65.     Moreover, in many instances the Insureds did not seek medical attention immediately following the accident.

66.     To the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

67.     Even so, the Defendants purported to subject Insureds to a medically unnecessary course of "treatment" that was provided pursuant to a pre–determined, fraudulent protocol designed to maximize the billing that the Defendants could submit or cause to be submitted to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

68.     The Defendants purported to provide their pre–determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation, or – in most cases – the absence of any serious medical problems arising from any actual automobile accidents.

69.     Each step in the Defendants' fraudulent treatment protocol was designed to provide a false rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

70.     No legitimate physician, chiropractor, or other healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under their auspices.

71.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.      The Fraudulent Charges for Initial Examinations at Adjust for Life, Dassa Ortho, and Garden State Neuro**

72.     As an initial step in their fraudulent treatment and billing scheme, Kaloz, Adjust for Life, Datta, Garden State Neuro, Dassa, and Dassa Ortho purported to provide virtually every Insured in the claims identified in Exhibits "1" - "3" with initial examinations.

73.     The initial examinations were performed as a "gateway" in order to provide Insureds with phony, predetermined "diagnoses" to allow the Defendants to then provide medically unnecessary, illusory, or otherwise non-reimbursable follow-up examinations, chiropractic/physical therapy services, pain management injections, "pain fiber" testing, EDX testing, anesthesia services, and surgical facility space.

74.     Typically, Kaloz purported to perform the initial examinations on behalf of Adjust for Life, Dassa purported to perform the initial examinations on behalf of Dassa Ortho, and Datta purported to perform the initial examinations on behalf of Garden State Neuro.

75.     As set forth in Exhibits "1"-"3", the initial examinations were then billed to GEICO: (i) through Adjust for Life under CPT code 99203, typically resulting in a charge of $44.04 to $83.71; (ii) through Dassa Ortho under CPT code 99204, typically resulting in a charge of $119.60 to $400.00; and (iii) through Garden State Neuro under CPT code 99244, typically resulting in a charge of $190.59 to $217.97.

76.     The charges for the initial examinations were fraudulent and unlawful in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the unlawful compensation that Adjust for Life, Kaloz, Garden State

Neuro, Datta, Dassa, and Dassa Ortho provided to one another in exchange for patient referrals, not to treat or otherwise benefit the Insureds.

77.     As set forth below, the charges for the initial examinations also were fraudulent and unlawful in that they misrepresented the nature, extent, and results of the purported examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

**(i)     Adjust for Life**

78.     In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Adjust for Life and Kaloz routinely misrepresented the severity of the Insureds' presenting problems.

79.     At all relevant times, pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99203 to bill for an initial patient examination typically required that the Insured present with problems of moderate severity.

80.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

81.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)     Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)      Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

82.     Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

83.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

84.     Even so, in the claims for initial examinations identified in Exhibit "1", Adjust for Life and Kaloz routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

85.     For example:

(i)      On January 15, 2016, an Insured named SD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, the day after the accident SD traveled on his own to Vassar Brothers Medical Center. The contemporaneous hospital records indicated that SD was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue sprain diagnosis. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, SD presented at Adjust for Life on February 1, 2016, for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial

examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)     On February 18, 2016, an Insured named EG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EG's vehicle was drivable following the accident. The police report further indicated that EG was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that EG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, EG presented at Adjust for Life on April 29, 2016, for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)    On March 4, 2016, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day JP traveled on his own to St. Lukes Cornwall Hospital. The contemporaneous hospital records indicated that JP was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue injury diagnosis. To the extent that JP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, JP presented at Adjust for Life on March 15, 2016, for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)    On June 9, 2016, an Insured named ST was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ST's vehicle was drivable following the accident. The police report further indicated that ST was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that ST experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, ST presented at Adjust for Life on June 17, 2016, for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)     On July 7, 2016, an Insured named OJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-

impact collision, and that OJ's vehicle was drivable following the accident. The police report further indicated that OJ was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day OJ traveled on his own to Westchester Medical Center. The contemporaneous hospital records indicated that OJ was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue injury. To the extent that OJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, OJ presented at Adjust for Life on July 29, 2016, for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)   On July 30, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, the day following the accident KS traveled on his own to St. Lukes Cornwall Hospital where he was briefly observed on an outpatient basis and then discharged with a minor soft tissue injury diagnosis. To the extent that KS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, KS presented at Adjust for Life on August 9, 2016, for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)   On August 19, 2016, an Insured named LF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LF's vehicle was drivable following the accident. The police report further indicated that LF was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that LF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Even so, later that day LF traveled on his own to St. Lukes Cornwall Hospital where he was briefly observed on an outpatient basis and then discharged. To the extent that LF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, LF presented at Adjust for Life on August 22, 2016, for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(viii)   On October 11, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day after the accident EL traveled on her own to Orange Region Medical Center. The contemporaneous hospital records indicated that EL was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue injury diagnosis. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, EL presented at Adjust for Life on November 2, 2017, for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)   On November 3, 2017, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GB's vehicle was drivable following the accident. The police report further indicated that GB was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day GB traveled on her own to St. Lukes Cornwall Hospital. The contemporaneous hospital records indicated that GB was briefly observed on an outpatient basis and then discharged that same day with nothing more than a recommendation to take over the counter medication as necessary for any pain. To the extent that GB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time.  Nonetheless, GB presented at Adjust for Life on March 1, 2018. for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(x)   On January 2, 2018, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, two weeks after the accident JV traveled on his own to Orange Region Medical Center. The hospital records indicated that JV was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor lower back strain diagnosis. To the extent that JV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time.  Nonetheless, JV presented at Adjust for Life on January 22, 2018, for a purported initial examination. Adjust for Life and Kaloz then billed GEICO for the initial examination using CPT code 99203, and thereby falsely

represented that the initial examination involved presenting problems of moderate severity.

86.     These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Adjust for Life and Kaloz routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

87.     In the claims for initial examinations identified in Exhibit "1", Adjust for Life and Kaloz routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the putative examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

88.     In the claims for initial examinations identified in Exhibit "1", Adjust for Life and Kaloz also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide.

**(ii)     Dassa Ortho**

89.     In the claims for initial examinations identified in Exhibit "2", Dassa Ortho and Dassa routinely misrepresented the severity of the Insureds' presenting problems so as to bill for the initial examinations under CPT code 99204.

90.     At all relevant times, pursuant to the American Medical Association's CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination typically required that the patient present with problems of moderate to high severity.

91.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

92.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(i)     Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

93.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

94.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their relatively minor automobile accidents, the

problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

95.     Even so, in the claims for initial examinations identified in Exhibit "2", Dassa and Dassa Ortho routinely billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

96.     For example:

(i)     On February 18, 2016, an Insured named EG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EG's vehicle was drivable following the accident. The police report further indicated that EG was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that EG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, EG presented at Dassa Ortho on May 11, 2016, for a purported initial examination. Dassa Ortho and Dassa then billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On March 4, 2016, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day JP traveled on his own to St. Lukes Cornwall Hospital. The contemporaneous hospital records indicated that JP was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue injury diagnosis. To the extent that JP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, JP presented at Dassa Ortho on March 15, 2016, for a purported initial examination. Dassa Ortho and Dassa then billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)   On July 7, 2016, an Insured named OJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OJ's vehicle was drivable following the accident. The police report further indicated that OJ was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day OJ traveled on his own to Westchester Medical Center. The

contemporaneous hospital records indicated that OJ was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue injury. To the extent that OJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, OJ presented at Dassa Ortho on July 12, 2016, for a purported initial examination. Dassa Ortho and Dassa then billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)    On July 30, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, the day following the accident KS traveled on his own to St. Lukes Cornwall Hospital where he was briefly observed on an outpatient basis and then discharged with a minor soft tissue injury diagnosis. To the extent that KS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, KS presented at Dassa Ortho on August 9, 2016, for a purported initial examination. Dassa Ortho and Dassa then billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)    On February 3, 2017, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that CR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, CR presented at Dassa Ortho on February 15, 2017, for a purported initial examination. Dassa Ortho and Dassa then billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)    On June 2, 2017, an Insured named RJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RJ's vehicle was drivable following the accident. The police report further indicated that RJ was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that RJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, RJ presented at Dassa Ortho on June 22, 2017, for a purported initial

examination. Dassa Ortho and Dassa then billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)   On October 11, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day after the accident EL traveled on her own to Orange Region Medical Center. The contemporaneous hospital records indicated that EL was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue injury diagnosis. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, EL presented at Dassa Ortho on November 6, 2017, for a purported initial examination. Dassa Ortho and Dassa then billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)   On November 3, 2017, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GB's vehicle was drivable following the accident. The police report further indicated that GB was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day GB traveled on her own to St. Lukes Cornwall Hospital. The contemporaneous hospital records indicated that GB was briefly observed on an outpatient basis and then discharged that same day with nothing more than a recommendation to take over the counter medication as necessary for any pain. To the extent that GB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, GB presented at Dassa Ortho on January 16, 2018, for a purported initial examination. Dassa Ortho and Dassa then billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)   On June 12, 2018, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that LM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, LM presented at Dassa Ortho on July 10, 2019, for a purported initial examination. Dassa Ortho and Dassa then billed GEICO for the initial

examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)     On December 20, 2018, an Insured named YA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YA's vehicle was drivable following the accident. The police report further indicated that YA was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that YA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, over three weeks later, YA presented at Dassa Ortho on January 15, 2019, for a purported initial examination. To the extent that YA experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, Dassa Ortho and Dassa then billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

97.     These are only representative examples. In the claims for initial examinations identified in Exhibit "2", Dassa Ortho and Dassa routinely falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the examinations.

98.     In the claims for initial examinations identified in Exhibit "2", Dassa Ortho and Dassa routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

99.     In the claims for initial examinations identified in Exhibit "2", Dassa Ortho and Dassa also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide.

(iii)     **Garden State Neuro**

100.     In the claims for initial examinations identified in Exhibit "3", Garden State Neuro and Datta routinely falsely represented the severity of the Insureds' presenting problems so as to bill for the initial examinations under CPT code 99244.

101.     Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99244 to bill for an initial examination typically required that the Insured present with problems of moderate to high severity.

102.     The CPT Assistant also provides various clinical examples of the types of presenting problems of moderate to high severity for use of CPT code 99244 to bill for an initial examination.

103.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99244 to bill for an initial examination: In particular:

    (i)      Office consultation with 38-year-old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra-abdominal abscess. (Colon and Rectal Surgery)

    (ii)     Initial office consultation for discussion of treatment options for a 40-year-old female with a two-centimeter adenocarcinoma of the breast. (Radiation Oncology)

    (iii)    Initial office consultation with 72-year-old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

104.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99244 to bill for an initial examination typically require problems that pose a serious threat to the patient's health, or even the patient's life.

105.    By contrast, to the extent that the Insureds in the claims identified in Exhibit and "3" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

106.    Even so, in the claims for initial examinations identified in Exhibit "3", Garden State Neuro and Datta routinely billed for their putative initial examinations using CPT code 99244, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

107.    For example:

(i)     On July 7, 2016, an Insured named OJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OJ's vehicle was drivable following the accident. The police report further indicated that OJ was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day OJ traveled on his own to Westchester Medical Center. The contemporaneous hospital records indicated that OJ was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue injury. To the extent that OJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, OJ presented at Garden State Neuro on January 27, 2017, for a purported initial examination. Garden State Neuro and Datta then billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On February 3, 2017, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day RC traveled on his own to St. Luke's Cornwall Hospital but chose to leave without being examined. To the extent that RC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, RC presented at Garden State Neuro on August 14, 2017, for a purported initial examination. Garden State Neuro and Datta then billed GEICO for the initial

examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)     On October 11, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day after the accident EL traveled on her own to Orange Region Medical Center. The contemporaneous hospital records indicated that EL was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue injury diagnosis. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, EL presented at Garden State Neuro on December 18, 2017, for a purported initial examination. Garden State Neuro and Datta then billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)     On November 3, 2017, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GB's vehicle was drivable following the accident. The police report further indicated that GB was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day GB traveled on her own to St. Lukes Cornwall Hospital. The contemporaneous hospital records indicated that GB was briefly observed on an outpatient basis and then discharged that same day with nothing more than a recommendation to take over the counter medication as necessary for any pain. To the extent that GB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, GB presented at Garden State Neuro on August 1, 2018, for a purported initial examination. Garden State Neuro and Datta then billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)     On January 2, 2018, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, two weeks after the accident JV traveled on his own to Orange Region Medical Center. The hospital records indicated that JV was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor lower back strain diagnosis. To the extent that JV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset

and improved over time. Nonetheless, JV presented at Garden State Neuro on January 22, 2018, for a purported initial examination. Garden State Neuro and Datta then billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)     On August 15, 2018, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CS's vehicle was drivable following the accident. The police report further indicated that CS was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day CS traveled on his own to HealthAlliance Hospital Broadway. The contemporaneous hospital records indicated that CS was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor upper back sprain diagnosis. To the extent that CS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, CS presented at Garden State Neuro on January 22, 2018, for a purported initial examination. Garden State Neuro and Datta then billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)    On February 27, 2020, an Insured named TL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TL's vehicle was drivable following the accident. The police report further indicated that TL was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that TL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, on March 9, 2020, TL presented to Garden State Neuro for a purported initial examination. Garden State Neuro and Datta then billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)   On June 11, 2020, an Insured named KM was involved in a minor collision with an automobile. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KM's vehicle was drivable following the accident. The police report further indicated that KM was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that KM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, KM presented at Garden State Neuro on June 29, 2020, for a purported initial examination. Garden State Neuro and Datta then billed GEICO for the initial examination using CPT code 99244, and thereby falsely

represented that the initial examination involved presenting problems of moderate to high severity.

(ix)     On October 20, 2020, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day LS traveled on her own to Orange Region Medical Center. The hospital records indicated that LS was briefly observed on an outpatient basis and then discharged that same day with a finding that she suffered no acute injury. To the extent that LS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, LS presented at Garden State Neuro on November 2, 2020, for a purported initial examination. Garden State Neuro and Datta then billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)     On December 3, 2020, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset and improved over time. Nonetheless, over five months later, JC presented to Garden State Neuro on April 29, 2021, for a purported initial examination. To the extent that JC experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, Garden State Neuro and Datta billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

108.     These are only representative examples. In the claims for initial examinations identified in Exhibit "3", Garden State Neuro and Datta routinely falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the initial examinations.

109.    In the claims for initial examinations identified in Exhibit "3", Garden State Neuro and Datta routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT code 99244, because examinations billable under CPT code 99244 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

110.    In the claims for initial examinations identified in Exhibit "3", Garden State Neuro and Datta also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

111.    Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

112.    Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial examination represents that the physician or chiropractor who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

113.    Pursuant to the Fee Schedule, the use of CPT code 99244 to bill for an initial examination represents that the physician or chiropractor who performed the examination spent at least 60 minutes of face-to-face time with the patient or the patient's family.

114.    As set forth in Exhibit "1", Adjust for Life, Kaloz, Dassa Ortho, Dassa, Garden State Neuro, and Datta submitted virtually all of their billing for initial examinations under CPT codes 99203, 99204, and 99244, and thereby represented that the chiropractor and physicians who purported to perform the examinations – virtually always Kaloz, Dassa, and Datta – spent either

30 minutes, 45 minutes, or 60 minutes of face-to-face time with the Insureds or the Insureds'
families during the examinations.

115.    In fact, in the claims for initial examinations identified in Exhibits "1" - "3", neither
Kaloz, Dassa, Datta nor any other healthcare provider spent 30 minutes of face-to-face time with
the Insureds or their families when conducting the examinations, much less 45 minutes or 60
minutes.

116.    For example -- and in keeping with the fact that the initial examinations allegedly
provided through Adjust for Life, Garden State Neuro, and Dassa Ortho did not entail at least 30
minutes of face-to-face time with the Insureds or their families, much less 45 or 60 minutes --
Kaloz, Dassa, Datta used template forms in purporting to conduct the patient examinations.

117.    The template forms that Kaloz, Dassa, Datta used in purporting to conduct the
initial examinations set forth a very limited range of examination parameters.

118.    The only face-to-face time between the examining physicians and the Insureds that
was reflected in the limited range of examination parameters consisted of brief patient interviews,
limited examinations of the Insureds' musculoskeletal systems, and -- in the case of Garden State
Neuro -- brief neurological examinations.

119.    These brief interviews and limited examinations did not require Kaloz, Dassa,
Datta, or any other healthcare provider associated with Adjust for Life, Dassa Ortho, or Garden
State Neuro to spend more than 15-20 minutes of face-to-face time with the Insureds or their
families during the examinations.

120.    In the claims for initial examinations identified in Exhibit "1", Adjust for Life,
Kaloz, Dassa Ortho, Dassa, Garden State Neuro, and Datta routinely falsely represented that the
examinations involved at least 30 minutes of face-to-face time with the Insureds or their families

(when billed under CPT code 99203), at least 45 minutes of face-to-face time with the Insured or their families (when billed under CPT code 99204), and in at least 60 minutes (when billed under CPT code 99244), in order to create a false basis for their charges under CPT codes 99203, 99204, and 99244, because examinations billable under CPT codes 99203, 99204, and 99244 are reimbursable at a higher rate than examinations that require less time to perform.

**c.    Misrepresentations Regarding "Detailed" or "Comprehensive" Physical Examinations**

121.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99203 to bill for a patient examination represented that the chiropractor or physician who performed the examination conducted a "detailed" physical examination.

122.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the chiropractor or physician conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

123.    To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to musculoskeletal complaints.

124.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor or physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the chiropractor or physician has documented findings with respect to the following:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

125.    In the claims for initial examinations identified in Exhibit "1", when Adjust for Life and Kaloz billed for the initial examinations under CPT code 99203, they falsely represented that the chiropractor who purported to perform the examinations -- typically Kaloz -- performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

126.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", neither Kaloz, nor any other healthcare provider associated with Adjust for Life, ever conducted an extended examination of the Insureds' musculoskeletal systems.

127.    For instance, in each of the claims under CPT code 99203 identified in Exhibit "1", neither Kaloz nor any other healthcare provider associated with Adjust for Life ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)      examination of sensation.

128.    For example:

(i)      On or about November 19, 2015, Kaloz and Adjust for Life billed GEICO under CPT code 99203 for an initial examination on an Insured named GF, and thereby represented that they had provided a "detailed" physical examination to GF. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of GF's musculoskeletal system, despite the fact that – to the extent GF had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)     On or about March 15, 2016, Kaloz and Adjust for Life billed GEICO under CPT code 99203 for an initial examination on an Insured named JP, and thereby represented that they had provided a "detailed" physical examination to JP. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of JP's musculoskeletal system, despite the fact that – to the extent JP had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)    On or about May 9, 2016, Kaloz and Adjust for Life billed GEICO under CPT code 99203 for an initial examination on an Insured named SP. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of SP's musculoskeletal system, despite represented that they had provided a "detailed" physical examination to SP. However, neither

45

Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of SP's musculoskeletal system, despite the fact that – to the extent SP had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv) On or about June 28, 2016, Kaloz and Adjust for Life billed GEICO under CPT code 99203 for an initial examination on an Insured named LK, and thereby represented that they had provided a "detailed" physical examination to LK. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of LK's musculoskeletal system, despite the fact that – to the extent LK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v) On or about August 9, 2016, Kaloz and Adjust for Life billed GEICO under CPT code 99203 for an initial examination on an Insured named KS, and thereby represented that they had provided a "detailed" physical examination to KS. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of KS's musculoskeletal system, despite the fact that – to the extent KS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi) On or about August 22, 2016, Kaloz and Adjust for Life billed GEICO under CPT code 99203 for an initial examination on an Insured named LF, and thereby represented that they had provided a "detailed" physical examination to LF. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of LF's musculoskeletal system, despite the fact that – to the extent LF had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii) On or about November 2, 2017, Kaloz and Adjust for Life billed GEICO under CPT code 99203 for an initial examination on an Insured named EL, and thereby represented that they had provided a "detailed" physical examination to EL. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of EL's musculoskeletal system, despite the fact that – to the extent EL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii) On or about November 7, 2017, Kaloz and Adjust for Life billed GEICO under CPT code 99203 for an initial examination on an Insured named MM, and thereby represented that they had provided a "detailed" physical examination to MM. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of MM's musculoskeletal system, despite the fact that – to the extent MM had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix) On or about November 1, 2018, Kaloz and Adjust for Life billed GEICO under

CPT code 99203 for an initial examination on an Insured named EC, and thereby represented that they had provided a "detailed" physical examination to EC. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of EC's musculoskeletal system, despite the fact that – to the extent EC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)   On or about March 12, 2019, Kaloz and Adjust for Life billed GEICO under CPT code 99203 for an initial examination on an Insured named BT, and thereby represented that they had provided a "detailed" physical examination to BT. However, neither Kaloz, nor any other chiropractor acting on behalf of Adjust for Life, documented an extended examination of BT's musculoskeletal system, despite the fact that – to the extent BT had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

129.   These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Adjust for Life and Kaloz routinely falsely represented that they had provided "detailed" physical examinations, and that their putative examinations therefore were billable under CPT code 99203, because examinations that are billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require "detailed" patient examinations.

130.   In addition, pursuant to the CPT Assistant, in the claims for initial examinations identified in Exhibit "2", when Dassa Ortho and Dassa billed GEICO for the putative initial examinations using CPT code 99204, they falsely represented that the physicians or other healthcare providers who purported to conduct the examinations – typically Dassa – provided "comprehensive" physical examinations to the Insureds who purportedly received the examinations.

131.   Similarly, pursuant to the CPT Assistant, when Garden State Neuro and Datta billed GEICO for the putative initial examinations using CPT code 99244, they falsely represented that the physicians or other healthcare providers who purported to conduct the initial examinations – typically Datta – provided "comprehensive" physical examinations to the Insureds who purportedly received the examinations.

132.     Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

133.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician or other healthcare provider has not conducted a general examination of multiple patient organ systems unless the physician or provider has documented findings with respect to at least eight organ systems.

134.     The CPT Assistant recognizes the following organ systems:

(i)       constitutional symptoms (e.g., fever, weight loss);

(ii)      eyes;

(iii)     ears, nose, mouth, throat;

(iv)      cardiovascular;

(v)       respiratory;

(vi)      gastrointestinal;

(vii)     genitourinary;

(viii)    musculoskeletal;

(ix)      integumentary (skin and/or breast);

(x)       neurological;

(xi)      psychiatric;

(xii)     endocrine;

(xiii)    hematologic/lymphatic; and

(xiv)     allergic/immunologic

135.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or other healthcare provider has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or provider has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

136.    However, with respect to the claims for initial examinations billed to GEICO under CPT codes 99204 and 99244 that are identified in Exhibit "1", neither Dassa nor any other healthcare provider associated with Dassa Ortho, nor Datta or any other healthcare provider associated with Garden State Neuro, ever legitimately documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

137.    For example:

(i)      On June 17, 2014, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named SR, and thereby represented that they had provided a "comprehensive" physical examination to SR. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)     On August 24, 2015, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named MS, and thereby represented that they had provided a "comprehensive" physical examination to MS. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)    On March 7, 2016, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named AB, and thereby represented that they had provided a "comprehensive" physical examination to AB. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)     On August 1, 2016, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named JM, and thereby represented that they had provided a "comprehensive" physical examination to JM. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)      On December 6, 2016, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named RA, and thereby represented that they had provided a "comprehensive" physical examination to RA. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vi)     On February 15, 2017, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named RC, and thereby represented that they had provided a "comprehensive" physical examination to RC. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho,

documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vii)   On February 15, 2017, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named CC, and thereby represented that they had provided a "comprehensive" physical examination to CC. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(viii)  On February 15, 2017, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named JN, and thereby represented that they had provided a "comprehensive" physical examination to JN. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ix)    On August 2, 2017, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named JS, and thereby represented that they had provided a "comprehensive" physical examination to JS. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(x)     On October 18, 2017, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named RF, and thereby represented that they had provided a "comprehensive" physical examination to RF. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xi)    On November 15, 2017, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named RP, and thereby represented that they had provided a "comprehensive" physical examination to RP. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xii)   On January 24, 2018, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named PJ, and thereby represented that they

had provided a "comprehensive" physical examination to PJ. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xiii)   On July 6, 2018, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named YV, and thereby represented that they had provided a "comprehensive" physical examination to YV. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xiv)   On July 11, 2018, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named AL, and thereby represented that they had provided a "comprehensive" physical examination to AL. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xv)    On October 30, 2018, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named CR, and thereby represented that they had provided a "comprehensive" physical examination to CR. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xvi)   On January 24, 2019, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named JT, and thereby represented that they had provided a "comprehensive" physical examination to JT. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xvii)  On October 9, 2019, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named MS, and thereby represented that they had provided a "comprehensive" physical examination to MS. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xviii)   On November 21, 2019, Dassa Ortho and Dassa billed GEICO under CPT code 99204 for an initial examination of an Insured named JC, and thereby represented that they had provided a "comprehensive" physical examination to JC. However, neither Dassa, nor any other medical provider acting on behalf of Dassa Ortho, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xix)   On March 29, 2021, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named JC, and thereby represented that they had provided a "comprehensive" physical examination to JC. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xx)   On April 1, 2021, Garden State Neuro and Datta billed GEICO under CPT code 99244 for an initial examination of an Insured named VD, and thereby represented that they had provided a "comprehensive" physical examination to VD. However, neither Datta, nor any other medical provider acting on behalf of Garden State Neuro, documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

138.   These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Dassa Ortho, Dassa, Garden State Neuro, and Datta routinely falsely represented that they provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99204 and 99244, because examinations billable under CPT codes 99204 and 99244 are reimbursable at higher rates than examinations that are not "comprehensive".

**d.   Misrepresentations Regarding the Extent of Medical Decision-Making**

139.   In addition, pursuant to the CPT Assistant, when Dassa Ortho, Dassa, Garden State Neuro, and Datta submitted charges for initial examinations under CPT codes 99204 or 99244, they represented that Dassa, Datta, or some other healthcare provider associated with Dassa Ortho or Garden State Neuro engaged in medical decision-making of "moderate complexity".

140.     Similarly, pursuant to the CPT Assistant, when Adjust for Life and Kaloz submitted charges for initial examinations under CPT code 99203, they represented that Kaloz or some other healthcare provider associated with Adjust for Life engaged in medical decision-making of "low complexity".

141.     Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

142.     Though Dassa Ortho, Dassa, Garden State Neuro, Datta, Adjust for Life, and Kaloz routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity" (when billed under CPT codes 99204 or 99244) or "low complexity" (when billed under CPT code 99203), in actuality the initial examinations did not involve any significant medical decision-making at all.

143.     First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information. When the Insureds presented to Dassa Ortho, Garden State Neuro, or Adjust for Life for the putative initial examinations, they did not arrive with any medical records except, occasionally, basic radiology or electrodiagnostic testing reports. Furthermore, prior to the initial examinations, the Defendants neither requested any medical records from any other providers, nor conducted any diagnostic tests.

144.    Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

145.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants.

146.    In almost every instance, any diagnostic procedures and "treatments" that Dassa Ortho, Dassa, Garden State Neuro, Datta, Adjust for Life, and Kaloz actually provided were limited to a series of medically unnecessary diagnostic tests, interventional pain management procedures, or medically unnecessary/ineffective chiropractic/physical therapy services, none of which was health- or life-threatening if properly administered.

147.    Third, in virtually every case, the Defendants did not consider any significant number of diagnoses or treatment options for the Insureds during the purported initial examinations.

148.    Specifically, in almost every instance, during the initial examinations the Insureds did not report any serious, continuing medical problems that legitimately could be traced to an underlying automobile accident.

149.    Even so, at the conclusion of each of the putative initial examinations in the claims identified in Exhibits "1" – "3", Dassa, Datta, and Kaloz prepared initial examination reports in which they provided phony back, neck, and/or extremity soft tissue injury "diagnoses" to virtually every Insured.

150.    Then, based upon these phony "diagnoses", Dassa, Datta, and Kaloz directed virtually every Insured to report to Dassa Ortho, Garden State Neuro, and Adjust for Life on a

continuing basis for medically unnecessary follow-up examinations, chiropractic/physical therapy, EDX testing, and other Fraudulent Services regardless of their true circumstances or presentation.

151.    In keeping with the fact that the putative "diagnoses" were phony, the diagnoses frequently were contravened by contemporaneous police reports and hospital records (to the limited extent that the Insureds visited the hospital at all following their minor accidents), which indicated that the Insureds either had not been injured in the underlying accidents, or did not suffer from the injuries that Dassa, Datta, and Kaloz falsely purported to diagnose at the conclusion of their phony initial examinations.

152.    To the extent that the Insureds in the claims identified in Exhibits "1" – "3" suffered any injuries at all in their minor automobile accidents, the injuries were minor soft tissue injuries such as sprains and strains.

153.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all.

154.    Even so, and in keeping with the fact that their putative "diagnoses" were phony, and involved no genuine medical decision-making, Dassa, Datta, and Kaloz routinely falsely purported to diagnose continuing back, neck, and/or extremity pain in the Insureds long after the minor underlying automobile accidents occurred, and long after any soft tissue injury pain attendant to the automobile accidents would have resolved.

155.    In this context, it is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "3" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

156.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at Dassa Ortho, Garden State Neuro, and Adjust for Life with substantially identical injuries on or about the same dates after their accidents.

157.    Even so, in keeping with the fact that Dassa Ortho, Dassa, Garden State Neuro, Datta, Adjust for Life, and Kaloz's putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, Dassa Ortho, Dassa, Garden State Neuro, Datta, Adjust for Life, and Kaloz frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

158.    For example:

(i)     On February 18, 2016, two Insureds – EG and RG – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, over two months later, EG and RG presented – incredibly – on the exact same date, April 29, 2016, to Adjust for Life for initial examinations. EG and RG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EG and RG suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Kaloz or a medical provider acting on behalf of Kaloz, provided EG and RG with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ii)    On February 18, 2016, two Insureds – EG and RG – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, over two months later, EG and RG presented – incredibly – on the exact same date, May 11, 2016, to Dassa Ortho for initial examinations. EG and RG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EG and RG suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Dassa or a medical provider acting on behalf of Dassa, provided EG and RG with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of

them.

(iii)    On February 3, 2017, four Insureds – JN, RC, CC, and CC – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, nearly two weeks later, JN, RC, CC, and CC presented – incredibly – <u>on the exact same date</u>, February 15, 2017, to Dassa Ortho for initial examinations. JN, RC, CC, and CC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JN, RC, CC, and CC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Dassa or a medical provider acting on behalf of Dassa, provided JN, RC, CC, and CC with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iv)    On October 19, 2017, two Insureds – EG and JB – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, over one month later, EG and JB presented – incredibly – <u>on the exact same date</u>, November 20, 2017, to Adjust for Life for initial examinations by Kaloz. EG and JB were different genders, had different heights and weights, were in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EG and JB suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Kaloz or a medical provider acting on behalf of Kaloz, provided EG and JB with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(v)    On October 19, 2017, two Insureds – EG and JB – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, over one month later, EG and JB presented – incredibly – <u>on the exact same date</u>, November 20, 2017, to Garden State Neuro for initial examinations by Datta. EG and JB were different genders, had different heights and weights, were in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EG and JB suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Datta or a medical provider acting on behalf of Datta, provided EG and JB with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vi)    On June 12, 2018, two Insureds – LM and BM – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, over two weeks later, LM and BM presented – incredibly – <u>on the exact same date</u>, June 21, 2018, to Adjust for Life for initial examinations by Kaloz. LM and BM were different genders, had

different heights and weights, were in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LM and BM suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Kaloz or a medical provider acting on behalf of Kaloz, provided LM and BM with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vii)    On June 12, 2018, two Insureds – LM and BM – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, over two weeks later, LM and BM presented – incredibly – on the exact same date, July 2, 2018, to Garden State Neuro for initial examinations by Datta. LM and BM were different genders, had different heights and weights, were in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LM and BM suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Datta or a medical provider acting on behalf of Datta, provided LM and BM with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(viii)   On October 24, 2018, two Insureds – JM and DR – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, about five days later, JM and DR presented – incredibly – on the exact same date, October 29, 2018, to Garden State Neuro for initial examinations by Datta. JM and DR were different genders, had different heights and weights, were in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JM and DR suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Datta or a medical provider acting on behalf of Datta, provided JM and DR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ix)    On February 2, 2019, two Insureds – AS and HS – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, two later, AS and HS presented – incredibly – on the exact same date, February 4, 2019, to Garden State Neuro for initial examinations by Datta. AS and HS were different genders, had different heights and weights, were in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AS and HS suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Datta provided AS and HS with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(x)     On February 2, 2019, two Insureds – AS and HS – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, over three weeks later, AS and HS presented – incredibly – on the exact same date, February 27, 2019, to Dassa Ortho for initial examinations by Dassa. AS and HS were different genders, had different heights and weights, were in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AS and HS suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Dassa provided AS and HS with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xi)    On March 10, 2021, two Insureds – AC and CC – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, about a week later, AC and CC presented – incredibly – on the exact same date, March 19, 2021, to Dassa Ortho for initial examinations. AC and CC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AC and CC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Sovanna Mey, PA – at Dassa's direction – provided AC and CC with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xii)   On July 2, 2021, two Insureds – BM and AW – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, nearly one week later, BM and AW presented – incredibly – on the exact same date, July 9, 2021, to Adjust for Life for initial examinations by Kaloz. BM and AW were different genders, had different heights and weights, were in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BM and AW suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Kaloz provided BM and AW with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiii)  On July 2, 2021, two Insureds – BM and AW – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, nearly two weeks later, BM and AW presented – incredibly – on the exact same date, July 14, 2021, to Dassa Ortho for initial examinations by Dassa. BM and AW were different genders, had different heights and weights, were in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BM and AW

suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Dassa provided BM and AW with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiv)    On July 21, 2021, two Insureds – LD and DM – were involved in the same minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. Nonetheless, over one week later, LD and DM presented – incredibly – on the exact same date, August 2, 2021, to Adjust for Life for initial examinations. LD and DM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LD and DM suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Kaloz or a medical provider acting on behalf of Kaloz, provided LD and DM with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

159.    These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" – "3", Dassa Ortho, Dassa, Garden State Neuro, Datta, Adjust for Life, and Kaloz routinely provided substantially identical, phony back and neck injury "diagnoses" to two or more Insureds involved in a single accident, often long after the accidents occurred, despite the fact that the Insureds were differently situated.

## 2.    Dassa Ortho and Garden State Neuro's Fraudulent Charges for Follow-Up Examinations

160.    In addition to their fraudulent initial examinations, Dassa Ortho, Dassa, Garden State Neuro, and Datta typically purported to subject the Insureds in the claims identified in Exhibits "2" and "3" to at least one, but often multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

161.    As set forth in Exhibits "2" and "3", Dassa Ortho, Dassa, Garden State Neuro, and Datta typically billed the putative follow-up examinations to GEICO under CPT code 99213, resulting in charges of between $50 to $160 for each such follow-up examination that they

purported to provide.

162.     All of Dassa Ortho, Dassa, Garden State Neuro, and Datta's billing for their purported follow-up examinations was fraudulent because it misrepresented Dassa Ortho, Dassa, Garden State Neuro, and Datta's eligibility to collect PIP Benefits in the first instance.

163.     In fact, Dassa Ortho and Garden State Neuro were never eligible to collect PIP Benefits in the claims for follow examinations that are identified in Exhibits "2" and "3", because of the fraudulent and unlawful conduct described herein.

164.     Like their charges for their purported initial examinations, Dassa Ortho, Dassa, Garden State Neuro, and Datta's charges for the follow-up examinations identified in Exhibits "2" and "3" also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

165.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

166.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

167.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

168.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

169.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "2" – "3" suffered any injuries at all in their minor automobile accidents, the injuries were minor soft tissue injuries such as sprains and strains.

170.    By the time the Insureds in the claims identified in Exhibits "2" and "3" presented to Dassa Ortho, Dassa, Garden State Neuro, and Datta for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

171.    Even so, in the claims for follow-up examinations identified in Exhibits "2" and "3", Dassa Ortho, Dassa, Garden State Neuro, and Datta routinely billed for their putative follow-up examinations under CPT code 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity at the time of the purported examinations.

172.    For example:

(i)     On January 15, 2016, an Insured named SD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, the day after the accident SD traveled on his own to Vassar Brothers Medical Center. The contemporaneous hospital records indicated that SD was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor soft tissue sprain diagnosis. To the extent that SD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of SD on November 7, 2016 – nearly ten months after the accident – Dassa Ortho and Dassa billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that SD presented with problems of low to moderate severity at the follow-up examination.

(ii)    On February 18, 2016, an Insured named EG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EG's vehicle was drivable following the accident. The police report further indicated that EG was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that EG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of EG on January 26, 2017 – nearly one year after the accident – Garden State Neuro and Datta billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that EG presented with problems of low to moderate severity at the follow-up examination.

(iii)   On March 4, 2016, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day JP traveled on his own to St. Lukes Cornwall Hospital. The contemporaneous hospital records indicated that JP was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor back pain diagnosis. To the extent that JP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of JP on November 29, 2016 – nearly nine months after the accident – Dassa Ortho and Dassa billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that

JP presented with problems of low to moderate severity at the follow-up examination.

(iv)     On June 9, 2016, an Insured named ST was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ST's vehicle was drivable following the accident. The police report further indicated that ST was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that ST experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of ST on March 15, 2017 – over nine months after the accident – Garden State Neuro and Datta billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ST presented with problems of low to moderate severity at the follow-up examination.

(v)      On June 9, 2016, an Insured named ST was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ST's vehicle was drivable following the accident. The police report further indicated that ST was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. To the extent that ST experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of ST on May 16, 2017 – nearly one year after the accident – Dassa Ortho and Dassa billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ST presented with problems of low to moderate severity at the follow-up examination.

(vi)     On July 30, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, the day following the accident KS traveled on his own to St. Lukes Cornwall Hospital where he was treated and discharged on an outpatient basis with a minor back and neck pain diagnosis. To the extent that KS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of KS on February 14, 2017 – nearly six months after the accident – Dassa Ortho and Dassa billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that KS presented with problems of low to moderate severity at the follow-up examination.

(vii)   On July 30, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, the day following the accident KS traveled on his own to St. Lukes Cornwall Hospital where he was treated and discharged on an outpatient basis with a minor back and neck pain diagnosis. To the extent that KS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of KS on August 16, 2017 – over a year after the accident – Garden State Neuro and Datta billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that KS presented with problems of low to moderate severity at the follow-up examination.

(viii)   On October 11, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day after the accident EL traveled on her own to Orange Region Medical Center. The contemporaneous hospital records indicated that EL was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor acute strain of her neck muscle and lumbar strain diagnosis. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of EL on September 24, 2018 – over eleven months after the accident – Garden State Neuro and Datta billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that EL presented with problems of low to moderate severity at the follow-up examination.

(ix)   On October 11, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, later that day after the accident EL traveled on her own to Orange Region Medical Center. The contemporaneous hospital records indicated that EL was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor acute strain of her neck muscle and lumbar strain diagnosis. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so,

following a purported follow-up examination of EL on May 29, 2019 – over nineteen months after the accident – Dassa Ortho and Dassa billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that EL presented with problems of low to moderate severity at the follow-up examination.

(x)    On January 2, 2018, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured, did not complain of any pain, and did not seek medical assistance immediately following the accident. Even so, two weeks after the accident JV traveled on his own to Orange Region Medical Center. The hospital records indicated that JV was briefly observed on an outpatient basis and then discharged that same day with nothing more serious than a minor lower back strain diagnosis. To the extent that JV experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of JV on September 24, 2018 – over eight months after the accident – Garden State Neuro and Datta billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JV presented with problems of low to moderate severity at the follow-up examination.

173.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "2" and "3", Dassa Ortho, Dassa, Garden State Neuro, and Datta routinely falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

174.    In the claims for follow-up examinations identified in Exhibits "2" and "3", Dassa Ortho, Dassa, Garden State Neuro, and Datta routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for their charges for the examinations under CPT code 99213, because follow-up examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

175.     In the claims for follow-up examinations identified in Exhibits "2" and "3", Dassa Ortho, Dassa, Garden State Neuro, and Datta routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide.

**b.     Misrepresentations Regarding the Results of the Follow-Up Examinations**

176.     Pursuant to the CPT Assistant, when Dassa Ortho, Dassa, Garden State Neuro, and Datta billed for their putative follow up examinations under CPT code 99213, they represented that the physicians or other healthcare providers who performed the examinations – virtually always Dassa on behalf of Dassa Ortho and Datta on behalf of Garden State Neuro – performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

177.     In actuality, however, the physicians or other healthcare providers who performed the examinations did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

178.     Rather, following their purported follow-up examinations, Dassa, Datta, or another healthcare provider working at their direction, simply reiterated the phony soft tissue injury "diagnoses" from the Insureds' initial examinations or previous follow-up examinations, recommended continued chiropractic and/or physical therapy treatment, interventional pain management services, and additional follow-up examinations, or discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

179.     In the claims for initial examinations identified in Exhibits "2" and "3", the Defendants routinely fraudulently misrepresented that the follow-up examinations were lawfully

provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

 (i) the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

 (ii) the charges for the putative follow-up examinations misrepresented the nature and extent of the examinations; and

 (iii) the Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in pervasive violation of New York law.

**3. Adjust for Life, Dassa Ortho, and Datta Endoscopic's Fraudulent Charges for "Pain Fiber" Testing and Electrodiagnostic Testing**

180. As set forth in Exhibit "1", based upon the fraudulent, pre-determined findings and diagnoses provided during the Defendants' examinations, Adjust for Life and Kaloz purported to subject many Insureds to a series of medically unnecessary "pain fiber" tests.

181. Likewise, and as set forth in Exhibits "3" and "4", based upon the fraudulent, pre-determined findings and diagnoses provided during the Defendants' examinations, Garden State Neuro, Datta Endoscopic, and Datta purported to subject many Insureds to a series of medically unnecessary EDX tests, specifically nerve conduction velocity ("NCV") tests and electromyography ("EMG") tests.

182. Kaloz and Adjust for Life purported to perform virtually all of the "pain fiber" tests at the offices of Dassa Ortho pursuant to the Defendants' unlawful referral scheme, and then billed the tests through Adjust for Life to GEICO either as multiple charges under CPT Code 95904, or as a single charge under CPT code 95913, typically resulting in charges of more than $1,000.00 per Insured.

183.    The use of CPT codes 95904 and 95913 is reserved for genuine NCV tests, and these codes cannot be used to bill for "pain fiber" tests. By billing their medically useless "pain fiber" tests under CPT codes 95904 and 95913, Koloz and Adjust for Life falsely represented that Adjust for Life had provided NCV tests to the Insureds, when in fact Adjust for Life provided medically useless "pain fiber" tests.

184.    Garden State Neuro, Datta Endoscopic, and Datta purported to perform virtually all of the NCV and EMG tests at the offices of Dassa Ortho, and then billed the tests to GEICO under CPT codes 95861, 95886, 95903, and 95913, typically resulting in charges between $1,450.00 and $2,234.00 for each Insured on whom the NCV and EMG tests purportedly were performed.

185.    In the claims for EDX tests and "pain fiber" identified in Exhibits "1", "3", and "4", the charges for the EDX and "pain fiber" tests were fraudulent in that they were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the fraudulent treatment protocol instituted by the Defendants, not to benefit the Insureds who were purportedly subjected to them.

186.    Furthermore, in the claims for "pain fiber" tests identified in Exhibit "1", the charges for the "pain fiber" tests were fraudulent in that the charges misrepresented the nature of the service that supposedly was provided.

187.    Moreover, in the claims for EDX and "pain fiber" tests identified in Exhibits "1", "3", and "4", the charges for the EDX and "pain fiber" tests were fraudulent in that they misrepresented Garden State Neuro, Datta Endoscopic, Adjust for Life, Datta, and Kaloz's eligibility to collect PIP Benefits in the first instance.

188.    In fact, Garden State Neuro, Datta Endoscopic, Adjust for Life, Datta, and Kaloz never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1",

"3", and "4", because – as a result of the fraudulent and unlawful conduct described herein – Garden State Neuro, Datta Endoscopic, and Adjust for Life, were not in compliance with all relevant licensing laws.

**a.     The Human Nervous System and Electrodiagnostic Testing**

189.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

190.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

191.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

192.    Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

193.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

194.     EMGs, NCVs, and "pain fiber" tests are forms of EDX tests, and purportedly were provided by Adjust for Life, Kaloz, Datta Endoscopic, Garden State Neuro, and Datta because they were medically necessary to determine whether the Insureds had radiculopathies.

195.     The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

196.     The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**b.       The Fraudulent "Pain Fiber" Tests**

197.     There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities in the peripheral nerves (i.e., neuropathies), which include radiculopathies. These diagnostic tests are NCV tests, EMG tests, and magnetic resonance imaging ("MRI") studies.

198.     Except in very limited circumstances, for diagnostic purposes NCV tests and EMG tests are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

199.    If NCV tests and EMG tests are necessary to diagnose nerve damage, they should be performed no fewer than 14-21 days following an automobile accident because it typically takes at least that long for nerve damage to appear following a trauma.

200.    MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following automobile accidents to diagnose abnormalities in the nerve roots through images of the nerves, nerve roots and surrounding areas.

201.    A "pain fiber" test supposedly is a non-invasive sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

202.    The Recommended Policy does not identify "pain fiber" tests as having any documented usefulness in diagnosing radiculopathies. In fact, "pain fiber" tests are not recognized as having any value in the diagnosis of any medical condition.

203.    A "pain fiber" tests is performed by administering electricity through specific skin sites to stimulate skin on the arms, legs, hands, feet and/or face. The voltage stimulus is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. "Findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

204.    In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in "pain fiber" testing.

205.    If the patient's sensation threshold is greater than the purported normal range of stimulation required to evoke a sensation, it supposedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the amplitude required

for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it purportedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

206.    Though Adjust for Life and Kaloz purported to subject many Insureds to "pain fiber" tests, supposedly to diagnose radiculopathies and neuropathies, the "pain fiber" tests were medically useless, not only because the "pain fiber" tests themselves have no legitimate diagnostic utility, but also because many of the Insureds who were purportedly subjected to the "pain fiber" tests by Adjust for Life and Kaloz also received, at or about the same time, MRIs.

207.    Even if the "pain fiber" tests purportedly provided by Adjust for Life and Kaloz had any legitimate value in the diagnosis of neuropathies (and they did not), they were duplicative of the MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the "pain fiber" tests that Adjust for Life and Kaloz purported to provide.

208.    Indeed, in many cases, Adjust for Life and Kaloz themselves had referred the Insureds for MRIs, or the Insureds had otherwise already received the MRIs, before Adjust for Life and Kaloz purported to provide the "pain fiber" tests.

209.    Thus, even assuming that there was some diagnostic value for "pain fiber" tests (and there was not), the "pain fiber" tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through the MRIs.

210.    For example:

(i)     Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named MS on December 14, 2015, despite the fact that MS was previously referred for an MRI, which MS received on November 18, 2015.

(ii)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named EC on November 5, 2018 and November 15, 2018, despite the fact that

Adjust for Life and Kaloz previously referred EC for an MRI, which EC received on November 1, 2018.

(iii)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named CR on February 5, 2019, despite the fact that CR was previously referred for an MRI, which CR received on December 18, 2018.

(iv)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named BJ on June 17, 2019, despite the fact that BJ was previously referred for an MRI, which BJ received on June 12, 2019.

(v)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named LR on July 2, 2019, despite the fact that LR was previously referred for two MRIs, which LR received on May 15, 2019, and June 20, 2019.

(vi)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named BL on September 12, 2019, and September 16, 2019, despite the fact that BL was previously referred for an MRI, which BL received on September 11, 2019.

(vii)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named MB on October 7, 2019, despite the fact that MB was previously referred for two MRIs, which MB received on September 9, 2019, and September 25, 2019.

(viii)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named AJ on November 4, 2019, despite the fact that AJ was previously referred for an MRI, which AJ received on October 25, 2019.

(ix)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named AF on January 14, 2020, despite the fact that AF was previously referred for an MRI, which CR received on January 2, 2020.

(x)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named NG on July 21, 2020, and July 28, 2020, despite the fact that NG was previously referred for three MRIs, which NG received on April 23, 2020, May 28, 2020, and June 24, 2020.

(xi)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named TP on September 3, 2020, despite the fact that TP was previously referred for two MRIs, which TP received on June 25, 2020, and July 20, 2020.

(xii)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named TB on March 18, 2021, despite the fact that TB was previously referred for an MRI, which TB received on January 29, 2021.

(xiii)    Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named RG on December 7, 2021, despite the fact that RG was previously referred

for an MRI, which RG received on December 6, 2021.

(xiv)   Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named AP on February 22, 2022, despite the fact that AP was previously referred for an MRI, which AP received on January 18, 2022.

(xv)   Adjust for Life and Kaloz purported to administer "pain fiber" testing to an Insured named CK on April 19, 2022, despite the fact that CK was previously referred for an MRI, which CK received on April 1, 2022.

211.   These are only representative examples. In the claims for "pain fiber" tests identified in Exhibit "1", Adjust for Life and Kaloz routinely purported to administer the "pain fiber" testing despite the fact that Adjust for Life and Kaloz had previously referred the Insureds for MRIs or the Insureds had already received MRIs prior to receiving the "pain fiber" testing.

212.   The "pain fiber" tests were part and parcel of Adjust for Life and Kaloz's fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich Adjust for Life and Kaloz.

213.   In any case, there are no legitimate data to support the use of "pain fiber" tests to diagnose radiculopathies or other neuropathies.

214.   There is no reliable evidence of the existence of normal ranges of intensity or amplitude required to evoke a sensation using a "pain fiber" test device. Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal "pain fiber" test results are or are not abnormal.

215.   Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a "pain fiber" test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicated a hypoesthetic condition or that sensation threshold less than the normal range would indicated a hyperesthetic condition.

216.    Even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from "pain fiber" tests. Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage that can cause hyperesthesia and hypoesthesia.

217.    Furthermore, even if "pain fiber" tests could produce any valid diagnostic information regarding the sensory nerve fibers: (i) there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient; (ii) there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots; (iii) there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways; (iv) "pain fiber" tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and (v) there would be no legitimate diagnostic advantage to using "pain fiber" tests to obtain information regarding the sensory nerve fibers where, as here, the "pain fiber" tests were duplicative of contemporaneously-provided MRIs as well as NCV tests and EMG tests as discussed more fully below.

218.    In keeping with the fact that Adjust for Life and Kaloz's purported "pain fiber" tests were medically useless, the Centers for Medicare & Medicaid Services ("CMS") have determined that "pain fiber" tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and are therefore not compensable.

219.    In keeping with the fact that Adjust for Life and Kaloz's putative "pain fiber" tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for "pain fiber" tests.

220.    In keeping with the fact that Adjust for Life and Kaloz's purported "pain fiber" tests were medically useless, the putative "results" of the "pain fiber" tests were not incorporated into any Insured's treatment plan, and the "pain fiber" tests played no legitimate role in the treatment or care of the Insureds.

221.    For example:

(i)     Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named MS on December 14, 2015. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to MS after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into MS's treatment plan in any way.

(ii)    Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named AV on December 14, 2015. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to AV after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into AV's treatment plan in any way.

(iii)   Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named MP on January 26, 2018. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to MP after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into MP's treatment plan in any way.

(iv)    Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named EC on November 5, 2018. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to EC after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into EC's treatment plan

in any way.

(v)    Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named BJ on January 30, 2019. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to BJ after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into BJ's treatment plan in any way.

(vi)    Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named DY on February 25, 2019. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to DY after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into DY's treatment plan in any way.

(vii)    Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named JL on December 21, 2020. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to JL after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into JL's treatment plan in any way.

(viii)    Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named BM on July 22, 2021. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to BM after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into BM's treatment plan in any way.

(ix)    Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named AV on November 23, 2021. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to AV after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into AV's treatment plan in any way.

(x)    Adjust for Life and Kaloz purported to provide "pain fiber" testing to an Insured named PD on March 14, 2022. Thereafter, Adjust for Life and Kaloz purported to provide the same chiropractic and physical therapy treatments to PD after the "pain fiber" testing, in the same manner, as they had before the "pain fiber" testing, without incorporating the results of the "pain fiber" testing into PD's treatment plan in any way.

222.    These are only representative examples. In all of the claims for "pain fiber" testing

identified in Exhibit "1", the "pain fiber" testing: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich Adjust for Life and Kaloz.

223.    Until 2004, about the same time that CMS was considering the medical benefits of "pain fiber" testing before ultimately issuing its National Coverage Determination denying Medicare coverage of "pain fiber" tests as medically unnecessary, the two primary manufacturers of "pain fiber" testing devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

224.    Neurotron, Inc. manufactures a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purports to provide quantitative data on sensory nerve conduction threshold.

225.    In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II". Notably, Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

226.    To the extent that Adjust for Life and Kaloz actually provided any "pain fiber" tests to Insureds in the first instance, they were provided using an Axon-II or re-branded Medi-Dx 7000 device.

227.    Notwithstanding the Medi-Dx 7000's cosmetic re-branding as the Axon-II, Neurotron, Inc. claims that neither device produces valid data or results, and that both the Medi-

Dx 7000 and Axon-II have been fraudulently marketed. For its part, Neuro Diagnostic Associates, Inc. had asserted the same claims regarding Neurotron, Inc.'s Neurometer device.

228.    Among the charges made by Neurotron, Inc. against the Medi-Dx 7000 are that: (i) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber; (ii) the alternating output of electrical current used by the Medi-Dx 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi-Dx 7000; (iii) the Medi-Dx 7000 protocols are "incapable of measuring the thresholds in the sensory nerves"; and (iv) there are no peer-reviewed studies that validate the tests performed using the Medi-Dx 7000.  These charges are all correct.

229.    Because the Axon-II is virtually identical to the Medi-Dx 7000, any and all of Neurotron, Inc.'s criticisms of the Medi-Dx 7000 would also apply to the Axon-II/Medi-DX 7000 that was used by Adjust for Life and Kaloz.

**c.    The Fraudulent NCV Tests**

230.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

231.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

232.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

233.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

234.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

235.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Garden State Neuro, Datta Endoscopic, and Datta routinely purported to test far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, Garden State Neuro, Datta Endoscopic, and Datta routinely purported to perform and/or provide: (i) NCV tests of 4 or more motor nerves; (ii) NCV tests of 4 sensory nerves; (iii) multiple H-reflex studies and/or (iv) multiple F-wave studies.

236.    For example:

(i)     On December 17, 2018, Garden State Neuro and Datta purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, as well as two H-reflex studies, and 4 F-Wave studies to an Insured named DJ, supposedly to determine whether DJ suffered from a radiculopathy.

(ii)    On November 7, 2019, Datta Endoscopic and Datta purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, as well 4 F-Wave studies to an Insured named JV, supposedly to determine whether JV suffered from a radiculopathy.

(iii)   On November 5, 2020, Datta Endoscopic and Datta purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, as well as 4 F-Wave studies to an Insured named TC, supposedly to determine whether TC suffered from a radiculopathy.

(iv)    On December 3, 2020, Datta Endoscopic and Datta purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, 2 H-Reflex studies, as well as 4 F-Wave studies to an Insured named MG, supposedly to determine whether MG suffered from a radiculopathy.

(v)     On December 7, 2020, Garden State Neuro and Datta purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and 4 F-Wave studies to an Insured named LS, supposedly to determine whether LS suffered from a radiculopathy.

(vi)    On December 21, 2020, Garden State Neuro and Datta purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and 4 F-Wave studies to an Insured named AL, supposedly to determine whether AL suffered from a radiculopathy.

(vii)   On December 28, 2020, Garden State Neuro and Datta purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and 4 F-Wave studies to an Insured named WC, supposedly to determine whether WC suffered from a radiculopathy.

(viii)  On December 28, 2020, Garden State Neuro and Datta purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and 4 F-Wave studies to an Insured named NH, supposedly to determine whether NH suffered from a radiculopathy.

(ix)    On January 21, 2021, Datta Endoscopic and Datta purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, as well as 4 F-Wave studies to an Insured named SW, supposedly to determine whether SW suffered from a radiculopathy.

(x)     On June 3, 2021, Datta Endoscopic and Datta purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, as well as 4 F-Wave studies to an Insured named NG, supposedly to determine whether NG suffered from a radiculopathy.

237.    These are only representative examples. In the claims for NCV tests identified in

Exhibits "3" and "4", Garden State Neuro, Datta Endoscopic, and Datta routinely purported to perform and/or provide an excessive and medically unwarranted number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

238.    Garden State Neuro, Datta Endoscopic, and Datta purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies or other nerve damage.

239.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

240.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

241.    This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

242.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

243.    Garden State Neuro, Datta Endoscopic, and Datta did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

244.     Instead, Garden State Neuro, Datta Endoscopic, and Datta applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in the majority of the claims identified in Exhibits "3" and "4".

245.     Specifically, in the majority of the claims for NCV testing identified in Exhibits "3" and "4", Garden State Neuro, Datta Endoscopic, and Datta purported to test some combination of the following peripheral nerves and nerve fibers – and, in many instances, all of them – in each Insured to whom they purported to provide NCV tests:

(i)      left and right median motor nerves;

(ii)     left and right ulnar motor nerves;

(iii)    left and right peroneal motor nerves;

(iv)     left and right tibial motor nerves;

(v)      left and right median sensory nerves;

(vi)     left and right radial sensory nerves;

(vii)    left and right ulnar sensory nerves;

(viii)   left and right sup peron sensory nerves;

(ix)     left and right sural sensory nerves.

246.     The cookie-cutter approach to the NCVs that Garden State Neuro, Datta Endoscopic, and Datta purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that Garden State Neuro, Datta Endoscopic, and Datta could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**d.      The Fraudulent EMG Tests**

247.     EMGs involve insertion of a needle into various muscles in the spinal area

("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

248.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

249.    Garden State Neuro, Datta Endoscopic, and Datta did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentation.

250.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

251.    Even if there were any need for any of the EMG tests that Garden State Neuro, Datta Endoscopic, and Datta purported to provide, the nature and number of the EMGs that Garden State Neuro, Datta Endoscopic, and Datta purported to provide exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

252.    For example:

(i)     On April 21, 2016, Datta Endoscopic and Datta purported to provide a two-limb EMG to an Insured named CO, and on May 5, 2016, Datta Endoscopic and Datta purported to provide another two-limb EMG to CO, supposedly to determine whether CO suffered from a radiculopathy.

(ii)    On October 3, 2016, Garden State Neuro and Datta purported to provide a two-limb EMG to an Insured named EA, and on November 14, 2016, Garden State Neuro and Datta purported to provide another two-limb EMG to EA, supposedly to determine whether EA suffered from a radiculopathy.

(iii)   On August 13, 2018, Garden State Neuro and Datta purported to provide a two-limb EMG to an Insured named RA, and on January 14, 2019, Garden State Neuro and Datta purported to provide another two-limb EMG to RA, supposedly to determine whether RA suffered from a radiculopathy.

(iv)    On May 18, 2020, Garden State Neuro and Datta purported to provide a two-limb EMG to an Insured named TL, and on June 1, 2020, Garden State Neuro and Datta purported to provide another two-limb EMG to TL, supposedly to determine whether TL suffered from a radiculopathy.

(v)     On June 1, 2020, Garden State Neuro and Datta purported to provide a two-limb EMG to an Insured named RA, and on July 27, 2020, Garden State Neuro and Datta purported to provide another two-limb EMG to RA, supposedly to determine whether RA suffered from a radiculopathy.

(vi)    On July 27, 2020, Garden State Neuro and Datta purported to provide a two-limb EMG to an Insured named KM, and on August 24, 2020, Garden State Neuro and Datta purported to provide another two-limb EMG to KM, supposedly to determine whether KM suffered from a radiculopathy.

(vii)   On November 5, 2020, Datta Endoscopic and Datta purported to provide a two-limb EMG to an Insured named TC, and on December 3, 2020, Datta Endoscopic and Datta purported to provide another two-limb EMG to TC, supposedly to determine whether TC suffered from a radiculopathy.

(viii)  On January 21, 2021, Datta Endoscopic and Datta purported to provide a two-limb EMG to an Insured named SW, and on April 1, 2021, Datta Endoscopic and Datta purported to provide another two-limb EMG to SW, supposedly to determine whether SW suffered from a radiculopathy.

(ix)    On June 3, 2021, Datta Endoscopic and Datta purported to provide a two-limb EMG to an Insured named NG, and on June 17, 2021, Datta Endoscopic and Datta purported to provide another two-limb EMG to NG, supposedly to determine whether NG suffered from a radiculopathy.

(x)     On June 3, 2021, Datta Endoscopic and Datta purported to provide a two-limb EMG

to an Insured named JL, and on June 17, 2021, Datta Endoscopic and Datta purported to provide another two-limb EMG to JL, supposedly to determine whether JL suffered from a radiculopathy.

253.     In the EMG claims identified in Exhibits "2", Garden State Neuro, Datta Endoscopic, and Datta routinely purported to provide EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured.

**e.     The Concealment of Excessive and Unnecessary EDX Testing**

254.     Not only did Garden State Neuro, Datta Endoscopic, and Datta routinely bill for an excessive and medically unnecessary number of EDX tests, but Garden State Neuro, Datta Endoscopic, and Datta also routinely acted to conceal the excessive number of EDX tests that they purported to provide.

255.     EDX tests, and particularly EMG tests, are uncomfortable for most patients, and even painful. As a result, there generally is no legitimate reason why a patient should be subjected to multiple rounds of EDX tests within a short period of time.

256.     Rather, to the extent that a patient requires EDX tests in the first instance, the EDX tests generally should be performed, collectively, on a single date.

257.     However, to conceal the excessive number of EDX tests they purported to provide to Insureds, on various occasions Garden State Neuro, Datta Endoscopic, and Datta routinely and unnecessarily purported to provide EDX tests to Insureds to two separate dates of service, and then split the EDX test charges onto two separate bills.

258.     For example:

(i)     Datta Endoscopic and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named CO over the course of two separate dates of service – April 21, 2016 and May 5, 2016 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ii)     Garden State Neuro and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named CA over the course of two separate dates of service – April 25, 2016 and May 9, 2016 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iii)    Garden State Neuro and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named EA over the course of two separate dates of service – October 3, 2016 and November 14, 2016 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iv)    Garden State Neuro and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named RA over the course of two separate dates of service – August 13, 2018 and January 14, 2019 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(v)     Garden State Neuro and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named TL over the course of two separate dates of service – May 18, 2020 and June 1, 2020 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(vi)    Garden State Neuro and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named CA over the course of two separate dates of service – June 1, 2020 and July 27, 2020 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(vii)   Datta Endoscopic and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named TC over the course of two separate dates of service – November 5, 2020 and December 3, 2020 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(viii)  Datta Endoscopic and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named SW over the course of two separate dates of service – January 21, 2021 and April 1, 2021 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ix)    Datta Endoscopic and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named NG over the course of two separate dates of service – June 3, 2021 and June 17, 2021 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the

excessive, medically unnecessary testing.

(x)     Datta Endoscopic and Datta purported to provide an excessive and medically unnecessary NCV and EMG test to an Insured named JL over the course of two separate dates of service – June 3, 2021 and June 17, 2021 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

259.    These are only representative examples. In the claims for EDX tests identified in Exhibits "3" and "4", Garden State Neuro, Datta Endoscopic, and Datta routinely and unnecessarily purported to subject the Insureds to EDX tests on separate dates of service, and split the EDX test charges onto separate bills, to conceal the fact that they were purporting to provide an excessive and unnecessary number of EDX tests to the Insureds.

**f.      The Fraudulent Radiculopathy Diagnoses**

260.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in <u>Muscle & Nerve</u>, the official journal of the AANEM.

261.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom Advanced Spine, Rosania, and Dhillon purported to treat.

262.    As a result, the frequency of radiculopathy in <u>all</u> motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is significantly lower than 19 percent.

263.    As set forth above, the substantial majority of the Insureds whom Garden State Neuro, Datta Endoscopic, and Datta purportedly treated did not suffer any serious medical

problems as the result of any automobile accident, much less any radiculopathies.

264.     Even so, in the EMG and NCV claims identified in Exhibits "3" – "4", Garden State Neuro, Datta Endoscopic, and Datta purported to identify radiculopathies in the substantial majority of the Insureds to whom they purported to provide EMG and NCV testing.

265.     Garden State Neuro, Datta Endoscopic, and Datta purported to arrive at their phony, pre-determined radiculopathy "diagnoses" in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide.

### 4.     Dassa Ortho and Adjust for Life's Fraudulent Charges for Chiropractic and Physical Therapy Services

266.     Based on the phony, pre-determined "results" of their examinations, Dassa Ortho, Dassa, Adjust for Life, and Kaloz virtually always purported to subject each of the Insureds in the claims identified in Exhibits "1" and "2" to months of medically unnecessary physical therapy and/or chiropractic services.

267.     As set forth in Exhibits "1" and "2", Dassa Ortho, Dassa, Adjust for Life, and Kaloz typically billed their putative chiropractic/physical therapy services to GEICO under CPT codes 97010, 97014, 97110, 97124, 97140, and 98941.

268.     In the claims for chiropractic/physical therapy services identified in Exhibits "1" and "2", the charges for the services were fraudulent in that they misrepresented Dassa Ortho and Adjust for Life's eligibility to collect PIP Benefits in the first instance.

269.     In fact, Dassa Ortho and Adjust for Life were never eligible to collect PIP Benefits in the claims for chiropractic/physical therapy services that are identified in Exhibits "1" and "2", because – as a result of the fraudulent scheme described herein – neither Dassa Ortho and Adjust for Life was in compliance with all relevant licensing laws in New York.

270.    In the claims for chiropractic/physical therapy services identified in Exhibits "1" and "2", the charges for the services were fraudulent in that they falsely represented that the services were medically necessary.

271.    In a legitimate clinical setting, the individual chiropractic/physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

272.    In keeping with the fact that the purported physical therapy services that were billed through Dassa Ortho and Adjust for Life to GEICO were not medically necessary, Dassa ortho, Dassa, Adjust for Life, and Kaloz did not tailor the chiropractic and physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

273.    For instance, there are a large number of individual types of physical therapy and chiropractic services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

274.    However, Dassa Ortho, Dassa, Adjust for Life, and Kaloz routinely purported to provide the same handful of chiropractic and physical therapy "treatments" to virtually every Insured in the claims identified in Exhibits "1" and "2", on substantially the same schedule, without regard for the Insureds' individual circumstances.

275.    Specifically, Adjust for Life and Kaloz purported to provide virtually every Insured in the claims identified in Exhibit "1" with four to six weeks of chiropractic and physical therapy services, at a frequency of 3 times per week. This, despite the fact that the Insureds were differently situated, and could not possibly all have required a substantially-identical course of physical therapy treatment.

276.     Similarly, Dassa Ortho and Dassa purported to provide virtually every Insured in the claims identified in Exhibit "1" with physical therapy services, consisting of hot/cold pack application, mechanical traction, paraffin bath, ultrasound, therapeutic exercises, manual therapy, therapeutic activities, and electric stimulation. This, despite the fact that the Insureds were differently situated, and could not possibly all have required a substantially-identical course of physical therapy treatment.

### 5.     Datta Endoscopic's Fraudulent Charges for Pain Management Injections

277.     In order to maximize the fraudulent no-fault billing Datta and Datta Endoscopic could submit to GEICO, Datta would routinely engage in a pattern of illegal self-referrals to and among his entities Garden State Neuro, Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia.

278.     As set forth above, the New York Public Health Law provides – in substance – that "physicians" may not refer a patient to "healthcare practices" in which the practitioner has an "ownership or investment interest". See New York Public Health Law § 238-d.

279.     However – and again, as set forth above – the New York Public Health Law's restrictions on patient self-referrals do not apply when:

(i)      the ownership or investment interest is disclosed to the patient; and

(ii)     the disclosure informs the patient of his or her "right to utilize a specifically identified alternative healthcare provider if any such alternative is reasonably available".

See id.

280.     In the context of the New York Public Health Law, Datta was a licensed "physician". See New York Public Health Law 238.

281.    In the context of the New York Public Health Law, Garden State Neuro, Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia were "healthcare practices." Id.

282.    Finally, in the context of the New York Public Health Law, Datta – who owned Garden State Neuro, Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia – had an "ownership or investment interest" in all four of Garden State Neuro, Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia. Id.

283.    Notwithstanding his respective ownership or investment interests in Garden State Neuro, Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta routinely self-referred – or directed his employees to self-refer – Insureds from Garden State Neuro to Datta Endoscopic for medically unnecessary pain management injections which in many cases were performed at Datta's ambulatory surgery center, Saddle Brook ASC, with anesthesia services provided by Datta's anesthesia practice, Saddle Brook Anesthesia.

284.    These self-referrals violated the New York Public Health Law, inasmuch as none of the applicable disclosure requirements were made to the Insureds who were subject to these self-referrals.

285.    Datta did not disclose his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia when referring the Insureds to receive pain management injections.

286.    Nor did Datta inform the Insureds of their "right to utilize a specifically identified alternative healthcare provider…", despite the fact that such alternative healthcare providers most certainly were available, and in fact would have been far more convenient for the Insureds. See New York Public Health Law 238-D.

287. For example, the overwhelming majority of the Insureds referred to Datta Endoscopic in the claims identified in Exhibit "4" resided and worked in New York, a substantial distance away from New Jersey, where Datta, Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia purported to perform or provide the injections.

288. There was no legitimate reason why Insureds who resided in New York would require pain management referrals for injections to be performed in New Jersey, which was inconveniently located far from the Insureds' homes and workplaces.

289. In fact, there were numerous pain management practices and ambulatory surgery centers located in New York, which were much closer to the Insureds' homes, and which were far more established and reputable than Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia.

290. Moreover, and as set forth herein, the Insureds in the claims identified in Exhibit "4" generally did not legitimately require any pain management injections from Datta Endoscopic.

291. As set forth in Exhibit "4", pursuant to the fraudulent, boilerplate pain "diagnoses" that the Defendants provided during their purported examinations, and the bogus radiculopathy "diagnoses" that Datta and Garden State Neuro supplied at the conclusion of their putative EDX testing, Datta Endoscopic and Datta subjected many Insureds to a series of medically unnecessary pain management injections.

292. Then, Datta Endoscopic and Datta billed the pain management injections to GEICO under CPT codes 62310, 62311, 62321, 64483, 64484, 64493, 64494, and 64495, among others, typically resulting in thousands of dollars in charges for each Insured who received the injections.

293. In the claims for pain management injections identified in Exhibit "4", the charges for the pain management injections were fraudulent in that they misrepresented Datta

Endoscopic's compliance with applicable law and eligibility to collect PIP Benefits in the first instance.

294.     The charges for the pain management injections also were fraudulent in that the injections were medically unnecessary.

295.     In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including pain management medication.

296.     In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

297.     This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

298.     However, and as set forth in Exhibit "4", in order to maximize the fraudulent no-fault insurance billing that they could submit to GEICO, Datta Endoscopic and Datta often purported to administer multiple pain management injections to Insureds within a span of weeks, despite the fact that such an injection regimen placed the Insureds at considerable risk.

299.     For example:

(i)      On November 26, 2018, Datta caused an Insured named TL to be referred from Garden State Neuro to Datta Endoscopic for pain management injection. Datta

Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to TL on June 25, 2020 and September 15, 2020, for a total of at least four pain management injections within less than two months. The September 15, 2020 pain management injections were provided at Saddle Brook ASC, Datta's ambulatory surgery center, with anesthesia services for the September 15, 2020 injections provided by Saddle Brook Anesthesia, Datta's anesthesia practice. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

(ii)     On May 23, 2019, Datta caused an Insured named EH to be referred from Garden State Neuro to Datta Endoscopic for pain management injections. Datta Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to EH on June 6, 2019, September 13, 2019, October 22, 2019, November 12, 2019, and December 10, 2019, for a total of at least 7 pain management injections within approximately 6 months. The pain management injections were provided at Saddle Brook ASC, Datta's ambulatory surgery center, with anesthesia services for the September 13, 2019, and November 12, 2019 injections provided by Saddle Brook Anesthesia, Datta's anesthesia practice. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

(iii)    On June 20, 2019, Datta caused an Insured named MH to be referred from Garden State Neuro to Datta Endoscopic for pain management injections. Datta Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to an Insured named MH on July 10, 2019, August 13, 2019, August 20, 2019, October 8, 2019, October 22, 2019, and January 7, 2020, for a total of at least 9 pain management injections within less than six months. The pain management injections were provided at Saddle Brook ASC, Datta's ambulatory surgery center, with anesthesia services for the July 10, 2019, October 8, 2019, and January 7, 2020 injections provided by Saddle Brook Anesthesia, Datta's anesthesia practice. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never

disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

(iv)    On July 10, 2019, Datta caused an Insured named DE to be referred from Garden State Neuro to Datta Endoscopic for pain management injections. Datta Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to DE on July 26, 2019, August 8, 2019, and August 20, 2019, for a total of at least six pain management injections within less than one month. The pain management injections were provided at Saddle Brook ASC, with anesthesia services provided by Saddle Brook Anesthesia, Datta's ambulatory surgery center and anesthesia practice respectively. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

(v)    On October 30, 2019, Datta caused an Insured named LM to be referred from Garden State Neuro to Datta Endoscopic for pain management injections. Datta Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to LM on November 8, 2019, December 26, 2019, and January 31, 2020, for a total of at least six pain management injections within less than three months. The pain management injections were provided at Saddle Brook ASC, Datta's ambulatory surgery center, with anesthesia services for the November 8, 2019 and January 31, 2020 injections provided by Saddle Brook Anesthesia, Datta's anesthesia practice. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

(vi)    On July 27, 2020, Datta caused an Insured named RA to be referred from Garden State Neuro to Datta Endoscopic for pain management injections. Datta Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to RA on September 15, 2020 and October 17, 2020, for a total of at least six pain management injections within less than two months. The pain management injections were provided at Saddle Brook ASC, with anesthesia services provided by Saddle Brook Anesthesia, Datta's ambulatory surgery center and anesthesia practice respectively. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and

Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

(vii)   On August 12, 2020, Datta caused an Insured named SB to be referred from Garden State Neuro to Datta Endoscopic for pain management injections. Datta Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to SB on September 15, 2020 and October 15, 2020, for a total of at least six pain management injections within less than two months. The pain management injections were provided at Saddle Brook ASC, with anesthesia services provided by Saddle Brook Anesthesia, Datta's ambulatory surgery center and anesthesia practice respectively. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

(viii)  On August 17, 2020, Datta caused an Insured named KU to be referred from Garden State Neuro to Datta Endoscopic for pain management injections. Datta Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to KU on October 17, 2020, January 29, 2021, March 31, 2021 for a total of at least twelve pain management injections within less than six months. The October 17, 2020 pain management injections were provided at Saddle Brook ASC, with anesthesia services provided by Saddle Brook Anesthesia, Datta's ambulatory surgery center and anesthesia practice respectively. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

(ix)   On January 11, 2021, Datta caused an Insured named WC to be referred from Garden State Neuro to Datta Endoscopic for pain management injections. Datta Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to WC on January 29, 2021, March 26, 2021, June 18, 2021, July 9, 2021, and July 20, 2021 for a total of at least seven pain management injections within less than six months. The June 18, 2021, July 9, 2021, and July 20, 2021 pain management injections were provided at Saddle Brook ASC, with anesthesia services provided by Saddle Brook Anesthesia, Datta's ambulatory surgery center

and anesthesia practice respectively. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

(x)  On March 1, 2021, Datta caused an Insured named AS to be referred from Garden State Neuro to Datta Endoscopic for pain management injections. Datta Endoscopic and Datta thereafter purported to administer multiple epidural steroid injections to AS on March 31, 2021, April 13, 2021, May 12, 2021, and June 15, 2021, for a total of at least four pain management injections within less than three months. The June 15, 2021 pain management injection was provided at Saddle Brook ASC, with anesthesia services provided by Saddle Brook Anesthesia, Datta's ambulatory surgery center and anesthesia practice respectively. In addition to being excessive and medically unnecessary, the resulting pain management injections were unlawful insofar as they were the product of a self-referral from Datta to Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, three entities which Datta owned. Despite his ownership interest in Datta Endoscopic, Saddle Brook ASC, and Saddle Brook Anesthesia, Datta never disclosed his ownership interest to the Insured, nor did Datta inform the Insured of their "right to utilize a specifically identified alternative healthcare provider…."

300.  These are only representative examples of the Defendants' fraudulent charges for pain management injections, which in the vast majority of cases were the result of illegal self-referrals from Datta to Datta Endoscopic for the pain management injections, as well as to Saddle Brook ASC and Saddle Brook Anesthesia for the anesthesia services and surgical facility fees attendant to the pain management injections. The pain management injections, as well as the anesthesia services and surgical facility fees attendant to them, were routinely the product of illegal self-referrals.

301.  Following a substantial majority of these self-referrals, GEICO received three separate bills: (i) a bill from Datta Endoscopic for the pain management injections, themselves; (ii) a separate bill from Saddle Brook Anesthesia for the anesthesia services; and (iii) a bill for a

facility fee from the ambulatory surgery center – often Saddle Brook ASC – where the injections and anesthesia were provided.

302.    Datta Endoscopic and Datta administered medically-unnecessary injections to many Insureds despite the fact that such injections – to the extent that they actually occurred – placed Insureds at a significant risk.

303.    Even when performed correctly, the injections that Datta Endoscopic and Datta purported to provide can cause significant adverse events including infection, nerve injury, hypotension, anesthetic toxicity, or even death.

304.    To the extent that Datta Endoscopic and Datta actually administered injections to Insureds with the frequency set forth in their billing, Datta Endoscopic and Datta increased these risks exponentially.

305.    Datta Endoscopic, Saddle Brook ASC, Saddle Brook Anesthesia, and Datta's pre-determined treatment protocol, including subjecting patients to multiple, identical injections over the course of a few weeks or months was designed and employed by Datta Endoscopic, Saddle Brook ASC, Saddle Brook Anesthesia, and Datta solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

## C.    The Unlawful Operation of Saddle Brook ASC Without a Legitimate Medical Director

306.    In order to provide the Fraudulent Services to GEICO New York Insureds in New Jersey, Saddle Brook ASC had to be licensed as an ambulatory care facility.

307.    Datta knew that – as an ambulatory care facility – Saddle Brook ASC was required to have a qualified physician medical director on staff, and also had to comply with the numerous other significant regulatory and licensing requirements applicable to ambulatory care facilities,

which are designed to protect the public health and welfare.

308.    Accordingly, Datta listed himself as the medical director of Saddle Brook ASC.

309.    However, as described herein, Datta spent much of his time in New York operating out of the various offices of Dassa Ortho, pursuant to the Defendants' unlawful referral scheme.

310.    Thus, Datta was not present at Saddle Brook ASC to provide the day to day supervision required of an ambulatory care facility medical director.

311.    Datta listed himself as Saddle Brook ASC's medical director because he was concerned that – if he appointed a legitimate physician to serve as a medical director at Saddle Brook ASC – any such physician would impede the fraudulent and unlawful conduct described herein.

312.    In keeping with the fact that Saddle Brook ASC lacked a legitimate medical director, Saddle Brook ASC operated in the fraudulent and unlawful manner described herein and in pervasive violation of the pertinent regulations. For example, during Datta's purported tenue as Saddle Brook ASC's medical director, the New Jersey Department of Health repeatedly cited Saddle Brook ASC for serious regulatory violations, which amounted to violations of multiple standards for licensure of ambulatory care facilities, including, but not limited to, the following:

(i)     Failure to implement policies and procedures for ensuring visual and auditory privacy of patients, as required by N.J.A.C. 8.43A-6.3(a)(14).

(ii)    Failure to develop and implement written policies and procedures to control the administration of toxic and dangerous drugs, including at least narcotics, sedatives, anticoagulants, antibiotics, oxytocic's, corticosteroid products, intravenous infusion solutions, and other drugs specified in the facility's policies and procedures, as required by N.J.A.C. 8.43A-9.3(b)(3).

(iii)   Failure to implement and adhere to policies and procedures regarding the disposal of drugs in single dose or single use containers which are open or which have broken seals, drugs in containers missing drug source or exact identification, and outdated, recalled, or visible deteriorated medications, as required by N.J.A.C. 8.43A-9.5(f).

(iv)     Failure to designate a time frame and persons responsible for completing a medical history, physical examination, and laboratory tests prior to surgery, as required by N.J.A.C. 8:43A-12.6.

(v)      Failure to maintain a complete medical record for each patient which contains documentation of all services provided, as required by N.J.A.C. 8:43A-13.1.

(vi)     Failure to ensure the development and implementation of an infection prevention and control program, as required by N.J.A.C. 8:43A-14.1(a).

(vii)    Failure to ensure that hard surface floors, walls, storage shelves, and all horizontal surfaces are disinfected and kept clean, as required by N.J.A.C. 8:43A-14.6(a).

(viii)   Failure to develop a written plan for emergency transportation of patients, as required by N.J.A.C. 8:43A-15.3.

313.    Saddle Brook ASC's failure to appoint a legitimate medical director who legitimately fulfilled the required duties for ambulatory care facility medical directors placed patients at considerable risk, because they were subjected to Fraudulent Services at Saddle Brook ASC without the oversight required by the pertinent regulations.

## III.  The Fraudulent Charges the Defendants Submitted or Caused to be Submitted to GEICO

314.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA–1500, NF-3 forms, and treatment reports through Adjust for Life, Dassa Ortho, Garden State Neuro, Datta Endoscopic, Saddle Brook Anesthesia, and Saddle Brook ASC to GEICO, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

315.    The HCFA–1500, NF-3 forms, and treatment reports were false and misleading in the following material respects:

(i)      The HCFA–1500 forms, NF-3 forms, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants and the

Fraudulent Services were not in compliance with all applicable licensing laws, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants purported to provide, and billed for, the medically unnecessary, unlawful, and in some cases illusory Fraudulent Services; (b) the Defendants paid and received unlawful compensation in exchange for patient referrals; (c) the Defendants engaged in an unlawful self-referral scheme; (d) the Defendants routinely violated New York law by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services; and (e) in the case of Saddle Brook ASC, because it lacked a legitimate medical director and otherwise operated in violation of the pertinent licensing standards.

(ii)     The HCFA–1500 forms, NF-3 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iii)    The HCFA–1500 forms, NF-3 forms, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.    <u>GEICO's Justifiable Reliance</u>

316.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

317.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

318.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants were engaged in an unlawful referral and self-referral scheme.

319.    What is more, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a

fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

320.     The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time–consuming arbitration against GEICO and other insurers if the charges were not promptly paid in full.

321.     GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially–valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $6,500,000.00.

322.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Adjust for Life, Datta Endoscopic, Garden State Neuro, Saddle Brook Anesthesia, Saddle Brook ASC, and Dassa Ortho (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

323.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

324.     There is an actual case in controversy between GEICO and Adjust for Life, Datta Endoscopic, Garden State Neuro, Saddle Brook Anesthesia, Saddle Brook ASC, and Dassa Ortho regarding more than $150,000.00 in unpaid billing for the Fraudulent Services.

325.     Adjust for Life, Datta Endoscopic, Garden State Neuro, Saddle Brook Anesthesia, Saddle Brook ASC, and Dassa Ortho have no right to receive payment for any pending bills submitted to GEICO because of the fraudulent and unlawful scheme described herein.

326.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Adjust for Life, Datta Endoscopic, Garden State Neuro, Saddle Brook Anesthesia, Saddle Brook ASC, and Dassa Ortho have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Kaloz**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

327.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

328.     Adjust for Life is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

329.     Kaloz has knowingly conducted and/or participated, directly or indirectly, in the conduct of Adjust for Life's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Adjust for Life was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Adjust for Life was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and

regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

330.   Adjust for Life's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kaloz has operated Adjust for Life, inasmuch as Adjust for Life is not engaged in a legitimate medical practice and acts of mail fraud therefore are essential in order for Adjust for Life to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Kaloz continues to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Adjust for Life to the present day.

331.   Adjust for Life is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Adjust for Life in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

332.   GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $500,000.00 pursuant to the fraudulent bills submitted through Adjust for Life.

333.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against Dassa Ortho, Dassa, and Kaloz
### (Violation of RICO, 18 U.S.C. § 1962(d))

334.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

335.    Adjust for Life is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

336.    Dassa Ortho, Dassa, and Kaloz were employed by and/or associated with the Adjust for Life enterprise.

337.    Dassa Ortho, Dassa, and Kaloz knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Adjust for Life's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Adjust for Life was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Adjust for Life was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

338.     Dassa Ortho, Dassa, and Kaloz knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

339.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $500,000.00 pursuant to the fraudulent bills submitted through Adjust for Life.

340.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Adjust for Life and Kaloz
### (Common Law Fraud)

341.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

342.     Adjust for Life and Kaloz intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

343.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1", the representation that the Defendants were in compliance with all relevant licensing laws, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent

treatment and billing protocol designed to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "1", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

344.     Adjust for Life and Kaloz intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Adjust for Life that were not compensable under the New York no-fault insurance laws.

345.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $500,000.00 pursuant to the fraudulent bills submitted by Adjust for Life and Kaloz through Adjust for Life.

346.     Adjust for Life and Kaloz's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

347.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Dassa Ortho and Dassa**
**(Aiding and Abetting Fraud)**

348.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

349.     Dassa Ortho and Dassa knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Adjust for Life and Kaloz.

350.     The acts of Dassa Ortho and Dassa in furtherance of the fraudulent scheme include knowingly referring Insureds to Adjust for Life for medically unnecessary Fraudulent Services in exchange for unlawful compensation from Adjust for Life and Kaloz.

351.     The conduct of Dassa Ortho and Dassa in furtherance of the fraudulent scheme was significant and material. The conduct of Dassa Ortho and Dassa was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Adjust for Life and Kaloz to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Adjust for Life.

352.     Dassa Ortho and Dassa aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Adjust for Life for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

353.     The conduct of Dassa Ortho and Dassa caused GEICO to pay more than $500,000.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Adjust for Life.

354.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

355.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against Adjust for Life and Kaloz**
**(Unjust Enrichment)**

356.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

357.     As set forth above, Adjust for Life and Kaloz have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

358.     When GEICO paid the bills and charges submitted or caused to be submitted through Adjust for Life by Adjust for Life and Kaloz for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Adjust for Life and Kaloz's improper, unlawful, and/or unjust acts.

359.     Adjust for Life and Kaloz have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Adjust for Life and Kaloz voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

360.     Adjust for Life and Kaloz's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

361.     By reason of the above, Adjust for Life and Kaloz have been unjustly enriched in an amount to be determined at trial, but in no event less than $500,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Dassa**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

362.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

363.     Dassa Ortho is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

364.    Dassa has knowingly conducted and/or participated, directly or indirectly, in the conduct of Dassa Ortho's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over eight years seeking payments that Dassa Ortho was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Dassa Ortho was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

365.    Dassa Ortho's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dassa has operated Dassa Ortho, inasmuch as Dassa Ortho is not engaged in a legitimate healthcare practice, and acts of mail fraud therefore are essential in order for Dassa Ortho to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Dassa continues to attempt collection on the fraudulent billing submitted through Dassa Ortho to the present day.

366.    Dassa Ortho is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These

inherently unlawful acts are taken by Dassa Ortho in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

367. GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $4,500,000.00 pursuant to the fraudulent bills submitted through Dassa Ortho.

368. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
**Against Garden State Neuro, Adjust for Life, Dassa, Datta, and Kaloz**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

369. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

370. Dassa Ortho is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

371. Garden State Neuro, Adjust for Life, Dassa, Datta, and Kaloz are employed by and/or associated with the Dassa Ortho enterprise.

372. Garden State Neuro, Adjust for Life, Dassa, Datta, and Kaloz knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Dassa Ortho's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over eight years seeking payments that Dassa Ortho was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for

services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Dassa Ortho was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

373.    Dassa Ortho's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dassa has operated Dassa Ortho, inasmuch as Dassa Ortho is not engaged in a legitimate healthcare practice, and acts of mail fraud therefore are essential in order for Dassa Ortho to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Dassa continues to attempt collection on the fraudulent billing submitted through Dassa Ortho to the present day.

374.    Dassa Ortho is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Dassa Ortho in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

375.    Dassa Ortho, Garden State Neuro, Adjust for Life, Datta, Kaloz, and Dassa knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

376.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $4,500,000.00 pursuant to the fraudulent bills submitted through Dassa Ortho.

377.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Dassa Ortho and Dassa**
**(Common Law Fraud)**

378.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

379.    Dassa Ortho and Dassa intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

380.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2", the representation that the Defendants were in compliance with all relevant licensing laws, when in fact they were not; (ii) in every claim identified in Exhibit "2", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "2", the representation that the Fraudulent Services were provided in the first instance,

when in fact they were not; and (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

381.    Dassa Ortho and Dassa intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Dassa Ortho that were not compensable under the New York no-fault insurance laws.

382.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $4,500,000.00 pursuant to the fraudulent bills submitted by Dassa Ortho and Dassa through Dassa Ortho.

383.    Dassa Ortho and Dassa's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

384.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**Against Adjust for Life, Garden State Neuro, Kaloz, and Datta**
**(Aiding and Abetting Fraud)**

385.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

386.    Adjust for Life, Garden State Neuro, Kaloz, and Datta knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Dassa Ortho and Dassa.

387.    The acts of Adjust for Life, Garden State Neuro, Kaloz, and Datta in furtherance of the fraudulent scheme include knowingly cross-referring Insureds to Dassa Ortho for medically unnecessary Fraudulent Services pursuant to the Defendants' unlawful referral scheme.

388.    The conduct of Adjust for Life, Garden State Neuro, Kaloz, and Datta in furtherance of the fraudulent scheme was significant and material. The conduct of Adjust for Life, Garden State Neuro, Kaloz, and Datta was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Dassa Ortho and Dassa to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Dassa Ortho.

389.    Adjust for Life, Garden State Neuro, Kaloz, and Datta aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Dassa Ortho for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

390.    The conduct of Adjust for Life, Garden State Neuro, Kaloz, and Datta caused GEICO to pay more than $4,500,000.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Dassa Ortho.

391.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

392.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Dassa Ortho and Dassa
### (Unjust Enrichment)

393.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

394.    As set forth above, Dassa Ortho and Dassa have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

395.    When GEICO paid the bills and charges submitted or caused to be submitted through Dassa Ortho by Dassa Ortho and Dassa for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Dassa Ortho and Dassa's improper, unlawful, and/or unjust acts.

396.    Dassa Ortho and Dassa have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Dassa Ortho and Dassa voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

397.    Dassa Ortho and Dassa's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

398.    By reason of the above, Dassa Ortho and Dassa have been unjustly enriched in an amount to be determined at trial, but in no event less than $4,500,000.00.

## TWELFTH CAUSE OF ACTION
### Against Datta
### (Violation of RICO, 18 U.S.C. § 1962(c))

399.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

400.    Garden State Neuro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

401.    Datta has knowingly conducted and/or participated, directly or indirectly, in the conduct of Garden State Neuro's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Garden State Neuro was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Garden State Neuro was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

402.    Garden State Neuro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Datta has operated Garden State Neuro, inasmuch as Garden State Neuro is not engaged in a legitimate medical practice and acts of mail fraud therefore are essential in order for Garden State Neuro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Datta continues to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Garden State Neuro to the present day.

403.    Garden State Neuro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Garden State Neuro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

404.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $690,000.00 pursuant to the fraudulent bills submitted through Garden State Neuro.

405.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
### Against Dassa Ortho, Dassa, and Datta
### (Violation of RICO, 18 U.S.C. § 1962(d))

406.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

407.    Garden State Neuro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

408.    Dassa Ortho, Dassa, and Datta were employed by and/or associated with the Garden State Neuro enterprise.

409.    Dassa Ortho, Dassa, and Datta knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Garden State Neuro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be

submitted hundreds of fraudulent charges on a continuous basis for over eight years seeking payments that Garden State Neuro was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Garden State Neuro was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

410.    Garden State Neuro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Datta has operated Garden State Neuro, inasmuch as Garden State Neuro is not engaged in a legitimate medical practice and acts of mail fraud therefore are essential in order for Garden State Neuro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Datta continues to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Garden State Neuro to the present day.

411.    Garden State Neuro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Garden State Neuro in pursuit of inherently unlawful

goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

412. Dassa Ortho, Dassa, and Datta knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

413. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $690,000.00 pursuant to the fraudulent bills submitted through Garden State Neuro.

414. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTEENTH CAUSE OF ACTION**
**Against Garden State Neuro and Datta**
**(Common Law Fraud)**

415. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

416. Garden State Neuro and Datta intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

417. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "3", the representation that the Defendants were in compliance with all relevant licensing laws, when in fact they were not; (ii) in every claim identified in Exhibit "3", the representation that the Defendants were eligible to

receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "3", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

418.    Garden State Neuro and Datta intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Garden State Neuro and Datta that were not compensable under the New York no-fault insurance laws.

419.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $690,000.00 pursuant to the fraudulent bills submitted by Garden State Neuro and Datta.

420.    Garden State Neuro and Datta's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

421.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Dassa Ortho and Dassa
### (Aiding and Abetting Fraud)

422.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

423.    Dassa Ortho and Dassa knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Garden State Neuro and Datta.

424.    The acts of Dassa Ortho and Dassa in furtherance of the fraudulent scheme include knowingly referring Insureds to Garden State Neuro for medically unnecessary Fraudulent Services in exchange for unlawful compensation from Garden State Neuro and Datta.

425.    The conduct of Dassa Ortho and Dassa in furtherance of the fraudulent scheme was significant and material. The conduct of Dassa Ortho and Dassa was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Garden State Neuro and Datta to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Garden State Neuro.

426.    Dassa Ortho and Dassa aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Garden State Neuro for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

427.    The conduct of Dassa Ortho and Dassa caused GEICO to pay more than $690,000.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Garden State Neuro.

428.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

429.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTEENTH CAUSE OF ACTION
**Against Garden State Neuro and Datta**
**(Unjust Enrichment)**

430.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

431.     As set forth above Garden State Neuro and Datta have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

432.     When GEICO paid the bills and charges submitted or caused to be submitted through Garden State Neuro and Datta for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Garden State Neuro and Datta's improper, unlawful, and/or unjust acts.

433.     Garden State Neuro and Datta have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Garden State Neuro and Datta voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

434.     Garden State Neuro and Datta's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

435.     By reason of the above, Garden State Neuro and Datta have been unjustly enriched in an amount to be determined at trial, but in no event less than $690,000.00.

## SEVENTEENTH CAUSE OF ACTION
### Against Datta
### (Violation of RICO, 18 U.S.C. § 1962(c))

436.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

437.     Datta Endoscopic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

438.     Datta has knowingly conducted and/or participated, directly or indirectly, in the conduct of Datta Endoscopic's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over eight years seeking payments that Datta Endoscopic was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Datta Endoscopic was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

439.     Datta Endoscopic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Datta has operated Datta Endoscopic, inasmuch as Datta Endoscopic

is not engaged in legitimate medical practice, and acts of mail fraud therefore are essential in order for Datta Endoscopic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Datta Endoscopic continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Datta Endoscopic to the present day.

440.    Datta Endoscopic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Datta Endoscopic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

441.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $730,000.00 pursuant to the fraudulent bills submitted through Datta Endoscopic.

442.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTEENTH CAUSE OF ACTION
**Against Garden State Neuro, Saddle Brook ASC,**
**Saddle Brook Anesthesia, and Datta**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

443.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

444.    Datta Endoscopic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

445.    Garden State Neuro, Saddle Brook ASC, Saddle Brook Anesthesia, and Datta were employed by and/or associated with the Datta Endoscopic enterprise.

446.    Garden State Neuro, Saddle Brook ASC, Saddle Brook Anesthesia, and Datta knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Datta Endoscopic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over eight years seeking payments that Datta Endoscopic was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Datta Endoscopic was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

447.    Garden State Neuro, Saddle Brook ASC, Saddle Brook Anesthesia, and Datta knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

448.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $730,000.00 pursuant to the fraudulent bills submitted through Datta Endoscopic.

449.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against Datta Endoscopic and Datta**
**(Common Law Fraud)**

450.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

451.     Datta Endoscopic and Datta intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

452.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "4", the representation that the Defendants were in compliance with all relevant licensing laws, when in fact they were not; (ii) in every claim identified in Exhibit "4", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "4", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "4", the representation that the Fraudulent Services were provided in the first instance,

when in fact they were not; and (v) in every claim identified in Exhibit "4", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

453.    Datta Endoscopic and Datta intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Datta Endoscopic that were not compensable under the New York no-fault insurance laws.

454.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $730,000.00 pursuant to the fraudulent bills submitted by Datta Endoscopic and Datta through Datta Endoscopic.

455.    Datta Endoscopic and Datta's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

456.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
**Against Datta Endoscopic and Datta**
**(Unjust Enrichment)**

457.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

458.    As set forth above, Datta Endoscopic and Datta have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

459.     When GEICO paid the bills and charges submitted or caused to be submitted through Datta Endoscopic by Datta Endoscopic and Datta for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Datta Endoscopic and Datta's improper, unlawful, and/or unjust acts.

460.     Datta Endoscopic and Datta have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Datta Endoscopic and Datta voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

461.     Datta Endoscopic and Datta's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

462.     By reason of the above, Datta Endoscopic and Datta have been unjustly enriched in an amount to be determined at trial, but in no event less than $730,000.00.

## TWENTY-FIRST CAUSE OF ACTION
### Against Datta
### (Violation of RICO, 18 U.S.C. § 1962(c))

463.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

464.     Saddle Brook Anesthesia is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

465.     Datta has knowingly conducted and/or participated, directly or indirectly, in the conduct of Saddle Brook Anesthesia's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Saddle Brook Anesthesia was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not

medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Saddle Brook Anesthesia was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

466.    Saddle Brook Anesthesia's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Datta has operated Saddle Brook Anesthesia, inasmuch as Saddle Brook Anesthesia is not engaged in a legitimate medical practice and acts of mail fraud therefore are essential in order for Saddle Brook Anesthesia to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Datta continues to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Saddle Brook Anesthesia to the present day.

467.    Saddle Brook Anesthesia is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Saddle Brook Anesthesia in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

468.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $28,000.00 pursuant to the fraudulent bills submitted through Saddle Brook Anesthesia.

469.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<u>**TWENTY-SECOND CAUSE OF ACTION**</u>
**Against Saddle Brook Anesthesia and Datta**
**(Common Law Fraud)**

470.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

471.    Saddle Brook Anesthesia and Datta intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

472.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "5", the representation that the Defendants were in compliance with all relevant licensing laws, when in fact they were not; (ii) in every claim identified in Exhibit "5", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "5", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in

Exhibit "5", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "5", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

473.    Saddle Brook Anesthesia and Datta intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Saddle Brook Anesthesia and Datta that were not compensable under the New York no-fault insurance laws.

474.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $28,000.00 pursuant to the fraudulent bills submitted by Saddle Brook Anesthesia and Datta.

475.    Saddle Brook Anesthesia and Datta's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

476.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Saddle Brook Anesthesia and Datta**
**(Unjust Enrichment)**

477.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

478.     As set forth above Saddle Brook Anesthesia and Datta have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

479.     When GEICO paid the bills and charges submitted or caused to be submitted through Saddle Brook Anesthesia and Datta for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Saddle Brook Anesthesia and Datta's improper, unlawful, and/or unjust acts.

480.     Saddle Brook Anesthesia and Datta have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Saddle Brook Anesthesia and Datta voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

481.     Saddle Brook Anesthesia and Datta's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

482.     By reason of the above, Saddle Brook Anesthesia and Datta have been unjustly enriched in an amount to be determined at trial, but in no event less than $28,000.00.

### TWENTY-FOURTH CAUSE OF ACTION
**Against Datta**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

483.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

484.     Saddle Brook ASC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

485.     Datta has knowingly conducted and/or participated, directly or indirectly, in the conduct of Saddle Brook ASC's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a

continuous basis for over two years seeking payments that Saddle Brook ASC was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Saddle Brook ASC was not in compliance with applicable licensing requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

486.    Saddle Brook ASC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Datta has operated Saddle Brook ASC, inasmuch as Saddle Brook ASC is not engaged in a legitimate ambulatory care facility business, and acts of mail fraud therefore are essential in order for Saddle Brook ASC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Saddle Brook ASC continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Datta Endoscopic to the present day.

487.    Saddle Brook ASC is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Saddle Brook ASC in pursuit of inherently unlawful

goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

488.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $556,000.00 pursuant to the fraudulent bills submitted through Saddle Brook ASC.

489.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Garden State Neuro, Datta Endoscopic, Saddle Brook Anesthesia, and Datta
### (Violation of RICO, 18 U.S.C. § 1962(d))

490.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

491.    Saddle Brook ASC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

492.    Garden State Neuro, Datta Endoscopic, Saddle Brook Anesthesia, and Datta were employed by and/or associated with the Saddle Brook ASC enterprise.

493.    Garden State Neuro, Datta Endoscopic, Saddle Brook Anesthesia, and Datta knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Saddle Brook ASC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Saddle Brook ASC was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically

necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed to enrich the Defendants; (iii) Saddle Brook ASC was not in compliance with applicable licensing requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

494.    Garden State Neuro, Datta Endoscopic, Saddle Brook Anesthesia, and Datta knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

495.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $556,000.00 pursuant to the fraudulent bills submitted through Saddle Brook ASC.

496.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Saddle Brook ASC and Datta**
**(Common Law Fraud)**

497.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

498.    Saddle Brook ASC and Datta intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

499.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "6", the representation that the Defendants were in compliance with all relevant licensing laws, when in fact they were not; (ii) in every claim identified in Exhibit "6", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "6", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; and (iv) in every claim identified in Exhibit "6", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

500.    Saddle Brook ASC and Datta intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Saddle Brook ASC that were not compensable under the New York no-fault insurance laws.

501.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above–described conduct in that it has paid at least $556,000.00 pursuant to the fraudulent bills submitted by Saddle Brook ASC and Datta through Saddle Brook ASC.

502.     Saddle Brook ASC and Datta's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

503.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-SEVENTH CAUSE OF ACTION**
**Against Saddle Brook ASC and Datta**
**(Unjust Enrichment)**

504.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

505.     As set forth above, Saddle Brook ASC and Datta have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

506.     When GEICO paid the bills and charges submitted or caused to be submitted through Saddle Brook ASC by Saddle Brook ASC and Datta for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Saddle Brook ASC and Datta's improper, unlawful, and/or unjust acts.

507.     Saddle Brook ASC and Datta have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Saddle Brook ASC and Datta voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

508.     Saddle Brook ASC and Datta's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

509.    By reason of the above, Saddle Brook ASC and Datta have been unjustly enriched in an amount to be determined at trial, but in no event less than $556,000.00.

## JURY DEMAND

510.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Adjust for Life, Datta Endoscopic, Garden State Neuro, Saddle Brook Anesthesia, Saddle Brook ASC, and Dassa Ortho, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Adjust for Life, Datta Endoscopic, Garden State Neuro, Saddle Brook Anesthesia, Saddle Brook ASC, and Dassa Ortho have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Kaloz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Dassa Ortho, Dassa, and Kaloz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Adjust for Life and Kaloz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Dassa Ortho and Dassa, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Adjust for Life and Kaloz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

G.      On the Seventh Cause of Action against Dassa, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $4,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Garden State Neuro, Adjust for Life, Dassa, Datta, and Kaloz, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $4,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Dassa Ortho and Dassa, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $4,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Adjust for Life, Garden State Neuro, Kaloz, and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $4,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Dassa Ortho and Dassa, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $4,500,000.00, plus costs and interest and such other and further relief as this Court deems just and proper.

L.      On the Twelfth Cause of Action against Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $690,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Dassa Ortho, Dassa, and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $690,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Garden State Neuro and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $690,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Dassa Ortho and Dassa, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $690,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Garden State Neuro and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $690,000.00, plus costs and interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Datta, compensatory damages in favor

of GEICO an amount to be determined at trial but in excess of $730,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Garden State Neuro, Saddle Brook ASC, Saddle Brook Anesthesia, and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $730,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Datta Endoscopic and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $730,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Datta Endoscopic and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $730,000.00, plus costs and interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $28,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Saddle Brook Anesthesia and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $28,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

W.      On the Twenty-Third Cause of Action against Saddle Brook Anesthesia and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$28,000.00, plus costs and interest and such other and further relief as this Court deems just and proper;

X.      On the Twenty-Fourth Cause of Action against Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $556,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y.      On the Twenty-Fifth Cause of Action against Garden State Neuro, Datta Endoscopic, Saddle Brook Anesthesia, and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $556,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Z.      On the Twenty-Sixth Cause of Action against Saddle Brook ASC and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $556,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

AA.    On the Twenty-Seventh Cause of Action against Saddle Brook ASC and Datta, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $556,000.00, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: December 13, 2022

RIVKIN RADLER LLP

By:      _____*/s/ Max Gershenoff*_____
Barry I. Levy, Esq.
Max Gershenoff, Esq.
Christina M. Bezas, Esq.
Qasim I. Haq, Esq. (to be admitted *pro hac vice*)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*