# Exhibit A

OA1HGeiC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  GOVERNMENT EMPLOYEES INSURANCE
   COMPANY, *et al.*,
4
                    Plaintiffs,
5
             v.                        22 Civ. 1531 (JHR)OTW
6
   SUKDEB DATTA, M.D., *et al.*,
7                                      Conference

8                    Defendants.
   ------------------------------x
9                                      New York, N.Y.
                                       October 1, 2024
10                                     10:20 a.m.

11 Before:

12                     HON. ONA T. WANG,

13                                     U.S. Magistrate Judge

14                         APPEARANCES

15 RIVKIN RADLER LLP
        Attorneys for Plaintiffs
16 BY:  MAX S. GERSHENOFF

17 MANDELBAUM BARRETT, P.C.
        Attorneys for Defendants Sukdeb Datta, M.D., Datta
18 Endoscopic, Garden State Neuro, and Saddle Brook
   BY:  MICHAEL SCOTT KIVOWITZ
19
   HARFENIST KRAUT & PERLSTEIN, LLP
20      Attorneys for Defendant Sukdeb Datta, M.D., Datta
   Endoscopic, Garden State Neuro, and Saddle Brook
21 BY:  STEVE JAY HARFENIST

22 PETER BIRZON & ASSOCIATES, P.C.
        Attorneys for Defendants Darrin Kaloz, D.C., and Adjust
23 for Life Chiropractic
   BY:  PETER MARC BIRZON
24
   THE SALLOUM LAW FIRM LLC
25      Attorneys for Interest Party Skazka LLC
   BY:  CHRISTOPHER SALLOUM

1          (Case called)

2          MR. GERSHENOFF:  For the plaintiffs, my name is Max

3    Gershenoff of Rivkin Radler.  Good morning.

4          THE COURT:  All right.  Good morning.

5          MR. KIVOWITZ:  For defendants Sukdeb Datta, Datta

6    Endoscopic, Garden State Neuro Stimulation, Saddle Brook

7    Anesthesia, and Surgistar Holdings, Michael Kivowitz from

8    Mandelbaum Barrett.

9          THE COURT:  So just before we go on, are these the

10   parties that are called the ASC parties?

11         MR. KIVOWITZ:  I believe that there's only one ASC,

12   but I am representing that party.

13         THE COURT:  OK.

14         MR. HARFENIST:  I'm Steven Harfenist from Harfenist

15   Kraut & Perlstein, and I represent the Dassa defendants.  Good

16   morning, Judge.

17         MR. SALLOUM:  Good morning, your Honor.  Christopher

18   Salloum of the Salloum Law Firm LLC on behalf of Skazka LLC.

19         MR. BIRZON:  Good morning, your Honor.  I'm Peter

20   Birzon on behalf of Darrin Kaloz and Adjust for Life

21   Chiropractic, P.C.

22         THE COURT:  Sorry, say that name again.

23         MR. BIRZON:  My name is Peter Birzon.

24         THE COURT:  Who do you represent?

25         MR. BIRZON:  Darrin Kaloz.

1          THE COURT:  Sit up, please.

2          MR. BIRZON:  Darrin Kaloz and Adjust for Life

3   Chiropractic.

4          THE COURT:  Do you represent parties or nonparties?

5          MR. BIRZON:  I represent parties.  They're the last

6   named defendants in the case.

7          THE COURT:  So Skazka is the only nonparty here?

8          MR. SALLOUM:  Yes, your Honor.

9          THE COURT:  All right.  We're here on a status

10  conference in light of Judge Rearden's prior orders about

11  discovery and various discovery disputes.  And rather than get

12  more letters and phone calls, I decided that we should just

13  have a conference.

14         It turns out that when we were trying to get your

15  letter consenting to magistrate judge jurisdiction entered, our

16  clerk's office said that they needed the AO4, which is what you

17  filled out and signed earlier today.  It has not been signed

18  off by Judge Rearden, but I have been in contact with Judge

19  Rearden, and she is going to sign off on it.  So we will treat

20  this conference as the beginning of our beautiful relationship

21  under consent.

22         All right.  So I see two groups of disputes.  One

23  relates to document production with nonparty Skazka and then

24  one relates to —— this is why I was asking about the ASC

25  defendants —— and then one regarding Datta and, I guess,

1  related parties that you're the only attorney who represents

2  the parties who are having the other dispute.

3          MR. KIVOWITZ:  Yes, your Honor.

4          THE COURT:  OK.  Then apparently not disputed is your

5  request to extend the discovery deadlines.

6          All right.  Let's talk first about nonparty Skazka.

7  Can you just, Mr. Salloum, tell me what is Skazka, who is

8  Skazka, and then I'll let Mr. Gershenoff speak.

9          MR. SALLOUM:  I will be happy to do that, your Honor,

10  but I'm pleased to report that I've reached an agreement with

11  Mr. Gershenoff regarding this dispute that we would like to

12  place on the record.  I can proceed to answer your Honor's

13  question if you would like, but we've reached an agreement that

14  we're going to put ——

15          THE COURT:  Why don't you tell me who Skazka is,

16  because if I have this case on consent, if we're going to

17  trial, I'd like to have some of that background anyway.

18          MR. SALLOUM:  Of course.  Skazka LLC is, with respect

19  to the defendants in this matter, the management services

20  provider for these defendants, and that's the relationship

21  between Skazka LLC and these defendants.

22          THE COURT:  All right.

23          Go ahead, Mr. Gershenoff.

24          MR. GERSHENOFF:  I agree that Skazka LLC has, I'll

25  say, purported to provide management and other services to the

1  defendants.  One of the allegations that we make in this case,

2  the plaintiffs make, is that the defendants were paying illegal

3  compensation in exchange for patient referrals and were

4  disguising that — I'm prefacing it by saying these are

5  allegations — they were disguising the compensation that they

6  were paying in exchange for patient referrals as ostensibly

7  legitimate payments for rent at each other's offices.

8          During discovery so far in this case, it's indicated

9  very large amounts of money being paid by each of the different

10  three groups of defendants to Skazka.  And so we served this

11  subpoena on Skazka's bank, and we have reached an agreement to

12  resolve the dispute.  Mr. Salloum, I believe, has it in

13  writing.

14          What we would propose to do, your Honor, if it's

15  acceptable to the Court, is we'd like to just read the

16  agreement into the record right now, and then if we could

17  submit a proposed order by tomorrow just reflecting what's

18  said.

19          THE COURT:  That would be great.  Go ahead.

20          MR. GERSHENOFF:  OK.

21          MR. SALLOUM:  Thank you, your Honor.

22          I just would like to note that Skazka LLC denies the

23  allegations made by the plaintiffs in this matter which have

24  not been asserted in the 510-paragraph complaint that they

25  filed two years ago.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        So the agreement that was reached is similar to an

2   order that Judge Philip Halpern entered in a related matter

3   concerning a motion to quash that Skazka LLC filed, when Skazka

4   LLC was a defendant in that matter, in response to a subpoena

5   that was issued to TD Bank.  I'm going to read what Judge

6   Halpern wrote in his order with a modification that

7   Mr. Gershenoff and I agreed to, off the record, prior to the

8   beginning of today's status conference.

9        So with respect to the order that I'm referring to, it

10  was entered by Judge Halpern on February 26, 2024, in case

11  No. 7:23-CV-07515-PMH.  In that matter, the judge limited the

12  scope of the subpoena of the plaintiffs in that matter issued

13  to TD Bank to only those records concerning the defendants

14  which will include, in this matter, outgoing payments made to

15  the defendants, entities owned by the defendants in whole or in

16  part, and to any other person or entity in connection with or

17  in furtherance of any agreements between Skazka and the

18  defendants, any entities owned by the defendants, or any of

19  them.

20       Then to continue with what Judge Halpern wrote in his

21  order concerning defendants named in the complaint or

22  defendants employees:  TD Bank is directed to produce the

23  responsive documents to counsel for moving defendants in that

24  matter.  It would be for the moving interested parties, Skazka

25  LLC.  Counsel for, in this case, Skazka LLC will then either

1    redact the documents and produce them to plaintiffs or produce

2    the unredacted documents.

3         And because Skazka is not a party in this case, it is

4    not presently subject to any protective order, and so the

5    plaintiffs and Skazka LLC have agreed that all documents

6    produced pursuant to this subpoena will be subject to the

7    protective order that Judge Rearden entered in this matter on

8    February 13, 2024, as if Skazka LLC were a party to this case.

9         To be clear, we agreed to produce the records that I

10   just outlined there, and that would resolve the final scope of

11   the last aspect of our disagreement here with respect to the

12   scope of the subpoena.  We had previously agreed to two produce

13   two categories of documents.  Those documents will be produced,

14   and we're also going to be producing the documents that I just

15   set forth.

16        Mr. Gershenoff, did I accurately convey what our

17   agreement was?

18        MR. GERSHENOFF:  I would say — although it's in real

19   time, you said a lot — it sounded right to me.  I don't think

20   there's any issues.  And we will, if it's acceptable to the

21   Court, submit a proposed order by tomorrow.

22        THE COURT:  Yes.  That's fine with me.  You'll also

23   have the benefit of a transcript later, and hopefully, there

24   will not be anything missing or insufficient.  But since you

25   referred to the order entered by Judge Halpern, we can always

1    also go back to that if there are any issues.

2              All right.  Thank you.  That was great.

3              MR. SALLOUM:  Your Honor, there was one more point,

4    I'm sorry.  We had also discussed that there should be some

5    kind of time limit on this, and we didn't discuss the specific

6    time, but I would respectfully request three weeks from the

7    date that I receive the records from TD Bank to produce them.

8              Mr. Gershenoff, is that OK with you, unless the

9    documents are ridiculously voluminous?

10             MR. GERSHENOFF:  That's fine with me, without

11   prejudice to your right to ask for more time in the event the

12   documents are ridiculously voluminous.

13             MR. SALLOUM:  OK.

14             THE COURT:  Of course, because we haven't talked about

15   the extension of discovery, obviously, there will be an

16   extension to discovery.  So let's worry about that at the end,

17   because that's something you all agree on.  All right.

18             MR. SALLOUM:  Thank you, your Honor.

19             THE COURT:  Anything else as to Skazka?  So Skazka

20   also is not a party but was a party in the case before Judge

21   Halpern?

22             MR. SALLOUM:  Yes, your Honor.

23             THE COURT:  All right.  So the next discovery dispute

24   I see has a list of 20 categories of documents which, I guess,

25   defendants have not — "defendants" meaning — this is why I

1  was calling it the ASC defendants, Datta and Saddle Brook

2  Surgery Center, or are there others?

3        MR. GERSHENOFF:  That's it, your Honor.

4        THE COURT:  OK.  Saddle Brook Surgery, ASC, and Datta

5  have not produced ——

6        MR. GERSHENOFF:  Those 20 categories.

7        THE COURT:  —— 20 categories.

8        Since, Mr. Gershenoff, you're standing up, why don't

9  you stay standing.

10        Is it still 20 categories, or have you reached some

11  agreement?

12        MR. GERSHENOFF:  No, your Honor.

13        MR. KIVOWITZ:  I'm sorry, if I could just go before

14  Mr. Gershenoff starts, I think that the extension of discovery,

15  to the extent that we will have an extension of discovery, is

16  important in this regard.

17        THE COURT:  OK.

18        MR. KIVOWITZ:  To the extent that we are going to have

19  an extension of discovery, I would request from the Court the

20  ability to submit a motion for a protective order.  I did not

21  make one earlier because we had this conference, and it was put

22  on the agenda that we were going to discuss it.  However, in

23  the event that discovery ——

24        THE COURT:  Wait, wait, wait.  Stop.  Motion for

25  protective order meaning you want to limit the type of

1   production?

2           MR. KIVOWITZ:  Yes, your Honor.

3           THE COURT:  OK.  I was planning to go through each of

4   these categories and just hash it out right now.  Are there any

5   — I think this is where Mr. Gershenoff was going — of these

6   20 categories, are there any categories that are no longer in

7   dispute?

8           MR. GERSHENOFF:  No, they're all in dispute, your

9   Honor.

10          THE COURT:  Well, then we'll take it one by one.

11          Committee meeting minutes of Saddle Brook ASC for any

12  years prior to September 2022, what's wrong with that?  No, I'm

13  asking Mr. Kivowitz.

14          MR. KIVOWITZ:  Prior to 2022?

15          THE COURT:  Yes.

16          MR. KIVOWITZ:  Well, overall, the production — what

17  counsel seeks to be produced is overbroad.  Counsel is trying

18  to —

19          THE COURT:  I want to hear specifics for each

20  category, category by category.  What's wrong with committee

21  meeting minutes at Saddle Brook ASC for any period prior to

22  September 2022?

23          MR. KIVOWITZ:  I can produce the meeting minutes.

24          THE COURT:  All right.  So that will be will produce.

25          We'll talk about a reasonable date for the production

1  after we get through this.  Part of it is I want to see, for

2  each category, what we end up with, and then we'll talk about

3  what makes sense and what's possible.  All right.  So that's a

4  yes.

5        What about signed copies — I'll give you a little

6  headliner here.  I expect, going forward, better meeting and

7  conferring, because some of these document categories may be a

8  little bit broad.

9        And I'm going to maybe put Mr. Gershenoff in the hot

10  seat soon, like now, with signed copies of Saddle Brook ASC's

11  patient care policy and procedure manuals from the relevant

12  period.  What is it about — I understand generally what the

13  case is about, so I don't need a complete rehashing of what the

14  case is about — and the peanut gallery will please keep your

15  laughter to yourselves — what is it about the patient care

16  policy and procedure manuals that is relevant here?  Let's

17  start with relevance and why is it not overbroad and why do you

18  care?

19        MR. GERSHENOFF:  Sure.  Just as an initial matter, to

20  set the table, your Honor, in order for an ambulatory surgery

21  center like Saddle Brook to be able to collect no-fault

22  insurance benefits from an insurance company like GEICO, it has

23  to be compliant with all significant licensing laws and

24  regulations governing its operation.  The licensing laws and

25  regulations require not only that ambulatory surgery centers

have patient care policy and procedure manuals but also require

that they be reviewed and signed by the facility's medical

director at regular intervals. Here, there is extremely good

cause to believe that Saddle Brook ASC didn't have a real

medical director who actually did his or her job as medical

director, as evidenced by, among other things, the fact that

Saddle Brook ASC was shut down by the regulators a week and a

half ago for its failure to comply with the ambulatory surgery

center licensing regulations.

THE COURT: Doesn't that end up being an admission?

Would it be easier to just get the admission that they don't

exist or they don't have them?

MR. GERSHENOFF: If they don't have them, that would

be fine. They should just be required to say as much. They

haven't said as much yet. To the extent that the defendants

wish to announce that they do not maintain documents that are

required by the regulations ——

THE COURT: Whoa, whoa. OK. Now you're going to go

overbroad, don't maintain, never maintain. Maybe they just

don't have them. Let's start with that. Or another

possibility would be, if it hasn't been explored at deposition

already, that it be explored at deposition. If you have an

admission from either Dr. Datta or somebody on behalf of Saddle

Brook Surgery Center that these documents don't exist or this

category doesn't exist, I don't know why there's still a

1   dispute here.

2           Go ahead.

3           MR. GERSHENOFF:  They were asked about it at

4   deposition.  Dr. Datta said that they had all the required

5   documents.  I'm paraphrasing.  I don't have the transcript

6   right in front of me.  But what they produced, your Honor —— I

7   have it; I brought it here with me —— they brought mimeographed

8   copies of stuff that was taken out of a three-ring binder.  No

9   one disputes that they had in a binder putative patient care

10  policy and procedure manuals, but they were just on a dusty

11  shelf apparently in the back room, and they were never being

12  reviewed and implemented by the facility's management or by the

13  medical director.

14          THE COURT:  Right.  But do you get your aha moment by

15  getting the manuals?  I think what you're getting to now is

16  maybe they had something on paper, maybe they were kept in a

17  binder, maybe they were kept on a shelf, but isn't that enough?

18  Do you have the actual documents or do you have ——

19          MR. GERSHENOFF:  They should just —— they produced a

20  manual, but they did not produce the indication that, as

21  required by the regulations, it had been reviewed and signed by

22  the facility's medical director at periodic intervals.  So if

23  they don't have that, they should just be required to say as

24  much.

25          THE COURT:  OK.  Turning it over to you, Mr. Kivowitz.

1        MR. KIVOWITZ:  Well, GEICO is trying to step into the

2    shoes of ——

3        THE COURT:  No, no.  Are there manuals?  Have you done

4    a reasonable search?  Is there any documentation that hasn't

5    already been produced that indicates that there was a medical

6    director who revised them or —— I mean, not revised, reviewed

7    them and signed off on them?

8        MR. KIVOWITZ:  There is documentation, but the extent

9    of what Mr. Gershenoff is asking for is extremely broad.

10        THE COURT:  No, no.  What has been produced?  Is there

11    anything ——

12        MR. KIVOWITZ:  So what has been produced is the

13    credentialing file for the AAAHC accreditation that took place

14    in 2022.  That's what we provided to Mr. Gershenoff.

15        THE COURT:  OK.

16        MR. KIVOWITZ:  So contained within that are numerous

17    policies, manuals.  But, quite frankly, the breadth of what

18    he's asked for is overbroad and ——

19        THE COURT:  What I see is signed copies of patient

20    care policy and procedural manuals.  What I'm hearing from

21    Datta and the ASC is that there have been numerous policies and

22    manuals produced.

23        I don't need to see them, Mr. Gershenoff.

24        MR. GERSHENOFF:  No, I was just getting them for

25    myself, your Honor.

1      THE COURT:  OK.

2      Are there other patient care policies or procedure

3 manuals that have not been produced?  Has there been a

4 reasonable search done?

5      MR. KIVOWITZ:  There are manuals that have not been

6 produced, and there has been a reasonable search done.  I

7 produced the most recent records to plaintiff, but that was not

8 good enough for him.

9      THE COURT:  Well, OK.  Let's stop with the

10 characterizing back and forth.

11      What is the basis on which you are withholding manuals

12 that exist and haven't been produced if they're responsive to

13 the document request?

14      MR. KIVOWITZ:  Well, the document request is

15 overbroad.

16      THE COURT:  No, stop.  Responsive —— signed copies of

17 Saddle Brook ASC's patient care policy procedure manuals.  Some

18 exist it.  They haven't been produced.  Why are you withholding

19 them?  I mean, if there's been a reasonable search done —— and

20 it sounds like there has —— based on your representation to the

21 Court that there has been a reasonable search done, you know

22 that they exist, why are you fighting about this?  Why can't

23 you just produce them?

24      MR. KIVOWITZ:  I can produce them, but I don't think

25 that he's entitled to them.

1          THE COURT:  Why not?

2          MR. KIVOWITZ:  Because the surgery center is

3     accredited by the Department of State by CMS, and they have all

4     conducted their own surveys.  It has passed.  The surgery

5     center has passed.  Now, there was on September 17, as

6     Mr. Gershenoff mentioned, a new finding by the Department of

7     Health.  However, that postdated the demands that

8     Mr. Gershenoff made.  That's an active investigation that's

9     going on, and Dr. Datta is dealing with the relevant — with

10    the Department of Health in New Jersey to rectify that.

11         THE COURT:  Look, if there's a Fifth Amendment issue

12    here, you should be meeting and conferring and talking about

13    that.  If there are policy and procedure manuals, I'm ruling

14    right now, in the absence of an applicable privilege, which I

15    have not yet heard, you're going to be producing those manuals,

16    and you're going to stop fight about this issue.  OK?

17         All right.  No. 3, documents and communications

18    evidencing the required reviews and implementation of the ASC's

19    policies and procedures.  I see this as related to No. 2.

20         Mr. Gershenoff, very briefly, what types of documents

21    are you talking about?  Is it something that gets signed off?

22    Is it a publicly available document?  Is it something else?

23         MR. GERSHENOFF:  Yes, your Honor.  The relevant

24    ambulatory care facility licensing regulations require that the

25    medical director's reviews of the facility's policy and procure

1    manual be documented.  That is an affirmative requirement in

2    the regulations.  It is material requirement.  Particularly in

3    light of recent events at the facility, we have reason to

4    believe that there were no reviews of the policies; there was

5    no documentation.  If that's the case, they should just be

6    required to say as much, your Honor.

7         THE COURT:  Well ——

8         MR. GERSHENOFF:  We don't have any documents.

9         THE COURT:  Yes, but now I just identified, in light

10   of recent events, there may be a Fifth Amendment issue.  So

11   what I'm going to say for this one and for some of these going

12   for is that Datta and Saddle Brook Surgery Center are directed

13   to —— you're directed to talk to your clients about this and

14   really counsel them whether documents exist, whether you can

15   produce them, and what representations you may be able to make

16   or not make as an officer of the court that also protects your

17   client's Fifth Amendment privileges.  OK.

18        MR. KIVOWITZ:  Your Honor, if I may, so this just says

19   "all."  We don't have any time period.  That's part of the ——

20        THE COURT:  Talk about a time limitation.  But you

21   know what?  Given the possible shutdown, I think that puts a

22   lot of documentation in the past in question, and that's why

23   I'm saying to you, before fighting about words in the rule

24   about overbreadth or proportionality, you have to do this first

25   go-round of making sure (a) that you're protecting your

1  client's rights —— and I should not be giving a law school

2  lecture here —— but consider whether it is simpler and easier

3  to produce the documents that are requested.

4        The meet-and-confer process is to say:  Look, you're

5  asking for everything under the sun.  The date range is too

6  broad.  Can we narrow it?  It sounds like you were able to ——

7  plaintiff's counsel was able to reach that kind of narrowing

8  with Skazka, so have the same kinds of conversations.  Think

9  about what you can do.  OK?  Think about what you can do in the

10 context of this new development, all right, because this is a

11 very serious for your clients.  So think about that and think

12 about meeting and conferring.

13        For plaintiff, for requests that defendant says

14 they're overbroad, what do you mean by all communications?

15 Every email?  Every text message?  Talk about what might be a

16 reasonable limitation to get you to that.  Given what you've

17 said today about this investigation, it's possible that certain

18 documents might not exist.  But if you're before me on these

19 categories again and there are documents that are being

20 withheld, we need to hear a reason that involves a privilege,

21 if documents exist and they're being withheld.

22        All right.  So No. 3 you're going to meet and confer

23 on.  So consider limitations if your concern is that they're

24 overbroad, but you need to talk.  You need to get a little more

25 granular.  What is that you, plaintiff's counsel, plaintiff,

1    expect to see or not see?  Can you start with certain types of

2    documentations?  Like if there's something that's signed off on

3    it, on the approval or registration, maybe start with that,

4    right?  Then you maybe dig deeper if you think you need to, if

5    you've seen other emails or something else.

6            On defendants' side, think about the privileges, think

7    about what exists or doesn't exist.  I'm not suggesting that

8    there is, but be aware of concerns about document retention and

9    destruction, but also be aware of what your clients' policies

10   were in that regard because there are also possibly innocuous

11   reasons why documents don't exist or previously existed and no

12   longer exist.  But you need to dig a little deeper.  You can't

13   stay at "the request is overbroad, so we're not producing

14   anything."  OK?  I think that's in the local rules also.

15           All right.  Documents evidencing the designation of an

16   alternate medical director at Saddle Brook ASC, what's this one

17   about, Mr. Gershenoff?

18           MR. GERSHENOFF:  Yes.  The regulations not only

19   require New Jersey ambulatory care facilities to have a medical

20   director that actually does their job as medical director and

21   lays out the specific responsibilities of the medical director

22   that must be satisfied, but it also requires every ambulatory

23   surgery center to designate an alternate medical director.

24   What happens if your medical director goes to Thailand for

25   three weeks or takes a vacation in the Caribbean or something

1    like that?  Who's ——

2              THE COURT:  Presumably, they're still reachable, no?

3              MR. GERSHENOFF:  I think that, arguably, the medical

4    director requirements require much more than just being

5    available by phone.

6              THE COURT:  Here we're talking about the identity, who

7    it was.

8              MR. GERSHENOFF:  Anything designating.

9              THE COURT:  Why didn't you get this from the

10   deposition?

11             MR. GERSHENOFF:  They said that they had it, I

12   believe, your Honor.

13             THE COURT:  Who was the medical director?

14             MR. GERSHENOFF:  The medical director is Dr. ——

15             THE COURT:  The alternate medical director?

16             MR. GERSHENOFF:  The medical director was Dr. Datta

17   himself.  We haven't seen anything indicating the designation

18   of an alternate, your Honor.

19             THE COURT:  So this should be a question before you

20   dive into full-bore "give me everything that exists," because

21   maybe it doesn't exist.  Maybe it no longer exists and used to

22   exist.  Why don't you find out who the alternate medical

23   director was, if any.  What's the identity, that's a different

24   discovery vehicle.

25             MR. GERSHENOFF:  Understood.

1          THE COURT:  Was that question asked at deposition?

2          MR. GERSHENOFF:  I don't think that that specific one

3     was asked, your Honor.

4          THE COURT:  Work together on this one.  This should be

5     a question, not a document request.

6          MR. GERSHENOFF:  OK.

7          THE COURT:  So get the answer to the question in lieu

8     of producing documents.

9          All right.  No. 5, documents and communications

10    evidencing the performance by the ASC's administrator of the

11    duties of a facility administrator.  How is this not overbroad,

12    and why can't you talk about this in the deposition?

13         MR. GERSHENOFF:  We did, but they testified that they

14    had an administrator who was doing their job as the

15    administrator.  But, again, they should be able to produce some

16    documents indicating that the administrator was performing

17    their duties.

18         THE COURT:  Who was the administrator?

19         MR. GERSHENOFF:  The person's name I don't recall off

20    the top of my head, your Honor.

21         THE COURT:  Does that mean you also haven't deposed

22    them?

23         MR. GERSHENOFF:  We haven't deposed the administrator.

24    We took the 30(b)(6) of the facility instead.  But, no, we have

25    not yet deposed the administrator.  I think, as a threshold

1    matter, we'd want to see some documents showing that they even

2    had an administrator who was doing anything.  One of the

3    reasons why ——

4            THE COURT:  You know what, you could maybe find out

5    who the administrator is, set up a deposition.  I should not be

6    telling you how to do your discovery, OK?  But you should be

7    working together.  It's in —— well, maybe it's not in

8    everybody's interest, that's the thing.  But you all should be

9    working together to make the discovery process more

10   streamlined, less cumbersome, and less argumentative than it

11   is.  Not everything has to be a fight.  All right?

12           MR. KIVOWITZ:  Your Honor.

13           THE COURT:  Yes, go ahead.

14           MR. KIVOWITZ:  Which number were you just referring

15   to?

16           THE COURT:  No. 5, documents and communications

17   evidencing the performance by the ASC's administrator of their

18   duties of an administrator.  This seems to me like a deposition

19   of the facility administrator.

20           MR. GERSHENOFF:  We'll do that, your Honor.

21           THE COURT:  Well, I want to hear from —— are you lost,

22   Mr. Kivowitz?  Am I reading from the wrong one?

23           MR. KIVOWITZ:  One of the No. 5s is all documents and

24   communications concerning the appointment of the director of

25   nursing, and the other is all previous written policies and

1    procedures — that's for everything.

2            THE COURT:  Do you really need to argue about the

3    director of nursing, or can the same ruling about the

4    administrator also go to the director of nursing.

5            MR. KIVOWITZ:  I think that that is the better

6    question.

7            THE COURT:  What?  You said that's a fair question?

8            MR. KIVOWITZ:  No, that's better to be a question

9    versus a document production.

10           THE COURT:  OK.  I'm trying to get us through this

11   faster.

12           MR. KIVOWITZ:  I appreciate it.  Thank you.

13           THE COURT:  What was the other category?  You said it

14   was prior.

15           MR. KIVOWITZ:  So the other one, No. 5, is all

16   previous written policies, procedures, or protocols for Saddle

17   Brook ASC, as well as all metadata for said documents,

18   including but not limited to patient care policies and

19   procedures —

20           THE COURT:  OK.  That was all, in my mind, subsumed

21   under my No. 3, which was all the policies.

22           MR. KIVOWITZ:  Understood.

23           THE COURT:  Consider what actually exists.  Have that

24   talk with your client.  Really try to drill down on it, but you

25   also need to talk.  I think, as written, the request probably

```
 1  is a little broad.  But, then again, given what I'm hearing
 2  from Mr. Gershenoff about recent events, there's possibly
 3  reason to need to inquire about that.  But have a conversation
 4  about what actually exists, what's being withheld, why is it
 5  being withheld, if you can say.
 6          MR. GERSHENOFF:  May I?
 7          THE COURT:  And talk about —— oops, yes,
 8  Mr. Gershenoff.
 9          MR. GERSHENOFF:  I was going to say I think
10  Mr. Kivowitz is reading from the document requests themselves
11  rather than my September 26 letter.  I would just point out
12  that Mr. Kivowitz and I met and conferred for about 30 minutes.
13  We significantly narrowed the scope of the document request,
14  and what's left is in my letter.
15          THE COURT:  Yes.
16          MR. GERSHENOFF:  So I think we should work off of the
17  letter instead of the requests that were ——
18          THE COURT:  The September 26 letter, is that ECF 99?
19          MR. GERSHENOFF:  Yes, Judge.
20          THE COURT:  It's all in a text.  It's not broken out
21  in a list.  It's on page 2 of the letter.
22          MR. KIVOWITZ:  I'm sorry, I don't remember the meet
23  and confer going like that, but OK.
24          MR. GERSHENOFF:  So in the letter at Dkt. No. 99, your
25  Honor, on ——
```

OA1HGeiC

1          THE COURT:  I have it in front of me.

2          Do you have it, Mr. Kivowitz?

3          MR. KIVOWITZ:  I do.

4          THE COURT:  OK.  You thought we were on to No. ——

5          MR. GERSHENOFF:  6.

6          THE COURT:  —— 6.  So No. 5 is do a deposition.

7          MR. GERSHENOFF:  Yes.

8          THE COURT:  And that goes for the director of nursing

9     if that issue is still in dispute.

10         MR. GERSHENOFF:  Yes, your Honor.

11         THE COURT:  Written job descriptions for staff?

12         MR. GERSHENOFF:  Yes, your Honor.  The ——

13         THE COURT:  Oh, you don't need to tell me.  I can

14    read.

15         Mr. Kivowitz, where are, if any, the written job

16    descriptions?

17         MR. KIVOWITZ:  We will conduct a search.

18         Your Honor, I'm sorry, the meet and confer that

19    Mr. Gershenoff and I had did not narrow anything.  So ——

20         THE COURT:  Yes, so that's why we're looking at this

21    letter.

22         MR. KIVOWITZ:  I understand.

23         THE COURT:  No. 6, written job descriptions.

24         MR. KIVOWITZ:  I can conduct a search for written job

25    descriptions.

1          THE COURT:  Look, you're probably going to have to do

2     that if you're preparing for the administrator or the director

3     of nursing depositions, right?  That search should have been

4     done already, but be that as it may, we're going forward.  Look

5     for them and produce them if they exist.  If they don't exist,

6     tell plaintiff's counsel.

7          OK.  No. 7, for No. 7, Mr. Kivowitz, staff orientation

8     and education plans, can you look for them?  Talk to counsel.

9          MR. KIVOWITZ:  I can speak to counsel.  I'm not sure

10    what he's looking for.

11         MR. GERSHENOFF:  How about the staff orientation and

12    education plans themselves rather than documents and

13    communication concerning them.  They're required to have them

14    pursuant to the applicable regulations.

15         THE COURT:  I had read it as the staff orientation and

16    education plans themselves.  Let's start with that.

17         MR. KIVOWITZ:  OK.

18         THE COURT:  If they look for them — they should have

19    been searched for already.

20         MR. KIVOWITZ:  I didn't read that — I didn't read

21    that request as narrow as that.

22         THE COURT:  You can start with that, though.

23         MR. KIVOWITZ:  Yes.

24         THE COURT:  I want you to note this is a 2022 case,

25    and now I understand why Judge Rearden was not giving you all

1    extensions.  But you can't read a broad document request and

2    not go into a meet and confer and talk about what you might be

3    producing first or saying:  I'll give you the

4    orientation/education plans, but I have no idea what had you

5    mean by all documents concerning.  And maybe let's start with

6    that, and then we'll have a conversation about where we go

7    next.

8            I think a lot of these requests could have been

9    handled in that way, and discovery and document production

10   would be a little further along.  And Mr. Gershenoff would have

11   a harder time, because I would have said:  Look, you produced

12   the plans themselves.  What else are you looking for?  Why

13   wouldn't you just do a deposition at this point off of the

14   plans, right?

15           It is not and has never been acceptable to not produce

16   anything in an entire category just on the ground that the

17   request is overbroad if you have no sense of what it means.

18   That's not a valid meet and confer.  That's not a productive

19   meet and confer.

20           So staff orientation, education plans, look for them,

21   produce them.  If they don't exist, tell plaintiff's counsel.

22           What about the existence of a governing authority or

23   governing board at the ASC and board meeting minutes?

24           MR. GERSHENOFF:  I think, your Honor, just, at a

25   minimum, they should be required to produce the board meeting

OA1HGeiC

1 minutes from prior to 2022 or the meeting minutes for the

2 governing authority prior to 2022.  They produced a handful of

3 minutes, but all of them date from September 2022 to the

4 present.  I think they should be required to produce all of

5 them, to the extent they have them, or else admit that the

6 meetings didn't occur or that the minutes don't exist if the

7 meetings did occur.

8        THE COURT:  OK.  One question for you, Mr. Gershenoff:

9 So the ASC was licensed before 2022 and had ——

10       MR. GERSHENOFF:  It had a facially valid license.

11       THE COURT:  OK.  Let's just say it had.  All right.

12 I'll grant you that chuckle.

13       MR. HARFENIST:  Thank you, Judge.  Been hearing that

14 for 20 years, "facially valid."

15       MR. GERSHENOFF:  The reason why I said that, your

16 Honor, is the law says that an insurance company can look

17 beyond a facially valid license.

18       THE COURT:  No, I totally get it.  I just want to make

19 sure, for example, the ASC existed pre-2022.

20       Somebody wanted to say something?

21       MR. HARFENIST:  Yeah.  There's a fundamental

22 disagreement in this case as to —— and I think that's why this

23 has gotten to the point —— what can they do in terms of looking

24 past the facially valid license?  That's not what *State Farm v.*

25 *Mallela* says.  We can argue about that later.  The question

1    then becomes what's the scope in which they're allowed to look

2    past the violation?  Let's see, if they don't have a CFO for

3    the ASC?  My understanding is some of the issues that this

4    facility necessarily has are physical, structural, not — which

5    fall within the regulatory guidelines.  Then are they allowed

6    to say:  Oh, you didn't have a CFO.  You didn't have a correct

7    CFO.  You're not allowed to bill us, and we paid you

8    incorrectly.  We're allowed to collect?

9          And, by the way, the courts have never addressed that

10   specific issue.  So we can talk about facially valid, but we

11   have to understand that we're on a — you know, my kid would

12   draw with crayons all over.  We have a plain slate here.  No

13   one knows what "facially valid" means.

14         THE COURT:  All right.  So remind me again who your

15   clients are and how —

16         MR. HARFENIST:  I have the Dassa defendants.

17         THE COURT:  The Dassa?

18         MR. HARFENIST:  He's a surgeon.

19         THE COURT:  Dassa is a surgeon.

20         MR. HARFENIST:  Correct.  They shared some office

21   space with the Datta defendants, and a portion of the

22   facilities in which they were located, not all of them —

23   although they're being sued for basically everything that they

24   did, although it's limited.  Interestingly enough, the

25   complaint doesn't talk about the surgeries of Dr. Dassa.  It

1    only talks about the physical therapy.

2              THE COURT:  OK.  Notwithstanding the similarity in the

3    names, there's no other relationship?

4              MR. HARFENIST:  There's no other relationship.  No,

5    they have no relationship.

6              THE COURT:  OK.

7              MR. HARFENIST:  At this juncture — for a short period

8    of time, Dr. Dassa did some surgery at the surgery center we're

9    talking about now.  That was long ago stopped, though.  He did

10   it for a very short period of time.  He closed down his New

11   Jersey practice and stopped doing anything in New Jersey.

12             THE COURT:  When was that?  Because that might be

13   relevant later.  "Later" meaning not later today, but later in

14   the case.

15             MR. HARFENIST:  I don't know.  I don't recall the

16   exact date, but it was certainly before the commencement of

17   this litigation.

18             THE COURT:  OK.

19             MR. HARFENIST:  That's a very vague answer.

20             THE COURT:  Not a help.

21             MR. HARFENIST:  That's a nonanswer answer, Judge.

22             THE COURT:  That might not help.

23             MR. HARFENIST:  In complete candor, I don't remember

24   the date.

25             THE COURT:  All right.  But this is how I want

31

OA1HGeiC

discovery to proceed.  I know that the rest of the parties

here, Skazka, resolved their dispute, and you guys don't seem

to have a dispute brewing right now, but this is how I expect

things to move going forward.  I understand that Mr. Kivowitz's

clients may be in a different posture or different position,

but that doesn't mean that you can just stop discovery.  OK.

So for No. 8, do you need me to actually order

something, or can you move forward with just understanding

whether and who was the governing authority and governing board

of the ASC before 2022 and then produce any board meeting

minutes if they exist?

MR. KIVOWITZ:  I said I would produce the minutes

earlier, so . . .

THE COURT:  So you'll produce.  So that's part of ——

well, No. 1 says "committee meeting" and then No. 8 says

"board."  Are the board and the committee the same thing?

MR. GERSHENOFF:  No, your Honor.  So I think they

should have to produce the board meeting minutes as well or the

meetings of the minutes of the governing authority, to the

extent that they exist.

THE COURT:  OK.  It's the same ruling, then.  Look for

the documents themselves.  Look for them, produce them, and if

they don't exist, tell plaintiff's counsel.

All right.  No. 9, I'm going to call that the look,

produce, search and then produce or tell.

1    All right.  Mr. Gershenoff, were you going to say

2 something?

3    MR. GERSHENOFF:  No, I was just putting a check mark

4 on it, your Honor.

5    THE COURT:  OK.  So, No. 9, establishment of a patient

6 care policy committee.  You're going to get the policies, and

7 you have some already.

8    Do the policies you have, do they have any names or

9 identify a facially valid committee?

10    MR. GERSHENOFF:  Not the policies themselves, your

11 Honor.  We got some meeting minutes.  I don't believe any of

12 the meeting minutes are designated as meetings of the patient

13 care policy committee.  They are required to have a patient

14 care policy committee.  It's required to have documented

15 minutes.  It's required to meet at regular intervals.  We think

16 that, at a minimum, your Honor, they should be producing those

17 minutes during the period of time covered by the complaint.

18 Not going back to the dawn of time, but during the period of

19 time discovered by the complaint, they should have to produce

20 them.

21    THE COURT:  So, Mr. Kivowitz, if the request had been

22 narrowed to that point, would you have produced them or done

23 the search, or would you still have objected?

24    MR. KIVOWITZ:  Well, if it had been narrowed, I would

25 have produced, but the way that this is written ——

1          THE COURT:  I know.  So we're not statically arguing

2     the same arguments for each category, right?  We learn from

3     what has come before.  So what are you going to say now?

4          MR. KIVOWITZ:  Well, I was going to say, to piggyback

5     what you said earlier, these questions were not asked at the

6     deposition.  They are overbroad.  When Mr. Gershenoff and I met

7     and conferred he told me that he wasn't changing anything and

8     that he wanted everything.

9          THE COURT:  And now we're here ——

10          MR. KIVOWITZ:  Now we're here.

11          THE COURT:  —— costing your clients a lot of money to

12     be here.  This is going to be a search and then produce or tell

13     for the documents themselves.  If you have follow-up questions,

14     Mr. Gershenoff, after you get the core documents, follow up

15     with a meet and confer before just sending and resending the

16     same request, because I am not going to like that.

17          MR. GERSHENOFF:  Understood.

18          THE COURT:  You've already done depositions.  You

19     should have been able to narrow some of these requests.  And at

20     future meeting and conferring, you're going to look —— neither

21     side is going to dig their heels in and say:  That's it.  This

22     is the whole request, and I'm not narrowing it.  Well, then I'm

23     not producing because it's overbroad.  That is not productive,

24     and it's going to cost your clients a lot of money, and it's

25     going to make me very unhappy.

34

OA1HGeiC

1          MR. GERSHENOFF:  Understood.

2          THE COURT:  So No. 9 is still going to be search,

3   produce, or say they don't exist.  Normally, I would not have

4   that third option, but given the nature of this case, it's

5   possible.

6          What about medical records, policies, and procedures?

7   Same narrowing?  Can you do this?

8          MR. KIVOWITZ:  I can narrow it, yes.

9          THE COURT:  Search for the specific documents,

10  produce, or say they don't exist.

11         MR. KIVOWITZ:  That's for the actual policies,

12  correct?

13         THE COURT:  Correct.

14         MR. KIVOWITZ:  Right.

15         THE COURT:  All right.  No. 11, review of medical

16  records, policies, and procedures.  You know what?  Meet and

17  confer on this.  Because if there's no policies and procedures,

18  then there's probably not going to be review of policies and

19  procedures that don't exist, right?  So meet and confer.  The

20  answers are what they are.  You're not on trial yet.

21         MR. GERSHENOFF:  Same for No. 12, your Honor.

22         THE COURT:  12, search, produce, and report, that's

23  what I'm calling it.  Search, produce, and report for the

24  actual documents.

25         MR. KIVOWITZ:  No. 12 seems like it should be a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  question.

2       THE COURT:  Who is the coordinator, who is the

3  alternate coordinator of medical records services?  Yes?

4  That's a question.  Answer the question first.  Answer the

5  question first.  If there are core relevant documents, produce

6  them, but seems to me, I agree with you, Mr. Kivowitz, that

7  that's a question that should be answered.

8       Infection prevention and control program?

9       MR. KIVOWITZ:  We did produce policies regarding

10  infection.  I believe that Mr. Gershenoff will say that it's

11  not for the entire time period.

12       THE COURT:  OK.  So go back and check, and if there

13  aren't ones within the time period, don't exist, just let him

14  know.  If you do find some, then just produce them.

15       Infection control committee?

16       MR. GERSHENOFF:  We'll take the meeting minutes, your

17  Honor.

18       THE COURT:  OK.  Meeting minutes.  Meeting minutes,

19  search, produce, or report.  OK.

20       MR. GERSHENOFF:  Same for 15, your Honor.

21       THE COURT:  Patient rights, right.  Do you have any

22  policies?

23       MR. GERSHENOFF:  I have what they've produced, which

24  was taken out of this three-wring binder and photocopied.

25       THE COURT:  OK.  Mr. Kivowitz is shaking his head.

1    What?

2            MR. KIVOWITZ:  If that's where the policies are,

3    that's where the policies are.  We can't change that.

4            THE COURT:  No, I know, but I think the question is

5    are there other —— are there more policies that have been

6    withheld?

7            MR. KIVOWITZ:  I will search.  I did produce a number

8    of policies.

9            THE COURT:  Yes.  I think he's saying that he's gotten

10   some.  He just doesn't think they cover the whole time period.

11   So SPR: search, produce, and report.

12           All right.  In-service education of staff.

13           MR. GERSHENOFF:  Can I speak on that real quick, your

14   Honor?

15           THE COURT:  Yes.

16           MR. GERSHENOFF:  The ambulatory surgery center is

17   required to conduct in-service education for its staff.

18           THE COURT:  Oh, I know.  I know, he's a doctor.

19           MR. GERSHENOFF:  Like continuing legal education, I

20   guess that kind of stuff.

21           THE COURT:  I know.  I know what it is.

22           MR. GERSHENOFF:  So if they have any documents ever

23   reflecting that any kind of in-service education was ever

24   provided —— when I go to a CLE, I get a handout, for example.

25           THE COURT:  I know.  I've been to CLEs.  My husband

1    has conducted and been to CMEs.  I understand.

2             MR. GERSHENOFF:  So we think they should have to

3    search ——

4             THE COURT:  OK.  Search, produce, and report,

5    certificates of attendance or anything like that.  OK?

6             MR. GERSHENOFF:  Yeah.

7             THE COURT:  OK.  Written quality assurance plan.  Has

8    a plan been produced?

9             MR. GERSHENOFF:  I don't think that there's been

10   anything that has been specifically denominated as a written

11   quality assurance plan.  There were policies and procedures.  I

12   guess if you want to give a broad reading to that, we just want

13   to know if there's anything else or they've produced everything

14   they have.

15            THE COURT:  So that's a search, produce, and report

16   too.

17            Quality assurance plan.  Not documents about the

18   implementation of?

19            MR. GERSHENOFF:  For now.

20            THE COURT:  Documents of the plan, yes.

21            Given where this case is, I may say you get there, and

22   you complete your depositions.

23            MR. GERSHENOFF:  Yes.

24            THE COURT:  All right.  So, No. 18, which is review of

25   the quality assurance program, well ——

1        MR. GERSHENOFF:  Here, your Honor, they didn't produce

2  anything that I think could really be ——

3        THE COURT:  Well, that follows on No. 17, right?

4        MR. GERSHENOFF:  Yeah.

5        THE COURT:  And you're saying that there hasn't been a

6  plan produced.  So if there hasn't been a plan produced or what

7  you think is a plan —— and, Mr. Kivowitz, feel free to let him

8  know in a meet and confer, not now, but let him know in a meet

9  and confer what the documents are if you think you already have

10 produced them.

11       So this concerns a review.  This is the second step.

12 So this is a meet and confer after you've figured out what's

13 going on with 17.  So No. 18 is meet and confer.

14       Well, No. 19, I guess we have new information, right?

15       MR. GERSHENOFF:  Yes.

16       THE COURT:  So has there been anything like that in

17 the past, an event like that in the past?

18       MR. GERSHENOFF:  Yes.

19       THE COURT:  Yes.

20       MR. GERSHENOFF:  In 2015 the facility was cited for

21 repeated regulatory or violations.  In 2019 the facility was

22 cited for a laundry list of regulatory violations.  And most

23 recently, they've shut the facility down.

24       THE COURT:  So 2015 and 2019.

25       MR. KIVOWITZ:  Your Honor, my clients did not own the

1    surgery center in 2015.  Mr. Gershenoff did make an open

2    request, and he did attach those to — he has those.

3            THE COURT:  Wait, wait, wait.  So talk to me about

4    2015.

5            MR. KIVOWITZ:  So based on a production that I

6    received from Mr. Gershenoff about 11 o'clock on Friday night,

7    he made an OCR request, and there was a 2015 survey by the

8    Department of State.  So there were findings made and then

9    there was a corrective action plan that was implemented, and

10   the Department of Health signed off.

11           THE COURT:  All those documents — the documentation

12   concerning the citation, the corrective action plan, and the

13   later sign-off — were all produced?

14           MR. KIVOWITZ:  Well, no, he has them.

15           THE COURT:  He has them?

16           MR. GERSHENOFF:  I have them from the state, your

17   Honor.  What I think I'm looking for here is any documents in

18   the possession of the ASC defendants.  And I think, in

19   particular, here communications become particularly relevant.

20           THE COURT:  Can you narrow at all?

21           MR. GERSHENOFF:  I can narrow it to 2019 and the —

22   between 2019 and the present.  We can take out the 2015 stuff.

23           What I'll say as well, just to illustrate the

24   relevance, for example, if the Department of Health came in and

25   gave them one of these heavy-duty citations like in 2019 and

1   Dr. Datta writes to the administrator an email, "They got us.

2   They're on to us," something along those lines — obviously,

3   it's an extreme —

4           THE COURT:  This also circles back to a Fifth

5   Amendment privilege.

6           MR. GERSHENOFF:  Yeah, they should have to invoke it.

7           THE COURT:  Go ahead, Mr. Kivowitz.

8           MR. KIVOWITZ:  I think Mr. Gershenoff's

9   characterization of what was found is not accurate.  It was a

10  routine — I believe in 2019 it was actually the CMS that went

11  in.  There were findings made.  There was a corrective action

12  plan implemented that was accepted.

13          THE COURT:  CMS went in, findings, corrective action?

14          MR. KIVOWITZ:  And this was asked about at the

15  deposition.  Mr. Gershenoff attached an incomplete copy to the

16  letter, but the document that was produced in the deposition

17  contained the corrective action plan.

18          THE COURT:  OK.  Mr. Gershenoff, so you have the

19  documents that you got from the CMS?

20          MR. GERSHENOFF:  We have those.  We got them from the

21  state of New Jersey.

22          THE COURT:  So now what are you looking for, and can

23  you narrow the time frame?

24          MR. GERSHENOFF:  I'm looking for between — I would

25  say, actually, from 2018 to the present.

1          THE COURT:  Why 2018?

2          MR. GERSHENOFF:  Because in 2019 was when they got

3   caught for those violations.

4          THE COURT:  Let's start with ——

5          MR. GERSHENOFF:  Yeah.

6          THE COURT:  —— they got caught.  What did they do

7   about it?  What was the corrective action?  So let's start with

8   they got caught.  I'm not saying go ahead and destroy any

9   documents that aren't in this narrow time frame, but they got

10  caught to ——

11         MR. GERSHENOFF:  2019, they got caught.  They

12  supposedly put into place a corrective action plan, but here we

13  are five years later, and they were actually shut down.

14         THE COURT:  No, no, no.  So I'm asking you to narrow.

15  So 2019, they got caught.  There was a corrective action plan.

16  What's the next step?  What happens next?

17         MR. KIVOWITZ:  It was accepted.

18         THE COURT:  They fix it, right?  What's that time

19  frame?

20         MR. KIVOWITZ:  It's included on the form.  It was

21  accepted by the state.

22         THE COURT:  No, I'm saying what's the time frame from

23  start to finish of that narrow event?  I'm helping you out

24  here, Mr. Kivowitz.

25         MR. KIVOWITZ:  No, I understand.  It was in 2019.

1          MR. GERSHENOFF:  It was about a month.

2          MR. KIVOWITZ:  Yeah.

3          MR. GERSHENOFF:  My point is this:  They could set up

4     a Potemkin village.

5          THE COURT:  I know that.  I worked on the *Madoff* case

6     for like ten years before I took the bench.  I am very well

7     aware of how one sets up a Potemkin village, OK?

8          But we're going to start with that time frame.

9     Everything — you're going to get everything

10    communications-wise.  From the first notice of the correction

11    to the finding that everything's OK, you're going to get

12    everything — email communications, to the extent they still

13    exist.  If they don't exist, there might be an issue, right?

14    But you're going to get everything in that narrow time frame.

15         Then what you're going to do, Mr. Gershenoff, is if

16    there are things that you see during that time frame or you

17    don't see certain things and there should be certain things, so

18    something is missing, you meet and confer and you talk about

19    that, and then you talk about moving that time frame back a

20    little bit.  OK?

21         MR. GERSHENOFF:  OK.

22         MR. KIVOWITZ:  Your Honor, if I can just ask, so

23    Mr. Gershenoff is given the flexibility to determine what

24    should and should not exist.  This is —

25         THE COURT:  No, you're going to get everything that

1    you find and that exists.  If it doesn't exist, nobody's

2    telling you or your client to make something up that doesn't

3    exist, right?

4          MR. KIVOWITZ:  Of course not.

5          THE COURT:  So if it doesn't exist, right — you're

6    going to search.  You're going to produce if it exists.  If it

7    doesn't exist, you're going to report, right?  You're going to

8    let them know:  I did a search.  I don't know why, or I know

9    why, or they were destroyed or can't find them.  But you can

10   say there were documents.  I talked to my client.  There seemed

11   to have been documents.  Maybe they don't exist anymore.  Or we

12   looked, and they don't exist.  I don't know why.  It could go

13   any number of ways, right?

14         MR. KIVOWITZ:  Yes.

15         THE COURT:  So I cannot fathom how you would dispute

16   the proportionality of that very narrow group of documents,

17   again, if they exist.  I mean, it would not be proportional to

18   demand production of documents if they don't exist.

19         MR. KIVOWITZ:  No, I understand that.

20         THE COURT:  Yes.  So then what's the problem here?

21         MR. KIVOWITZ:  There's no problem.

22         THE COURT:  OK.  So that was No. 19, right?  And you

23   worked out — you're OK with 2015, then, because —

24         MR. GERSHENOFF:  2015, yeah, he says that's from —

25   but I definitely want them for 2019 and this year.

1          MR. KIVOWITZ:  That I'll have to object to.

2          THE COURT:  Because it's an ongoing investigation?

3          MR. KIVOWITZ:  It's an ongoing investigation.

4          THE COURT:  Yes.  Do you want to brief it?

5          MR. GERSHENOFF:  I think there should be briefing on

6    that, your Honor, if they're going to take the position that

7    there's some kind of ongoing investigation privilege as opposed

8    to taking their Fifth Amendment privilege.  If they take the

9    Fifth Amendment privilege, then we can seek an adverse

10   inference.

11         THE COURT:  Right.

12         MR. GERSHENOFF:  If they say this kind of inchoate

13   ongoing investigation privilege, I'm not ——

14         THE COURT:  I get it.  I get it.  It may also be

15   something that resolves during the pendency of this case, which

16   has already been going on for a long time, that then might

17   allow Mr. Kivowitz's clients to do some production.

18         So, again, this goes under the umbrella of consult

19   with your clients whether there is a privilege that needs to be

20   asserted.  If there is, think about —— we'll work through it,

21   OK?  I'm not going —— obviously, I'm not going to demand that

22   your client give up their Fifth Amendment rights, but they also

23   have to invoke it first to avoid production, or we can agree,

24   because especially the 2024 incident is so recent, that let's

25   get through all this stuff, and maybe that concern will be

1    ameliorated in short order.

2              So I'm not going to require you to produce anything

3    right now.  I'm also not going to require your client to assert

4    a Fifth Amendment privilege at this moment, but when we get

5    through this other production that's not so hot, we may revisit

6    — we will revisit the issue.  All right.

7              MR. GERSHENOFF:  Last one.

8              THE COURT:  No. 20, written disclosure forms.

9              MR. GERSHENOFF:  May I explain the significance of

10   that?

11             THE COURT:  Sure.  I think I understand, but . . .

12             MR. GERSHENOFF:  Sure.  Both New York and New Jersey

13   law generally prohibit self-referrals by a doctor to any

14   facility that she or he owns or in which they have a financial

15   interest, subject to certain exceptions.  One of the

16   requirements in order to take advantage of one of those — of

17   all of those exceptions is a disclosure has to be made of the

18   referring physician's interest in the facility at or prior to

19   the time that the referral is made.

20             We made requests for all of the written disclosures

21   because one of our allegations in this case is that Dr. Datta

22   systematically and unlawfully self-referred his patients.

23             THE COURT:  I get it.

24             MR. GERSHENOFF:  So we asked for those disclosure

25   forms.

1          THE COURT:  So why not a search, produce, and report

2    of the actual disclosures?

3          MR. KIVOWITZ:  I did.

4          THE COURT:  OK.

5          So what's the problem?

6          MR. GERSHENOFF:  No.  In fact, what happened was

7    Mr. Kivowitz served discovery responses which said that

8    Dr. Datta's self-referrals to the other entities that he owned,

9    not the surgery center, could be found in the patient files

10   that were already produced, which is great, but he did not give

11   a similar response to our request for Dr. Datta's disclosures

12   of his ownership interests in the surgery center.

13         To the extent that Mr. Kivowitz will represent in

14   writing that any and all disclosure forms regarding Dr. Datta's

15   self-referrals to the surgery center will be contained in the

16   document productions that they have already made, we will take

17   that.  We just have not received that yet.

18         MR. KIVOWITZ:  I did provide that to you, but I can

19   provide it to you again.

20         MR. GERSHENOFF:  If you take a look at your document

21   responses, you will find ——

22         THE COURT:  OK.  Stop.  This should have been done

23   before.

24         MR. GERSHENOFF:  Yeah.

25         THE COURT:  OK.  I'm going to give you time to have

1    this conversation afterwards, but I'm going to assume that this

2    one is resolved.  It's going to be resolved by meeting and

3    conferring.  Either the documents exist or they don't exist.

4    They've either been produced already or they're not and they're

5    going to be produced, or they don't exist and you're going to

6    report.  OK.  It's as simple as that.  I have a new acronym

7    now.

8            All right.  So that takes care of issues 1 through 20.

9    Extension of the discovery deadline.  As you now can tell —

10           MR. HARFENIST:  Sorry for the laughter.

11           THE COURT:  — getting a new judge in this case, a new

12   presiding judge in this case, does not mean a complete do-over

13   or restart of the clock.  However, there are clearly things

14   that need to be done in this case, so you're going to get an

15   extension of the discovery deadline.  I'm inclined to give you

16   until December 23, but I want to understand what is left and

17   how you propose to get it done by December 23, because we've

18   got to get to some closure here.  OK.

19           All right.  Go ahead, Mr. Gershenoff, because you're

20   standing up.

21           MR. GERSHENOFF:  Oh.  I think that, in light of

22   today's discussion, plaintiffs have a few depositions that

23   we're going to take.  We —

24           THE COURT:  "A few" meaning approximately how many?

25           MR. GERSHENOFF:  Approximately three.

1          THE COURT:  OK.

2          MR. GERSHENOFF:  Maybe two.  Yeah, I can't think of

3     any more offhand.

4          THE COURT:  Who are they, just if you can give me a

5     general sense?

6          MR. GERSHENOFF:  I think we're going to depose the

7     administrator.  I think we're going to depose the director of

8     nursing.  And maybe that's it for now.  I think that we'll also

9     depose any experts that the defendants identify.

10         THE COURT:  Expert discovery disclosures and discovery

11    happens next.  So you've got two to three depositions.  You've

12    got some documents that are coming to you.

13         MR. GERSHENOFF:  Yeah.  We'll have to confer with

14    Mr. Kivowitz, as you've indicated.

15         THE COURT:  Is discovery with the other defendants

16    done?

17         MR. GERSHENOFF:  I think for the most part.  Well, we

18    may be done with them; they may not be done with us.

19         THE COURT:  Yes, I got that part.  I got that sense

20    too.  So you all are going to get a chance to talk.

21         MR. GERSHENOFF:  But, yeah, I think that there's some

22    depositions on both sides that are left to be done.  I think

23    there may be some follow-up document requests to the defendants

24    and from the defendants, although we haven't had any served on

25    us yet, and then expert discovery, Judge.

1          THE COURT:  All right.  Let's hear from —— I guess,

2    Mr. Kivowitz, you have a lot of homework.

3          MR. KIVOWITZ:  Yes, your Honor.

4          THE COURT:  Do you have depositions also?

5          MR. KIVOWITZ:  Yes.  The defendants collectively would

6    like to take two additional depositions of GEICO

7    representatives who were involved in the investigation and the

8    events leading up to drafting the complaint.

9          MR. GERSHENOFF:  Just for the record, GEICO's

10   30(b)(6) ——

11         THE COURT:  Wait.  How —— what —— I just don't even

12   know how that's going to read in the transcript, other than an

13   expression of surprise.

14         Talk to me about the two former GEICO employees and

15   why you think you need them.

16         MR. KIVOWITZ:  We took two depositions: one of a

17   former GEICO employee and one of a current GEICO employee.  The

18   current GEICO employee was not involved in the investigation

19   leading up to the complaint, so she did not have knowledge,

20   other than some general procedures with respect to GEICO.

21   Ms. Guastaferro, who used to work at GEICO, no longer does, she

22   advised us of the two people at GEICO who were involved in the

23   investigation which brought the facts alleged in the complaint

24   to light.  So those are the two people that we would like to

25   depose.

1        THE COURT:  Why can't you just do a 30(b)(6)?

2        MR. GERSHENOFF:  They did.  They wanted to put —— they

3   did GEICO's 30(b)(6).  They're mixing it up.

4        THE COURT:  That's the current GEICO?

5        MR. GERSHENOFF:  Correct, your Honor.

6        THE COURT:  So you don't need —— for a 30(b)(6) you

7   don't need personal knowledge.  So what's wrong with the

8   30(b)(6)?

9        MR. HARFENIST:  Because the witness that they produced

10  knows nothing, and they weren't relying on anything.  The

11  transcript is barren of any fundamental facts.

12        What we did learn from the 30(b)(6), of the two GEICO

13  employees that did conduct the investigation that led to this

14  lawsuit, the first was an individual named Eric Jacobs, who did

15  the statistical analysis which most of this case is based on.

16  He needs to be deposed.  That's the first time that we learned

17  about the reliance, based on the 30(b)(6) witness, of who

18  conducted the fundamental fact basis for the complaint.

19        The second person in the SIU, which is the special

20  investigations unit, who conducted —— who was part of this was

21  the investigator.  Both the GEICO witnesses who testified at

22  deposition said we assigned this to the investigator, and when

23  they were asked what did this person do, they didn't know.  So

24  we want to depose that person as well.

25        These are not long depositions.  I've deposed these

1    types of people multiple times before.  Getting it done by

2    December 23 may or may not be another issue for me because I

3    have two jury trials that are definitively going, not ones that

4    are going to settle.  The one that I knew was going to settle,

5    just settled.  But we'll figure out how to get it done, Judge,

6    if that's what you tell us to do.  If I have to squeeze it in

7    between, I'll squeeze it in between.

8            Those are the only two GEICO employees that were ——

9    that we think generally have actual firsthand knowledge as to

10   the basis of the allegations.  The interesting thing about this

11   is that we did learn from —— I'm sorry.

12           THE COURT:  Go ahead.  No.

13           MR. HARFENIST:  The interesting thing that we did

14   learn from these depositions is that this complaint came from

15   some alert from the National Insurance Fraud Bureau.  We're

16   going to put aside for a second what the basis of this industry

17   organization necessarily is.  I don't know what information

18   they necessarily have or produced.  So when we depose the folks

19   who actually were involved in the investigation, if the

20   National Insurance Fraud Agency or Bureau ——

21           MR. BIRZON:  Crime Bureau.

22           MR. HARFENIST:  —— Crime Bureau, whatever it is,

23   necessarily produced documents to them, we won't necessarily

24   need to see anything from them.  We may need a documentary

25   subpoena without a deposition to this entity.  That shouldn't

1    interfere necessarily with an end-of-December fact discovery

2    cutoff.

3            MR. GERSHENOFF:  The only thing that I would say, your

4    Honor, is that to the extent that it's been implied that

5    GEICO's 30(b)(6) corporate representative wasn't prepared to

6    testify regarding the topics listed in the notice, that's just

7    false, and there's been no showing that that's actually been

8    the case.  Our witness testified in accordance with the notice.

9    She was reasonably well prepared.

10           THE COURT:  Stop, stop, stop, stop with the formulaic

11   recitation of the rule.

12           What I want to understand is why this matters and how

13   is this discovery proportional.  I'm also not hearing other

14   objections, other than the 30(b)(6) witness was prepared to

15   testify.

16           MR. GERSHENOFF:  No, no objections to the depositions

17   of these employees, your Honor.

18           THE COURT:  OK.

19           MR. GERSHENOFF:  The only thing I would say is I'm not

20   sure how the facts surrounding the methodology of GEICO's

21   investigation ——

22           THE COURT:  Well, that's where I'm kind of getting to

23   why is this even a thing?

24           MR. GERSHENOFF:  But if they want to ——

25           THE COURT:  Yes.

1      MR. BIRZON:  I would point out that GEICO throughout

2  its deposition indicated that the statistical data done by

3  Mr. Jacobs and the investigation done by Ms. Akins were the ⸺

4  revealed the underlying indicia of the fraud scheme.  So they

5  deemed the data that he harvested and the investigations that

6  she conducted ⸺

7      THE COURT:  Has that data ⸺

8      MR. BIRZON:  ⸺ as revealing ⸺

9      THE COURT:  I will just give a little bit of a

10  suggestion.  When I talk and you're talking at the same time,

11  the court reporter can only get one person's statements down.

12  Probably not going to be you.

13      I apologize for interrupting you, but I see my 11:30

14  is here, and we're already after 11:30.  So I'm trying to get

15  to the heart of the matter here.

16      Mr. Gershenoff, my question for Mr. Gershenoff was,

17  has that data been provided?

18      MR. GERSHENOFF:  Yes, it was provided, your Honor.

19      THE COURT:  So why isn't this an expert discovery

20  issue?  I get that he's not objecting to providing these

21  depositions.  Maybe it might take a while, blah, blah, blah,

22  blah.  But why is this not an expert discovery issue where your

23  experts can then just each challenge each other's analysis of

24  the underlying data?  Why isn't that a quicker, more expedient,

25  and more practical way to get to it, if you're going to be

1    doing it anyway?

2           MR. HARFENIST:  Because we don't know what the

3    analysis is that this Mr. Jacobs did.  What they produced to us

4    was a series of claims files —— that's what we got —— and some

5    spreadsheets from Mr. Jacobs.  I want to know —— you have to

6    understand how they're going to try this case, Judge.  They're

7    going to say:  We've got 50 cases, and we think you can

8    extrapolate the rest of these —— everything else that they

9    treated these for as necessarily improper.  We'll get to

10   whether they can do that or not at a later date.  I don't think

11   they can.  Nobody's ever tested that theory, but we'll deal

12   with that at some other point.

13          But this individual is the one who did the —— he did

14   the math.

15          THE COURT:  OK.

16          MR. HARFENIST:  I want to know how he did the math.

17   What was the methodology?

18          THE COURT:  It might not be a problem, right?  It

19   doesn't sound like you're objecting to it.

20          MR. GERSHENOFF:  Yeah, I don't think that it's going

21   to do much, but that's fine.  We never have objected to the

22   deposition.

23          MR. HARFENIST:  I think it's a two-hour deposition.

24          THE COURT:  So let's do them.

25          MR. HARFENIST:  If I take it, it's two hours.  I don't

1    ask a million questions.

2            MR. GERSHENOFF:  The only other thing I'll say, your

3    Honor, is that I think that at present they're both employed by

4    GEICO.  If one or them or either have left ——

5            THE COURT:  Just work it out.

6            MR. HARFENIST:  We'll figure it out.

7            THE COURT:  There's no objection to the depositions

8    going forward ——

9            MR. HARFENIST:  We'll figure out.

10           THE COURT:  —— so you don't need to be having that

11   conversation right now in front of me while my next conference

12   is already running behind.

13           MR. HARFENIST:  We'll figure it out.

14           THE COURT:  Figure it out.

15           So what I hear is that, with the exception of the

16   document production issues with Dr. Datta and the ASC, is that

17   you then have maybe a max of five more depositions, and then we

18   should be done with discovery.  So December 23 is a fine fact

19   discovery deadline.

20           Has your date for amending the complaint passed?

21           MR. GERSHENOFF:  It has.

22           THE COURT:  I'm going to ask a question that might

23   really get me in trouble, but do you foresee ——

24           MR. HARFENIST:  You've got to stop being funny if you

25   don't want us to laugh, Judge.

1          THE COURT:  I know, but Mr. Salloum stood up right

2     away when I said "do you foresee."

3          MR. HARFENIST:  I'm going to sit down.

4          THE COURT:  Yes.

5          Do you foresee a need to amend the complaint yet

6     again?

7          MR. GERSHENOFF:  As I'm standing here right now,

8     maybe, but I don't want to — I want to wait and see what the

9     remaining little bit of discovery indicates that we're going to

10    get.

11         THE COURT:  OK.  If there is a —

12         MR. HARFENIST:  Can I go under the table, Judge,

13    instead of just sit?

14         THE COURT:  Your clients are already parties, right?

15         MR. HARFENIST:  Yeah, I understand that, but I don't

16    want to start over again.

17         THE COURT:  So if you see that this might become an

18    issue, I will advise you to start the meeting and conferring

19    early.  Because if this has to go to motion practice about

20    amendment, from what I've heard today, I might be more inclined

21    than not to allow leave to amend, even though the case has been

22    pending for two years.  So this is just talk — talk about

23    this, and let's not clog things up with more motions that maybe

24    don't need to be made if we can find a way to just move this

25    case forward.

1          MR. GERSHENOFF:  Understood.

2          THE COURT:  All right.

3          MR. SALLOUM:  Your Honor, may I say something on the

4     record?

5          THE COURT:  Sure.

6          MR. SALLOUM:  Skazka will vehemently oppose any

7     attempt by the plaintiffs to add it to this complaint, to this

8     matter as a defendant.  There's no basis for such an amendment.

9          THE COURT:  We're not on trial and I'm not hearing a

10    motion to amend, so we're not hearing oral argument right now.

11    I get that that might be your position.  But if it has to be

12    briefed, it will have to be briefed.  And if it happens, I hope

13    that there will not be additional weighing in; that there might

14    be some parties who could simply take no position.  That's all

15    I'm going to say.

16          All right.  We might ——

17          MR. HARFENIST:  Judge, may I make a suggestion?

18          THE COURT:  Sure.

19          MR. HARFENIST:  This is a good one, I think.

20          THE COURT:  OK.

21          MR. HARFENIST:  I think it will make things more

22    efficient.  I think after we complete discovery, before we set

23    an expert disclosure schedule, can we come back in and have

24    another conference?  I know you'll be so happy to see us.

25          THE COURT:  Well, what I was going to say is after

1   you've seen how this proceeding goes — I'm going to request

2   that the parties order a copy of the transcript and split it

3   50/50 between plaintiff and defendants.  I understand there are

4   more defendants.  You all work it out how much you're going to

5   pay for the transcript.  It's going to be half of the total

6   cost.  After you've had time to review it, you've seen how I go

7   through discovery disputes — I actually expected this

8   conference to be shorter than it was — think about working

9   together on just getting through things quickly.

10         What I do is I usually do one of two things:  I put

11   you on a periodic status letter schedule where you have to be

12   very clear what you have done since the last letter, where you

13   are, if there's disputes brewing, and where you propose to be

14   in the next month.  We can do that rather than having status

15   conferences before December 23.

16         You all have a lot to do.  So I'm going to suggest —

17   no, I'm going to order.  We're going to move forward with hope.

18   I'm going to order periodic joint status letters on the status

19   of discovery on the last business Friday of each month, which

20   might put your next letter at Halloween.

21         MR. HARFENIST:  Fortunately, my kids don't trick or

22   treat anymore.

23         MR. GERSHENOFF:  I don't think it's on a Friday.

24         THE COURT:  Let me just take a look.  I'm notoriously

25   bad at seeing dates unless I see them.

1          THE DEPUTY CLERK:  It's Thursday.

2          THE COURT:  So you're actually going to do this ——

3    this will be actually OK.  So the previous Friday, the last

4    business Friday, is actually October 25.  So joint status

5    letters the last business Friday of each month starting

6    October 25.  And then, in the spirit of the impending holidays,

7    I think that means that your next one for November is going to

8    be the Friday before Thanksgiving week.  It's not going to be

9    the day after Thanksgiving regardless of whatever that date is;

10   it's going to be the Friday before Thanksgiving.  And we'll go

11   from there.

12         OK.  So give me a heads-up if there are disputes

13   brewing, and if there's a ripe dispute, just try to give me a

14   very succinct summary of what that dispute is, and we'll try to

15   either resolve it by —— I might ask you to write other letters.

16   I might give you some other direction in the meantime, but

17   you're not going to have to come in —— I'm not going to right

18   now say you're going to have to come in before fact discovery

19   closes.

20         MR. HARFENIST:  I was suggesting ——

21         THE COURT:  We may start the new year in January with

22   an in-person conference just to see where we are and then get

23   going on expert discovery, but I'm not going to set those dates

24   now.

25         MR. HARFENIST:  That was what I was suggesting, when

1  we're done.

2          THE COURT:  Oh, yeah.

3          OK.  Anything else anybody needs to raise?

4          MR. HARFENIST:  You really want to ask that question?

5          THE COURT:  I always do it as a closeout.

6          MR. HARFENIST:  I know everybody does.

7          THE COURT:  The answer can be no.

8          MR. HARFENIST:  I have nothing, your Honor.

9          THE COURT:  Mr. Kivowitz?

10         MR. KIVOWITZ:  Nothing, your Honor.

11         THE COURT:  Mr. Salloum?

12         MR. SALLOUM:  Not at this time, your Honor.  Thank

13 you.

14         THE COURT:  And Mr. Birzon?

15         MR. HARFENIST:  Nothing.

16         THE COURT:  Mr. Gershenoff?

17         MR. GERSHENOFF:  No, ma'am.  No, Judge.  Thank you

18 very much.

19         MR. HARFENIST:  Judge, thanks for your time.

20         (Adjourned)

21

22

23

24

25